**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **EAST PLANO ISLAMIC CENTER (EPIC),** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | Civil Action No. 1:25-cv-1085 |
| **TEXAS FUNERAL SERVICES** | § | |
| **COMMISSION, TEXAS FUNERAL** | § | |
| **SERVICES COMMISSION EXECUTIVE** | § | |
| **DIRECTOR in their official capacity, and** | § | |
| **KRISTIN TIPS in her individual capacity.** | § | |
| *Defendants* | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT AND REQUEST FOR PERMANENT INJUNCTION

East Plano Islamic Center ("EPIC") brings this action to vindicate its longstanding right to conduct religious funeral and burial rites in accordance with Islamic faith and tradition—rights that belong not only to EPIC, but to its congregants and the broader Muslim community it serves. According to EPIC and its members' sincerely held religious beliefs, when a Muslim dies, the local religious community is obligated to perform the Janaza prayer before burial. For years, EPIC has performed these communal prayers and related rites without charge, in full compliance with Texas law, which expressly permits religious organizations to conduct such rites so long as they do not engage in commercial funeral services for compensation.

That changed on March 26, 2025, when the Texas Funeral Service Commission ("Commission"), through its Executive Director, issued an unlawful cease-and-desist letter ordering EPIC to halt its religious practices and referring the matter for criminal investigation. The Commission's actions forced EPIC to suspend sacred funeral rites, chilled its exercise of

religion, and caused funeral homes to refuse to transport remains to EPIC for religious services—effectively barring Muslim families from practicing their faith in the moments that matter most.

This lawsuit challenges the Commission's illegal overreach and the discriminatory conduct of Commissioner Kristin Tips, whose contemporaneous communications with the Executive Director revealed open hostility toward Islam and demonstrated animus toward EPIC's faith. Together, these actions violate the Texas and United States Constitutions and exceed the Commission's statutory authority under Chapter 651 of the Texas Occupations Code. EPIC seeks declaratory and injunctive relief to stop this unconstitutional interference, protect the religious liberty of its community, and ensure that no family is forced to abandon its faith in a time of grief because of state harassment masquerading as regulation.

**P<small>ARTIES</small>**

**A.    Plaintiff**

1.    Plaintiff East Plano Islamic Center ("EPIC") is a not-for-profit tax-exempt organization that has been formed exclusively for educational, religious, and social purposes. EPIC is registered with the Internal Revenue Service under revenue code 501(c)(3). EPIC's vision is to "establish a model community that serves Muslims and society-at-large with excellence, tolerance, and unity" and its mission is to "provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibilities and contribute to the betterment of society by following the principles of Quran and the noble life of Prophet Muhammad (peace be upon him)." **Ex. 1** (EPIC Constitution) at art. II.A.–B.[1]

**B.    Defendants**

---

[1] EPIC's Constitution, Committee By-Laws, and other policies and procedures are available online. EPIC, A<small>BOUT</small> E<small>PIC</small>, https://epicmasjid.org/about-epic/ (last accessed June 26, 2025).

2.    Defendant Texas Funeral Services Commission (the "Commission") is a public state agency.  The Commission "employ[s] and supervise[s] an executive director to manage the administrative affairs of the commission under [Chapter 651]."  TEX. OCC. CODE § 651.101.  The Commission also employs clerical and technical assistants, and investigators.  *See id.* at §§ 651.102–.103.  By statute, "[t]he [C]ommission's offices are located in Austin, Texas" and the Commission "shall meet in regular session in Austin at least once per calendar quarter to transact business."  *Id.* at §§ 651.058–.059.  The Commission's office is in the George H.W. Bush State Office Building, 1801 Congress Avenue, Suite 11.800, Austin, Texas 78701.

3.    Defendant Executive Director of the Commission is named in their official capacity only.[2]  During the underlying events described herein, the Commission's Executive Director was Scott Bingaman.  But on June 18, 2025, at a regularly held session, the Commission terminated Mr. Bingaman from that position and, upon information and belief, no successor has been appointed as of the date of this filing.[3]  At a meeting held on July 3, 2025, Maria Haynes was appointed as the Commission's interim executive director.[4]

4.    Defendant Kristin Tips is named in her individual capacity only.  Mrs. Tips may be served at 300 Terrell Road, San Antonio, Texas 78209, or wherever she may be found.

---

[2] *Cf.* Tex. R. App. P. 7.2(a) ("When a public officer is a party in an official capacity to an appeal or original proceeding, and if that person ceases to hold office before the appeal or original proceeding is finally disposed of, the public officer's successor is automatically substituted as a party if appropriate. Proceedings following substitution are to be in the name of the substituted party, but any misnomer that does not affect the substantial rights of the parties may be disregarded. Substitution may be ordered at any time, but failure to order substitution of the successor does not affect the substitution."); *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) ("A suit against a state official in his official capacity is not a suit against the official personally, for the real party in interest is the entity.").

[3] See *Executive director of Texas Funeral Service Commission fired*, by Brianna Hollis, KXAN, posted on June 19, 2025 https://www.kxan.com/news/texas/executive-director-of-texas-funeral-service-commission-fired/ (last accessed June 26, 2025).

[4] https://www.houstonchronicle.com/politics/texas/article/funeral-commission-interim-director-upheaval-20421484.php

---

<u>JURISDICTION</u>

5.      This Court has subject matter jurisdiction over this lawsuit because the suit involves federal and state law claims regarding a state administrative agency where the relief and attorney's fees sought are within the jurisdictional limits of this Court.

6.      Sovereign immunity does not deprive this Court of subject-matter jurisdiction over any claim asserted herein.  Sovereign immunity does not bar EPIC's *ultra vires* claims seeking prospective injunctive and declaratory relief against the Commission Executive Director in their official capacity.  *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009); *Hartzell*, 672 S.W.3d at 311, 319–20.  The verified facts alleged herein demonstrate actionable *ultra vires* conduct by this state official, placing EPIC's *ultra vires* claims comfortably within this well-recognized exception to sovereign immunity.

7.      Sovereign immunity does not bar EPIC's claims against Defendants under the Texas Constitution because they seek only prospective injunctive and declaratory relief.  *See City of Elsa v. MAL*, 226 S.W.3d 390, 381 (Tex. 2007) ("In this case we reaffirm . . . governmental entities may be sued for injunctive relief under the Texas Constitution."); *Hartzell v. S.O.*, 672 S.W.3d 304, 319–20 (Tex. 2023).  The verified facts alleged herein demonstrate actionable violations of the Texas Constitution.

8.      Sovereign immunity does not bar EPIC's claims under 42 U.S.C. § 1983 seeking prospective injunctive, declaratory, and individual capacity relief against the Commission Executive Director in their official capacity or Kristin Tips in her individual capacity.  *See Ex parte Young*, 209 U.S. 123 (1908); *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  For constitutional claims alleged under 42 U.S.C. § 1983, "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."  *Verizon Md.,*

*Inc.*, 535 U.S. at 646. State officials may be held liable in their individual capacities under Section 1983, and such suits are not barred by the Eleventh Amendment. *See Hafer v. Melo,* 502 U.S. 21, 25–31 (1991) (holding that state officials may be held personally liable in damages under § 1983 in their individual capacities).

9.      In addition to all the waivers and exceptions listed above, by removing this case to federal court, Defendants waived whatever sovereign or Eleventh Amendment immunity from suit they might otherwise have possessed. *See Meyers ex rel. Benzig v. Tex.*, 410 F.3d 236, 252–53 (5th Cir. 2005).

10.      Finally, qualified immunity cannot shield Tips's religious discrimination. By March 2025, it was clearly established that the Constitution forbids targeting religious exercise with animus. The Supreme Court has long held that official action "that targets religious conduct for distinctive treatment" violates the Free Exercise Clause. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993). It has likewise condemned government action marked by "clear and impermissible hostility" toward religion. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 634 (2018). Selectively enforcing a licensing rule to shut down a mosque's funeral rites—while permitting comparable secular or other religious activities—flouts those principles. It also violates the Equal Protection Clause, for more than a century the Court has warned that laws enforced "with an evil eye and an unequal hand" to disfavor a particular group are unconstitutional. *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.") And intentional discrimination on

the basis of religion is subject to the most exacting scrutiny. *Larson v. Valente*, 456 U.S. 228, 246 (1982). No reasonable official in 2025 could believe that ordering a mosque to cease its Islamic rites—particularly while expressing overt anti-Muslim animus—was lawful. This is the kind of "obvious" constitutional violation for which qualified immunity does not apply. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

## VENUE

11. As originally filed, venue was proper in Travis County because, among other things, Travis County is Defendants' principal office in this state. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3); TEX. OCC. CODE § 651.058. Post-removal, the U.S. District Court for the Western District of Texas, Austin Division, is the proper federal venue because its county composition includes Travis County. *See* 28 U.S.C. § 124(d)(1).

## BACKGROUND

### A. The Commission's Statutory Authority and Historic Practices

12. The Commission derives its existence and statutory authority from Chapter 651 of the Texas Occupations Code. Per Chapter 651, the Commission oversees the issuance and regulation of licenses for funeral directors and embalmers, TEX. OCC. CODE §§ 651.251–267, for provisional license holders, *id.* at §§ 651.301–306, for funeral and commercial embalmer establishments, *id.* at §§ 651.351–354, and for crematory businesses, *id.* at §§ 651.656. The Commission establishes standards for license-holders, *id.* at §§ 651.401–410, and prohibits activities such as fraudulent and deceptive acts, *id.* at §§ 651.151, .451–.461. The Commission has disciplinary authority over license-holders and may assess administrative penalties, subject to administrative procedures. *See id.* at §§ 651.501–.559. If the Commission wishes to stop a funeral

establishment, an embalmer, or a funeral director from operating, it "may bring an action for appropriate injunctive relief." *Id.* at § 651.601.

13.     Critical to understanding the scope of the Commission's authority are the definitions of the terms used throughout Chapter 651. A "funeral establishment" is "(A) a ***place of business*** used in the care and preparation for burial or transportation of a dead human body; or (B) any other place in which a person engages in, or represents the person to be engaged in, the ***business*** of embalming or funeral directing."  Tex. Occ. Code § 651.001(8) (emphasis added). "Funeral directing," in turn, is defined as "acts associated with or arranging for the disposition of a dead human body, ***performed by a person for compensation***, from the time of first call until: (A) inurnment, interment, or entombment services are complete; or (B) the body is permanently transported out of this state." *Id.* at § 651.001(7) (emphasis added).  And a "funeral director" is a person "who engages in ***for compensation***, or represents to the public ***as being engaged in for compensation***, the preparation, other than by embalming, of a dead human body for burial or other disposition." *Id.* at § 651.001(6) (emphasis added).

14.     That is not to say that the Commission has no statutory authority over individuals who are not receiving compensation or entities who are not running a business.  Subchapter J of Chapter 651, entitled "Prohibited Practices," includes many violations that "a person" might commit (not a "funeral director" or "funeral establishment").  Tex. Occ. Code §§ 651.451–460. For example, "[a] person violates this chapter if the person: refuses to promptly surrender a dead human body to a person or agent authorized to make funeral arrangements for the deceased." *Id.* at § 651.456(2).  For prohibitions that apply to "a person," the Commission's authority extends to any person who commit the violation.

15.     But other prohibitions apply specifically to "a funeral establishment" or "a person associated with a funeral establishment," and, in those instances, the prohibition only applies to an entity that meets the definition of a funeral establishment.  *E.g.*, *id.* at § 651.460(b)(1) ("A funeral establishment violates this chapter if the funeral establishment fails to substantially comply with Section 651.351."); *id.* at § 651.454 ("A person associated with a funeral establishment violates this chapter if the person solicits business or offers an inducement to secure or attempt to secure business for the funeral establishment unless the solicitation is made under a permit issued under Chapter 154, Finance Code.").

16.     Under Chapter 651, "[a] funeral establishment may not conduct a funeral business unless it is licensed by the [C]ommission."  Tex. Occ. Code § 651.351(a).  But an organization who does not meet the definition of funeral establishment does not need to be licensed.  And a religious organization praying over a deceased person as a religious activity for which compensation is not sought, not advertised, and not accepted does not meet the definition of a funeral establishment.  *See id.* at § 651.001(8).

17.     As the Commission has recognized for the better part of 40 years, "[t]he law allows a family or friends to prepare and bury a body so long as they do not receive compensation for services, file a death certificate and obtain a burial transit permit."  **Ex. 2** (Letter dated 12/09/87).  "Texas law requires that an individual or establishment be licensed only if they are engaged in directing funerals or preparing bodies for compensation."  *Id.*  In 1987, the Commission's then-Executive Director told the Islamic Center of Greater Austin ("ICGA") that it "may prepare and bury members of [its] mosque without being licensed by this agency so long as they follow the guidelines above."  *Id.*

18.    In 2014, a Commission Staff Attorney again confirmed that "there is no requirement in the State of Texas that a hospital or health care facility release a deceased person to a Funeral Director." **Ex. 3** (Letter dated 12/17/14). "The Commission has consistently maintained the position that family members and religious organizations may pick up and transport the bodies of members in keeping with their religious beliefs." *Id.* "Religious organizations may receive the bodies and transport the deceased to perform their burial services without the need of contracting a Funeral Establishment or Funeral Director." *Id.*

**B.    EPIC's Mission**

19.    EPIC's vision is to "establish a model community that serves Muslims and society-at-large with excellence, tolerance, and unity" and its mission is to "provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibilities and contribute to the betterment of society by following the principles of Quran and the noble life of Prophet Muhammad (peace be upon him)." **Ex. 1** (EPIC Constitution) at art. II.A.–B. Its stated objectives are (1) to "strive to work in harmony with other Muslim and non-Muslim civic organizations to enhance our collective future"; (2) to "provide a full spectrum of valuable services and resources to the community in a transparent and fair way, leveraging a team of dedicated volunteers"; (3) to "provide a safe and nourishing environment for people of all ages and backgrounds to connect, pray, learn, play, and grow in accordance with the Quran and tradition of Prophet Muhammad (peace be upon him)"; and (4) to "inspire and develop the future generation of responsible Muslims in America." *Id.* at art. II.C. EPIC membership is open to all who (1) "[s]ubscribe to the vision, mission[,] and objectives of EPIC as referenced [] in Article II," (2) "[a]gree to work under the general guidance of the EPIC [Board of Directors] in accordance with the Constitution of EPIC,"

(3) "[a]pply to be a member of EPIC," and (4) "Live within the following zip codes: [list of zip codes]."  *Id.* at art. VI.A.

## C.    EPIC's Sincerely-Held Religious Beliefs

20.    One of the sincerely-held religious beliefs held by EPIC and its Muslim membership is the collective obligation held by the religious community to perform proper Islamic funeral rites for the deceased.  To that end, EPIC offers traditional, non-commercial Muslim funeral services and burials, especially for Muslim families unable to afford the services.

21.    Islam mandates specific funeral rites as a matter of religious obligation.  "Proper burial including *salat al janazat* is one of the 5 cardinal duties of brotherhood in Islam."  *Islamic Ethico-Legal Perspective On Embalming, Cryopreservation*, Autopsy & Dead Corpse Research (paper presented at a training workshop on medical ethics at Nairobi on 26th July 2008 by Professor Dr Omar Hasan Kasule Sr. MB ChB (MUK), MPH (Harvard), DrPH (Harvard)).  The traditional Muslim rites include the ritual cleansing (Ghusl), shrouding, funeral prayer (salatul janazah), and burial in a dedicated Muslim cemetery.  Muslims do not cremate, nor do they embalm their dead, which is considered "haram," *i.e.*, forbidden, as a desecration of the human body, which is sacred.  Islam is similar to orthodox Judaism and the Baha'i Faith in this respect.  Instead, a simple burial of the shrouded body is performed.  Islamic religious law calls for prompt ritual cleansing, shrouding, prayer, and burial in which the integrity and dignity of the decedent's remains are scrupulously maintained throughout.  After the burial, a condolence gathering is typically held within a day or two to support the grieving family.

22.    The economic cost of these religious rites for EPIC is very modest.  The Imam's services are donated as part of his ministry.  He is assisted in the cleansing and shrouding by a limited number of family members of the decedent and volunteers from the congregation.

Transportation of the decedent's remains are coordinated using a proper person or entity. Voluntary monetary contributions toward these costs by the family of the decedent and members of the Muslim community are encouraged and accepted, but contributions are never required as a condition of receiving the traditional cleansing, prayer, and burial services given.

23.     The Janaza prayer is an individual Sunnah (a teaching and practice of the Prophet Muhammad (peace be upon him)), but a *communal* obligation. As Shaykh Dr. Yasir Qadahi explained in a video posted on EPIC's Youtube page in February 2022: "Some Muslims *must* take care of every Janaza in their community such that even if a stranger dies in a Muslim land, in a Muslim resident area—if a stranger dies, but we know he's a Muslim, dies [with] no relatives [and] no one [in the area]—the community is obligated in totality. . . *somebody* has to go and do Janaza and take care of this person. It is a communal obligation."[5]

24.     In sum, it is an important part of EPIC's beliefs and the beliefs of its membership that the community come together to observe the Janaza prayer whenever a member of their religious community dies and seeks their assistance performing the requisite rites.

### D.    EPIC's Religious Practices Regarding Deceased Members (2016–2025)

25.     Because of the prompt burial requirements of Islamic law (ideally within 24 hours), and the importance of holding a Janaza prayer at a mosque in the interim, EPIC has attempted to support the emotional, religious, and financial needs of its members and those within its religious community as it relates to Islamic funeral rites, as well as providing critical logistical assistance during a difficult time for the loved ones of the deceased. To be clear, EPIC does not own a

---

[5] Youtube, EPIC Masjid, *Whats is the Proper Procedure for the Janaza Prayer? | Q&A | Shaykh Dr. Yasir Qadhi*, https://youtu.be/xeOrQNir6es?si=KiLw2MK-Vhax-G7xd (last accessed June 28, 2025). A general description of the proper procedure for the Janaza prayer according to Shaykh Dr. Yasir Qadahi begins at the timestamp 10:47.

cemetery and has never operated a funeral establishment. But EPIC operates a mosque where members of the community may gather for the Janaza prayer and has, for years, worked with its membership, funeral establishments, and local cemeteries (such as the Farmersville Muslim Cemetery) to ensure at Muslims who have died receive the Janaza prayer prior to a timely burial. For example, in 2016, when a high school student and member of EPIC's religious community unexpectedly passed away after a tragic accident, EPIC performed the funeral service (with Janaza prayer) before the deceased youth was buried in the Restland Cemetery in Richardson, Texas.[6]

26.    During the Covid-19 pandemic, EPIC would sometimes host the Janaza prayer in the EPIC Masi (mosque) parking lot, to ensure "social distancing":



**Janaza Prayer Today at EPIC Masjid Parking Lot**

We are deeply sadden to inform the community that Br. ███████ ██████████████████ has passed away due to COVID complications. Inna Lillahi Wa Inna Alaihi Rage'oon. Will of Allah SWT!

**Janaza Prayer Today; 01/07/21 at the EPIC Masji Parking Lot after Dhuhr Prayer at 2:00 pm Insh'Allah.**
**EPIC Address: 4700 14th St. Plano 75074**

*Everyone attending the Dhuhr Prayer at EPIC and Janaza Prayer must bring his own prayer rug and must wear mask*

**Subsequent Burial will be done at the Denton Cemetery**

Please keep the departed soul and his family in your prayers. May Allah SWT grant the departed soul the highest place in Jennah and grant the Sabr-e-Jamil to the aggrieved family. انا لله و انا اليه راجعون

With our Condolences, sympathies & Prayers::
The MIA Shura

27.    Just to pick one example among many, in February 2024, when a member of the religious community tragically passed away in a bike accident, the religious ceremony was conducted at the EPIC mosque with burial to follow at the Farmersville Muslim Cemetery

---

[6] Friends Remember Wylie HS Student Who Died Jumping into Lake Lavon, NBCDFW, first published June 22, 2016 https://www.nbcdfw.com/news/local/search-for-missing-child-in-lake-lavon/229655/ (last accessed June 27, 2025).

(different location).  While EPIC helped organize the logistics and organized the community

Janaza prayer, the burial itself was conducted by a funeral establishment and funeral director—not

by EPIC.



28.    EPIC did not receive compensation for its services, it did not file a death certificate,

it did not obtain the burial transit permit.  EPIC did not transport the deceased or dispose of the

body.  And, as the Commission has long recognized, "[t]he law allows a family or friends to prepare

and bury a body so long as they do not receive compensation for services, file a death certificate

and obtain a burial transit permit."  **Ex. 2** (Letter dated 12/09/87).  Under Chapter 651, EPIC was

not engaged in funeral service operations as a matter of law.

29.    Nevertheless, on March 26, 2025, the Commission's Executive Director issued a cease and desist letter to EPIC, "order[ing]" EPIC "to cease and desist funeral service operations" and "making a criminal referral to the Collin County District Attorney."   **Ex. 4** (Letter dated 03/26/25).  Understanding why this happened after years of EPIC performing the Janaza prayer without protest requires a little background.

### E.    Hysteria About "Sharia Law" Leads to a Witch Hunt

30.    In recent years, EPIC began planning "EPIC City," a 402-acre development near Joesphine, Texas.  The 402-acre site was purchased in September 2024, and is slated for a planned development with 1,000 homes, a mosque, a K-12 religious school, a senior living center, and retail space.  This development caught the attention of some misguided activists who began posting on social media, raising an alarm about the rise of the rise of "Sharia law" in Texas.  Persons affiliated with the RAIR Foundation USA (Rise Align Ignite Reclaim) sought to the alarm.  RAIR describes itself as a "grassroots activist organization comprised of everyday Americans leading a movement to reclaim our Republic from the network of individuals and organizations waging war on Americans, our Constitution, our borders and our Judeo-Christian values."[7]  One of the main targets in RAIR's self-described "war" are patriotic, law-abiding Muslim Americans, including EPIC's leadership and members.

31.    On February 14, 2025, the founder and editor-in-chief at the RAIR Foundation posted a 222-word long incendiary Tweet about EPIC (excerpted in part below):

---

[7] RAIR Foundation USA, About Us, https://rairfoundation.com/about/ (last accessed on June 27, 2025).



**32.** This Tweet, which received over 2.4 *million* views, expressed bigoted anti-Muslim sentiments, peddled in baseless alarmism about EPIC, and pressured Republicans to "speak out." A few weeks later, Republicans did.

**33.** On February 24, 2025, responding to a Tweet by the same individual, Governor Abbot tweeted:



**34.** On February 27, 2025, State Representative Jeff Leach sent a letter to Attorney General Ken Paxton stating that the proposed EPIC City Community real estate development "may

---

seek to incorporate elements of Sharia law into its operations" and urging General Paxton to "initiate an immediate review and investigation."

35.    In late March 2025, the situation rapidly escalated.  State officials began a multi-pronged, highly publicized assault on EPIC based on its religious affiliation (Muslim).  This manifested as hysteria about Sharia law and accused law-abiding Muslim Americans of being a veritable "fifth column."

36.    On March 24, 2025, Governor Abbott tweeted:



37.    On March 25, 2025, Attorney General Paxton issued a Civil Investigative Demand as part of an ongoing investigation into EPIC City, tweeting:



38.     On March 27, 2025, Governor Abbott issued a press release announcing that the Texas State Securities Board launched an investigation into EPIC and its affiliated entities for "potential failures to comply with applicable state and federal securities requirements."

39.     On March 28, 2025, Governor Abbott announced that the Texas Workforce Commission had opened an investigation into EPIC and any affiliated entities for potential discrimination in violation of the Texas Fair Housing Act.

40.    On March 31, 2025, Governor Abbott directed the Texas Rangers to open an investigation into EPIC and any affiliated entities for potential criminal activities, again issuing a press release to publicize his actions.

41.    On April 1, 2025, Governor Abbot tweeted again about EPIC and "Sharia law."



42.    That same day, the Texas Commission on Environmental Quality issued a letter to EPIC's President and Community Capital Partners LP's President noting that EPIC has not obtained all the authorizations and permits required from TCEQ prior to development instructing them not to engage in any construction or pre-construction activities in violation of state law.  (Of course, EPIC had no intention of breaking ground without first obtaining the proper permits.).  On April 23, 2025, Attorney General Paxton issued two press releases indicating that it was "expanding its investigation into EPIC City, which is affiliated with East Plano Islamic Center ('EPIC'), by demanding documents from local city officials potentially tied to the real estate development" and from Plano Independent School District officials "after being made aware of

potential connections between school board members and East Plano Islamic Center ('EPIC'), which is affiliated with EPIC City."

43.     It is unclear why Attorney General Paxton was concerned that a religious organization in the City of Plano with members living in the City of Plano would have ties to Plano city officials and Plano school district officials. But it is telling that Attorney General Paxton announced the investigations by re-tweeting activists known for their virulent Islamophobia and anti-Muslim fear-mongering.





44.     Indeed, as oft' re-tweeted founder and editor-in-chief at the RAIR Foundation would tellingly put it:



## F.     The Commission Issues a Cease-and-Desist Letter

45.     It was during, and in furtherance of, this maelstrom that the Commission issued its cease-and-desist letter to EPIC, having "determined that you are operating as a funeral home without an establishment license in violation of Tex. Occ. Code § 651.351." **Ex. 4** (Letter dated 03/26/25). To be clear, EPIC was not operating a funeral home without an establishment license. As discussed above, EPIC led community prayers over the deceased as an exercise of its sincerely-held religious beliefs. EPIC also coordinated with licensed funeral establishments to arrange for the transportation of the deceased to and from the mosque where these prayers were performed. But EPIC did not profit from these activities, nor was it in the funeral business. Unfortunately, the

Commission and its Executive Director singled out EPIC for disparate treatment because of its Muslim religious affiliation.

46.    Indeed, so intent were Defendants on discriminating against EPIC based on its religious affiliation and the sincerely-held religious beliefs of its members, that the Executive Director declared that he was "making a *criminal* referral to the Collin County District Attorney." **Ex. 4** (Letter dated 03/26/25) (emphasis added).

47.    Not only were the Executive Director's actions discriminatory, but they were also unsupported by his statutory authority.  While the Commission has the general disciplinary power to "issue a reprimand, assess an administrative penalty, revoke, suspend, or probate the suspension of a license or provisional license, order a license holder to pay a refund under Section 651.603, or impose any combination of those penalties for a violation of this chapter or a rule adopted under this chapter," it may do so only "[a]fter a hearing as provided by [Subchapter K]." TEX. OCC. CODE § 651.501(a).  The Commission did not provide a hearing as provided by Subchapter K. Moreover, nothing in Subchapter K authorizes the Commission to issue an order prohibiting a non-license-holder from operating.  *See id.* §§ 651.501–.508.  While the Commission may assess administrative penalties against a person regulated by Chapter 651 if the Commission determines that the person has violated Chapter 651, it may do so only after providing a hearing.  *Id.* at §§ 651.551, .553–558.  And even there, the penalty is a monetary fine, not an order prohibiting future operations.  *Id.* at § 651.552.  To stop a non-license-holder who is allegedly operating a funeral establishment from operating, the Commission must "bring an action for appropriate injunctive relief."  *See id.* at § 651.601(a).  Needless to say, the Commission did not pursue this legal option, likely because it would have been unable to obtain such relief if forced to meet its burden of proof in a court of law.

48.    As a result of Defendants' discriminatory and *ultra vires* conduct, March 26, 2025, was the last day EPIC has performed funeral rites for members of its religious community or host the communal Janaza prayer at its mosque without incurring further retaliation.  As a result of Defendants' order, EPIC is unable to conduct this important religious service in its place of worship.  The result has been that EPIC has seen 11 of its congregants pass without receiving funeral rites at their home mosque since March, with an unknown number facing a similar fate without intervention from this Court.  Thus, EPIC has no choice but to initiate this litigation to vindicate its rights.

## G.    Defendant Kristin Tips's Role and Discriminatory Conduct

49.    Defendant Kristin Tips is a member and Presiding Officer of the Texas Funeral Service Commission and served in that capacity during the Commission's investigation of EPIC and issuance of the March 26, 2025 cease-and-desist order.

50.    While the Executive Director formally signed and transmitted the cease-and-desist letter, Defendant Tips actively participated in the Commission's handling of EPIC's matter.  She communicated directly with the Executive Director and other Commission officials during the same period the order was being prepared and enforced.  Publicly released text messages between Defendant Tips and the Executive Director show that, at the very time the Commission was pursuing enforcement against EPIC, she circulated anti-Muslim materials, including a video suggesting EPIC's planned development would "breed terrorists," and affirmatively agreed with the Executive Director's comment that it is "tough to be tolerant when taught hate."  *See* **Ex. 5** (KERA News Article).[8]

---

[8] Toluwani Osibamowo & Penelope Rivera, *Head of Texas Funeral Commission Shared Anti-Islam Media, Pictures of Muslim State Rep. in Texts*, KERA News (Aug. 16, 2025, 4:37 PM),



A message from Texas Funeral Service Commission Presiding Officer Tips, left, shows a graphic comparing Judaism, Christianity and Islam along with a link to a video by YouTuber Tal Oran. Scott Bingaman, then the executive director of the commission, responds with the message on the right.

51.     In those same exchanges, Defendant Tips endorsed and agreed with the Executive Director's comments suggesting that Muslims are "taught hate" and are inherently suspect. Defendant Tips further distributed images and videos portraying Islam as incompatible with American society, including a photograph of a Muslim state legislator taking his oath of office on a Qur'an as if that were improper or disloyal. *Id.*

52.     These communications occurred while the Commission was deliberating how to address EPIC's religious funeral rites and immediately before and after the March 26, 2025 cease-and-desist order. Defendant Tips's hostility toward EPIC's faith and her approval of disparaging comments about Islam demonstrate that the Commission's actions were motivated by religious animus rather than any legitimate regulatory concern.

---

https://www.keranews.org/government/2025-08-16/texas-funeral-service-commission-kristin-tips-anti-islam-media-scott-bingaman-suleman-lalani.

53.    By participating in the Commission's actions against EPIC, Defendant Tips personally contributed to and ratified the discriminatory treatment of EPIC's religious exercise. Her conduct reflects purposeful targeting of a Muslim institution for adverse action, in violation of EPIC's constitutional rights.

<u>**CAUSES OF ACTION**</u>

**Count 1:    *Ultra vires* claim (against the Commission Executive Director)**

54.    EPIC incorporates the foregoing paragraphs as if fully restated herein.

55.    Sovereign immunity does not bar an *ultra vires* suit seeking prospective injunctive relief against a state official in their official capacity for acting unlawfully.  *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009).  "To fall within this *ultra vires* exception, a suit . . . must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."  *Id.* at 372.  "An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority."  *Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017).  A government officers acts without legal authority if he exceeds the bounds of his granted authority or if his acts conflict with the law itself.  *Houston Belt & Terminal Railway Co. v. City of Houston*, 487, S.W.3d 154, 158 (Tex. 2016).

56.    Here, by issuing the cease-and-desist letter to EPIC on March 26, 2025, the Commission's Executive Director exceeded the bounds of the authority granted to him by Chapter 651.  The Executive Director lacks statutory authority to prohibit EPIC from engaging in the religious practices in which it was engaged at the time of the cease-and-desist letter for two distinct reasons.  *First*, nothing in Chapter 651 authorizes the Commission to order non-license-holders from operating a funeral establishment without obtaining an injunction.  *Second*, EPIC falls outside

of the Commission's statutory authority altogether because it was not operating a "funeral establishment" as a matter of law.  As shown by the verified facts, EPIC was not running a place of business and was not in the business of embalming or funeral directing.  *See* TEX. OCC. CODE § 651.001(8).  Indeed, funeral directing, by definition, is performed by a person for compensation. *See id.* at § 651.001(7).

57.    EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to organization of religious rites for a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

58.    EPIC further asks this Court to issue a declaration pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code (the "Uniform Declaratory Judgment Act" or "UDJA"). "The stated purpose of the UDJA is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations."  TEX. CIV. PRAC. & REM. CODE § 37.002(b). A declaratory judgment is appropriate where there is a justiciable controversy about the rights and status of the parties and the requested declaration will solve that controversy.  *Bonham State Bank*

*v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995).  EPIC asks this Court to declare that its planned activities surrounding the performance of religious funeral rites are not funeral service operations and are not prohibited by Chapter 651.

**Count 2:    Violation of Texas Religious Service Clause under Article I, Section 6-a of the Texas Constitution (against the Commission and the Commission's Executive Director)**

59.    EPIC incorporates the foregoing paragraphs as if fully restated herein.

60.    "The people of Texas voted to amend the Texas Constitution in 2021 by adding a new clause," the Texas Religious Service Clause, which prohibits the state or a political subdivision of this state from "enact[ing], adopt[ing], or issu[ing] a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief." *Perez v. City of San Antonio*, 715 S.W.3d 709, 717 (Tex. 2025); TEX. CONST. art. I, § 6-a. Where it applies, the Religious Service Clause "categorically bars a governmental prohibition or limitation on religious services without regard to whether it passes strict scrutiny or any other test that balances the right against the government's interests." *Perez*, 715 S.W.3d at 723.

61.    As a state agency, the Commission is the state or a political subdivision of this state. EPIC is a religious organization established to, among other things, support and serve the propagation of a sincerely held religious belief.  Defendants' March 26, 2025 order prohibited or limited EPIC's religious services, including religious services conducted in a place of worship.  As such, the Religious Service Clause applies.  "When the Texas Religious Services Clause applies, its force is absolute and categorical, meaning it forbids governmental prohibitions and limitations on religious services regardless of the government's interest in that limitation or how tailored the

limitation is to that interest. . . ." *Perez*, 715 S.W.3d at 730. Defendants' order violated this constitutional prohibition.

62.    EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

63.    EPIC further asks this Court to issue a declaration pursuant to the UDJA, declaring that its planned activities surrounding the performance of religious funeral rites are activities protected by the Texas Religious Service Clause.

**Count 3:    Violation of Freedom of Worship under Article I, Section 6 of the Texas Constitution (against the Commission and the Commission's Executive Director)**

64.    EPIC incorporates the foregoing paragraphs as if fully restated herein.

65.    Even before the enactment of the Religious Service Clause in 2021, "[t]he Texas Constitution [already] grant[ed] greater religious freedom than is provided for in the United States Constitution." *See Howell v. State*, 723 S.W.2d 755, 758 (Tex. App.—Texarkana 1986, no writ).

The Texas Constitution recognizes that "[a]ll men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences." TEX. CONST. art. I, § 6. "No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship." *Id.* Indeed, "it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally *every* religious denomination in the peaceable enjoyment of its own mode of public worship." *Id.* (emphasis added).

66.    Defendants' March 26, 2025 order and any future such actions taken to restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, violates EPIC's (and its members') freedom of worship under the Texas Constitution. As such, EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

**67.**    EPIC further asks this Court to issue a declaration pursuant to the UDJA, declaring that its planned activities surrounding the performance of religious funeral rites are activities protected by the Texas Freedom of Worship Clause under Article I, Section 6 of the Texas Constitution.

**Count 4:**    **Violation of Right to Free Exercise under the First Amendment of the United States Constitution brought under 42 U.S.C. § 1983 (against the Commission's Executive Director)**

**68.**    EPIC incorporates the foregoing paragraphs as if fully restated herein.

**69.**    "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty*., 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist*., 233 F.3d 871, 874 (5th Cir. 2000)).  Here, EPIC has alleged a violation of its right to free exercise secured by the First Amendment's Free Exercise Clause committed by the Commission's Executive Director while acting under color of state law.  The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. CONST., amend I.  The Supreme Court has long "held the [Free Exercise] Clause applicable to the States under the terms of the Fourteenth Amendment."  *Kennedy v. Bremerton Sch. Dist*., 597 U.S. 507, 524 (2022) (citing *Cantwell v. Connecticut*, 310 U. S. 296, 303 (1940)).  The Free Exercise Clause of the First Amendment protects religious activities.  *Id.* at 523.  Indeed, "[i]t does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'"  *Id.* (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

70.    "[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy*, 597 U.S. at 525. (quoting *Smith*, 494 U.S. at 525).  If the government acts pursuant to a seemingly neutral policy but a religious exercise is its "object," it fails the general applicability requirement.  *Id.* at 526. Likewise, "[a] government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way' or if it provides 'a mechanism of individualized exemptions'" and does not extend such exemptions to cases of religious hardship. *Id.* (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)).  Should the plaintiff make this showing, the "Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Id.* at 525.

71.    Here, the Commission's Executive Director has singled out EPIC's religious conduct while permitting secular conduct.  Upon information and belief, non-Muslim organizations are permitted to engage in the same activities as EPIC—just as EPIC itself engaged in the activities for years without issue prior to Islamophobic concerns about "Sharia law" being raised.  And the Executive Director lacks a compelling governmental interest for its order, which is also not narrowly tailored.  For all these reasons, March 16, 2025 order's ongoing prohibition constitutes an ongoing violation of federal law (the First Amendment) and EPIC asks this Court for prospective injunctive relief.

72.    EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on

March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

EPIC further asks this Court to issue a declaration pursuant to the UDJA, declaring that its planned activities surrounding the performance of religious funeral rites are activities protected by the Free Exercise Clause of the First Amendment, as applied to the State of Texas through the Fourteenth Amendment.

**Count 5:     Violation of Violation of the Texas Religious Freedom Restoration Act—Against the Texas Funeral Service Commission**

73.    EPIC re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

74.    The Texas Religious Freedom Restoration Act ("TRFRA") provides that a government agency may not substantially burden a person's free exercise of religion unless it demonstrates that imposing that burden on the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *See* Tex. Civ. Prac. & Rem. Code § 110.003(a)–(b). In other words, TRFRA mandates a strict scrutiny standard: the government cannot substantially interfere with religious exercise absent a compelling reason, pursued through the narrowest possible means. *See, e.g.*, *Barr v. City of Sinton*, 295 S.W.3d 287,

296–97 (Tex. 2009) (explaining that under TRFRA, once a substantial burden on religion is shown, the government must meet strict scrutiny).

75.    EPIC's practice of performing Islamic funeral rites for its congregants—including the washing, shrouding, prayer, and other burial preparations conducted according to Islamic faith—constitutes the "free exercise of religion" under TRFRA. These activities are carried out as a direct expression of EPIC's sincerely held religious beliefs and are central to the practice of the Islamic faith in EPIC's community. The Texas Funeral Service Commission's March 26, 2025 cease-and-desist order, issued through its Executive Director, substantially burdened EPIC's free exercise of religion by prohibiting EPIC from performing these essential religious rites at its own mosque. Under the cloud of this order (and the threat of civil or criminal penalties for non-compliance), EPIC had no choice but to stop engaging in its religious funeral services, thus impeding the congregation's ability to fulfill a fundamental religious obligation.

76.    The Commission's action in banning EPIC's religious funeral practices cannot withstand TRFRA's strict scrutiny test. Preventing a religious institution from carrying out time-honored and sacred burial rites does not further any compelling governmental interest. There is no evidence of a genuinely compelling interest (such as public health or safety) that required completely shutting down EPIC's religious ceremonies, especially given that EPIC was not engaging in any secular funeral-home business activities (no embalming, no commercial services, etc.). Even assuming, arguendo, that the Commission had a compelling regulatory interest, the means chosen—an outright cease-and-desist order against all of EPIC's religious funeral rites—was far from the least restrictive means of furthering any such interest. Less restrictive alternatives were available (for example, collaboration with EPIC to ensure any health standards were met, or targeting only specific hazardous conduct if it existed), but the Commission instead imposed a

total ban on EPIC's religious exercise. Because the Commission cannot show a compelling interest pursued through the least restrictive means, its action violates TRFRA. *See* TEX. CIV. PRAC. & REM. CODE § 110.003(b).

77.     By substantially burdening EPIC's sincere religious exercise without meeting the strict scrutiny requirements of TRFRA, Defendant Texas Funeral Service Commission has violated Texas law. Pursuant to TEX. CIV. PRAC. & REM. CODE § 110.005(a), a person whose religious exercise has been burdened in violation of TRFRA is entitled to seek appropriate relief against the government agency. EPIC accordingly seeks all relief available under TRFRA, including a declaratory judgment that the Commission's actions are unlawful and an injunction prohibiting the Commission (and its officers) from enforcing the cease-and-desist order or otherwise interfering with EPIC's religious funeral rites in the future. EPIC further seeks to recover its reasonable attorney's fees and costs, as authorized by TRFRA, and compensatory damages for the loss caused by the Commission's unlawful actions, to the extent permitted by TEX. CIV. PRAC. & REM. CODE § 110.005(a)(3)–(b) (providing for recovery of monetary damages up to the statutory cap of $10,000 per controversy). Each of these forms of relief is necessary to fully protect EPIC's rights and to remedy the harm inflicted by the Commission's violation of TRFRA.

**Count 6:     Violation of the Free Exercise Clause of the First Amendment—Against Kristin Tips (Individual Capacity)**

78.     Plaintiff East Plano Islamic Center ("EPIC") re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79.     The First Amendment to the United States Constitution, applicable to the States via the Fourteenth Amendment, provides that no law shall prohibit the free exercise of religion. U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  At all relevant times,

---

Defendant Kristin Tips was acting under color of state law in her capacity as Executive Director of the Texas Funeral Service Commission, making her a state actor subject to the First Amendment.

80.     During the same period in which the Texas Funeral Service Commission's Executive Director issued the March 26, 2025 cease-and-desist letter to EPIC, Defendant Tips—serving as a member of the Commission—engaged in text and email communications with the Executive Director that revealed overt hostility toward EPIC's Islamic faith. **Ex. 5** (KERA News Article). In those exchanges, Defendant Tips circulated anti-Muslim propaganda and affirmed disparaging statements about Islam, reflecting animus toward EPIC's religious exercise. These communications occurred contemporaneously with the Commission's enforcement action against EPIC, underscoring that the cease-and-desist was infected by discriminatory motive.

81.     The Texas Funeral Service Commission's March 26, 2025 cease-and-desist order was neither neutral nor generally applicable, but instead selectively targeted EPIC's religious activity. The order, issued through the Commission's Executive Director while Defendant Tips was serving as a Commission member, expressly forbade EPIC's performance of Islamic burial rites on its property, even though those rites are religious in nature and not part of any commercial enterprise. On information and belief, no comparable enforcement action was taken against secular entities or other organizations for analogous conduct. Defendant Tips, through her position and her contemporaneous communications with the Executive Director reflecting hostility toward Islam, participated in and endorsed the Commission's discriminatory treatment of EPIC. By singling out EPIC's religious funeral services for prohibition, the Commission, with Defendant Tips's involvement, imposed a special disability on EPIC's religious exercise that was not imposed on similar non-religious conduct, thereby violating the Free Exercise Clause.

82.     The First Amendment forbids government officials from targeting religious practices for discriminatory treatment or from acting with hostility toward religion.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993) (striking down ordinances aimed at suppressing Santeria religious practices).   By prohibiting EPIC from performing its religious funeral rites, the Commission—through actions in which Defendant Tips participated and which she endorsed—interfered with religious conduct in a way that was neither justified by a compelling interest nor narrowly tailored.   Defendant's involvement, including contemporaneous communications evincing animus toward Islam, shows that the enforcement action was motivated by hostility toward EPIC's faith rather than any legitimate health or safety concern.   Such conduct, which targets a religious institution's worship activities, strikes at the heart of what the Free Exercise Clause prohibits.   *See also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731–32 (2018) (reaffirming that government officials must not act with hostility toward religion in enforcing facially neutral laws).

83.     At the time the Texas Funeral Service Commission, through its Executive Director, issued the March 26, 2025 cease-and-desist order, it was clearly established that government officials may not impose special burdens or bans on religious exercise absent a compelling justification.   Decades of Supreme Court precedent have made clear that official action targeting religious conduct or stemming from animus toward a particular faith is unlawful.   *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993).   More recently, the Supreme Court reaffirmed that the Free Exercise Clause protects not just religious belief but religious practices, and that protection extends into public life.   *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-24 (2022) ("That the First Amendment doubly protects religious speech is no accident.   It is a natural outgrowth of the framers' distrust of government attempts to regulate

religion and suppress dissent."). Defendant Tips, as a member of the Commission and in contemporaneous communications reflecting religious hostility, participated in and endorsed the discriminatory treatment of EPIC. In short, no law or directive aimed at halting a church's or mosque's religious rites could be squared with the First Amendment, a principle well established long before 2025.

84.    Given this clearly established law, no reasonable public official in Defendant's position could have believed that her conduct was lawful. Targeting a religious institution's worship practices with discriminatory animus or hostility—as alleged here—is patently unconstitutional. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 542 (finding that official action targeting a particular religion is "religious gerrymandering" forbidden by the First Amendment). Any objectively reasonable officer would have understood that ordering a mosque to cease its fundamental religious ceremonies, under threat of legal sanction, violates EPIC's rights to free exercise of religion. Defendant Tips had fair warning that her actions infringed clearly established constitutional rights.

By acting under color of state law to deliberately suppress EPIC's religious exercise, Defendant Tips violated EPIC's rights under the Free Exercise Clause. Because those rights were clearly established and Defendant's conduct was objectively unreasonable, Defendant is not entitled to qualified immunity for this claim**.** Accordingly, pursuant to 42 U.S.C. § 1983, Defendant Tips is liable to EPIC for the violation of its First Amendment rights, and EPIC is entitled to appropriate relief including declaratory relief, injunctive relief, and compensatory damages in an amount to be proven at trial.

**Count 7:    Violation of the Free Exercise Clause of the First Amendment—Against Kristin Tips (Individual Capacity)**

85.     EPIC re-alleges and incorporates by reference all preceding paragraphs as if fully restated herein.

86.     The Fourteenth Amendment to the U.S. Constitution guarantees to every person the equal protection of the laws. U.S. Const. amend. XIV, § 1.  This guarantee prohibits state officials from intentionally discriminating against individuals or groups on the basis of religion. Government action that targets a particular religious group or denomination for adverse treatment is presumptively unconstitutional and triggers strict scrutiny.  *See Larson v. Valente*, 456 U.S. 228, 246 (1982) (a law that discriminates among religions must be justified by a compelling governmental interest).  At all relevant times, Defendant Tips acted under color of state law as Executive Director of the Texas Funeral Service Commission, making the Equal Protection Clause fully applicable to her conduct.

87.     The March 26, 2025 cease-and-desist order, issued through the Executive Director of the Texas Funeral Service Commission, was directed exclusively at EPIC and its Muslim congregation, thereby treating EPIC differently from other institutions on the basis of religion. Upon information and belief, no similarly situated secular or non-Muslim entity was subjected to a similar directive for engaging in analogous funeral or burial-related activities.  The order targeted the religious practices of EPIC's members—such as washing and shrouding the deceased and holding funeral prayers—precisely because those practices are religious.  The context and effect of the order, combined with Defendant Tips's contemporaneous communications reflecting hostility toward Islam and her role as a Commission member during the issuance and enforcement of the order, indicate that she participated in and endorsed the discriminatory treatment of EPIC, acting with purposeful religious animus or at least with an impermissible motive to single out EPIC's Islamic worship activities for restriction.

88.     By intentionally singling out a Muslim religious institution for harsh enforcement of funeral regulations (while not taking comparable action against others), Defendant Tips deprived EPIC of equal protection of the laws.  This disparate treatment cannot be justified by any legitimate—let alone compelling—government interest.  There is no evidence of any public health or safety issue that required shutting down EPIC's religious rites; indeed, EPIC's funeral practices involve no hazardous procedures and have long been carried out in coordination with licensed funeral homes.  Even if Defendant had some valid regulatory concern, completely prohibiting EPIC's religious funeral services is far from the least restrictive means of addressing it.  The unequal, religion-based classification embodied in Defendant's action fails even a basic rational basis review, and certainly cannot survive the strict scrutiny required for religious classifications.  *See Larson*, 456 U.S. at 246.  Defendant's conduct, therefore, violated EPIC's right to equal protection by intentionally subjecting it to adverse treatment on account of religion.

89.     The constitutional right to be free from intentional religious discrimination by government officials was clearly established well before 2025.  A reasonable official in Defendant Tips's position would have known that targeting a religious group or institution for disparate treatment is unlawful.  The Supreme Court has long made clear that official disfavor toward a particular religion or religious practice is an invidious form of discrimination that the Constitution forbids.  *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 542 (striking down city ordinances that were "gerrymandered" to suppress one faith community).  In *Cruz v. Beto*, the Court noted that adherents of minority faiths must be given equal rights and opportunities to practice their religion as those of the majority faiths, underscoring that blatant religious discrimination has no place in government action.  405 U.S. 319, 321–22 (1972) (per curiam), *superseded by statute*, Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C.

§§ 2000cc–2000cc-5, as recognized in *Cutter v. Wilkinson*, 544 U.S. 709, 714–17 (2005). These and other precedents had "clearly established" by the relevant time that an official may not selectively enforce laws or regulations to the detriment of a particular religious group.

90.    No reasonable official could believe that it is lawful to target a religious institution with discriminatory animus and treat it differently solely because of its religious character. Any objectively reasonable public official would understand that arbitrarily shutting down a mosque's religious practices, when such practices are permitted for others or pose no harm, is a blatant violation of equal protection. The March 26, 2025 cease-and-desist order was formally issued by the Commission's Executive Director, but Defendant Tips—through her contemporaneous communications reflecting hostility toward Islam and her position as a member of the Commission—participated in and endorsed that discriminatory course of action. Her conduct in supporting and facilitating the order was not only without legal justification, but it was also objectively unreasonable in light of clearly established law. A person of ordinary competence in Defendant Tips's position would have known that penalizing EPIC's Muslim congregation for practicing their faith would violate the Equal Protection Clause.

91.    By acting under color of state law to intentionally discriminate against EPIC on the basis of religion, Defendant Tips violated EPIC's clearly established rights under the Equal Protection Clause. Because her actions were undertaken with discriminatory intent and in contravention of well-settled constitutional principles, Defendant Tips is not entitled to qualified immunity for this claim. She may be held liable in her individual capacity under 42 U.S.C. § 1983. EPIC accordingly seeks judgment holding Defendant liable for violating the Equal Protection rights of EPIC and its members, and awarding appropriate relief including compensatory damages, declaratory relief, and injunctive relief as permitted by law.

### ATTORNEY'S FEES

92.     EPIC retained counsel to represent it in this action.  An award of reasonable and necessary attorneys' fees and expenses would be equitable and just and is authorized by both Section 37.009 of the Uniform Declaratory Judgments Acts (as invoked for the claims under state law), 42 U.S.C. § 1988, and TRFRA.

### JURY DEMAND

93.     Plaintiffs demand a jury trial.

### REQUEST FOR PERMANENT INJUNCTION

94.     EPIC further respectfully requests that the Court set its request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against the Texas Funeral Service Commission and its Executive Director.

### PRAYER

95.     For these reasons, EPIC asks that the Court issue citation for the Commission and its Executive Director to appear and answer, and that EPIC be awarded a judgment for the following:

> a.  Upon final trial, a Permanent Injunction enjoining the Commission and its Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC

mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate);

b.  A Declaratory Judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

    i.  EPIC has a constitutional and statutory right to conduct religious funeral rites for its members without compensation and without a license from the Commission;

    ii.  Defendants lack statutory authority under the Texas Occupations Code to prohibit EPIC from conducting religious funeral rites for its members without compensation;

    iii.  Prohibitions by Defendants that prevent EPIC from conducting religious funeral rites for its members without compensation violate the Texas Constitution and the United States Constitution;

c.  An award of compensatory damages against Defendant Kristin Tips in her individual capacity for violation of EPIC's rights under the First and Fourteenth Amendments, as enforced through 42 U.S.C. § 1983, in an amount to be determined at trial;

d.  An award of punitive damages against Defendant Kristin Tips in her individual capacity for her willful, malicious, and/or reckless disregard of EPIC's clearly established constitutional rights;

e.   An award of compensatory damages against the Texas Funeral Service Commission pursuant to TEX. CIV. PRAC. & REM. CODE § 110.005, up to the statutory cap;

f.   An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988, TEX. CIV. PRAC. & REM. CODE § 37.009, TEX. CIV. PRAC. & REM. CODE § 110.005(d), and any other applicable law; and

g.   Such other and further relief to which Plaintiff may be justly entitled at law or in equity.

**Dated:** October 3, 2025

Respectfully submitted,

**TERRAZAS PLLC**

1001 S. Capital of Texas Highway, Bldg. L, Suite 250
Austin, Texas 78746
512.680.3257

By:  /s/ *Eric A. Hudson*
Eric A. Hudson
State Bar No. 24059977
ehudson@terrazaspllc.com
Benjamin L. Dower
State Bar No. 24082931
bdower@terrazaspllc.com

**ATTORNEYS FOR EAST PLANO ISLAMIC CENTER**