## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| EAST PLANO ISLAMIC CENTER | § | |
| (EPIC), | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:25-CV-1085 |
| | § | |
| TEXAS FUNERAL SERVICE | § | |
| COMMISSION, TEXAS FUNERAL | § | |
| SERVICE COMMISSION EXECUTIVE | § | |
| DIRECTOR, in their official capacity, | § | |
| and KRISTIN TIPS, | § | |
| in her individual capacity, | § | |
| *Defendants.* | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT KRISTIN TIPS' MOTION TO DISMISS

EPIC alleges a straightforward and serious constitutional violation: the State of Texas, acting through its funeral commission and guided by the religious animus of its presiding officer, Kristin Tips, ordered a mosque to stop performing sacred Islamic funeral rites because they were Islamic. At this stage, those allegations must be accepted as true. And once accepted, Presiding Commissioner Tips's motion to dismiss fails.

The motion does not contend that shutting down a house of worship's religious practices based on its faith would be constitutional. Instead, it argues that Presiding Commissioner Tips cannot be liable because she did not personally sign the cease-and-desist letter. But § 1983 does not require a signature. It requires personal involvement. The complaint alleges that she directed, influenced, and approved the enforcement action—conduct that, if proven, is more than enough.

Nor does qualified immunity apply. To overcome qualified immunity, the Supreme Court "do[es] not require a case directly on point" but that existing precedent places the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). For decades, it has been

clearly established that state officials may not target religious exercise or discriminate against a religious group based on the official's bias against that religion. *Lukumi*, *Starkville*, and related cases put that principle and its application to the alleged facts beyond debate. No reasonable official could think it lawful.

EPIC's allegations easily satisfy Rule 12. The motion should be denied.

## I.    BACKGROUND

On July 2, 2025, EPIC filed suit against the Texas Funeral Service Commission ("TFSC") and its Executive Director in their official capacities (collectively, the "Agency Defendants"). Doc. 1-3 at 5. The Agency Defendants removed the case shortly thereafter. Doc. 1. On October 3, 2025, EPIC moved for leave to file its First Amended Complaint adding Kristin Tips, the presiding officer of TFSC, in her individual capacity ("Presiding Commissioner Tips"). Doc. 20 at 1; *see also* Doc. 23 at 22 (¶ 49) (alleging that Presiding Commissioner Tips served as Presiding Officer during TFSC's investigation of EPIC and issuance of the March 26, 2025 cease-and-desist order). The Court granted leave, and the First Amended Complaint became the operative pleading. Doc. 21; *see also* Doc. 23.

The First Amended Complaint alleges that Defendants violated EPIC's statutory and constitutional rights by prohibiting EPIC from conducting longstanding religious funeral rites based on EPIC's Islamic faith. *See* Doc. 23 at 9–22. On March 26, 2025, TFSC's Executive Director issued a cease-and-desist letter accusing EPIC of "operating a funeral home without a license" and ordering it to cease funeral-service activities. *Id*. at 20; *see also* Doc. 22-4. EPIC alleges that this enforcement action was one of several state-initiated actions targeting it based on unfounded and prejudiced concerns about "Sharia law." *See* Doc. 23 at 14–20. It further alleges

that Agency Defendants treated EPIC differently from similarly situated non-Muslim organizations because of its religious affiliation. Id. at 20–21, 37.

The Complaint also alleges that Presiding Commissioner Tips served as Presiding Officer during the investigation and issuance of the cease-and-desist order, and that she actively participated in TFSC's handling of EPIC's matter. Doc. 23 at 22. It alleges she communicated directly with the Executive Director and other TFSC officials during the period in which the order was being prepared and enforced. Id. Publicly released text messages show that, during the same period, she circulated anti-Muslim materials—including a video asserting that EPIC's development would "breed terrorists"—and endorsed the Executive Director's statement that it is "tough to be tolerant when taught hate." *Id*. These communications occurred while TFSC was deliberating how to handle EPIC's religious rites and immediately before and after issuance of the cease-and-desist order. *Id*. at 23.

The First Amended Complaint asserts two § 1983 claims against Presiding Commissioner Tips: a Free Exercise claim under the First Amendment, *id*. at 33–36, and an Equal Protection claim under the Fourteenth Amendment, *id*. at 37–39.

On November 20, 2025, Presiding Commissioner Tips moved to dismiss under Rules 12(b)(1) and 12(b)(6). Doc. 29. All three arguments in her motion rest on the same premise: that the Complaint does not adequately allege her involvement in the constitutional violations. *See id*. at 5–12. She argues, first, that EPIC has failed to plausibly allege that its injuries are fairly traceable to her conduct. *Id*. at 5–7. Second, she argues that EPIC has not alleged her personal participation in the constitutional violations. *Id*. at 7–10. Third, she asserts that she is entitled to qualified immunity because, again, EPIC has not alleged her personal involvement. *Id*. at 10–12. Each argument simply repackages the same asserted pleading deficiency.

On November 28, 2025, EPIC filed an opposed motion for leave to amend. Doc. 31. The proposed Second Amended Complaint contains detailed factual allegations further describing Presiding Commissioner Tips's involvement and the basis for EPIC's claims. Doc. 31-1; Doc. 31 at 1. Although a party may ordinarily amend once as a matter of course within 21 days of a Rule 12(b) motion, EPIC has already amended once to add Presiding Commissioner Tips as a defendant and therefore seeks leave under Rule 15(a)(1)(B). FED. R. CIV. P. 15(a)(1)(B).

## II.     ARGUMENTS & AUTHORITIES

**A.     The Court should grant EPIC's motion for leave to amend and deny Presiding Commissioner Tips's motion to dismiss as moot.**

While EPIC maintains that its current allegations regarding Presiding Commissioner Tips's conduct are sufficient, EPIC nevertheless seeks leave to amend to cure the purported deficiencies identified in the motion to dismiss. Doc. 31. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002); see also *Griggs v. Hinds Junior Coll.*, 563 F.2d 179, 180 (5th Cir. 1977) (holding that the district court abused its discretion by denying leave to amend and granting dismissal without affording an opportunity to cure). The purported defects raised in Presiding Commissioner Tips's motion are plainly curable—indeed, they are cured in the proposed amended pleading. *See* Doc. 31-1. Because Presiding Commissioner Tips was first added as a party in the First Amended Complaint and because her motion to dismiss is her first responsive pleading, EPIC has not yet had an opportunity to amend in response to her arguments.

The proposed Second Amended Complaint supplies substantial additional detail directly addressing each of the arguments—variations of the same argument—advanced in Presiding

Commissioner Tips's motion. In addition to the allegations already contained in the First Amended

Complaint, the proposed pleading:

- Identifies the statutory authority effectively wielded by Presiding Commissioner Tips to employ, supervise, and set the Executive Director's salary (Doc. 31-1 at 22–23);

- Provides considerable detail regarding the power dynamic between Presiding Commissioner Tips and the Executive Director, including specifics regarding his relationship with her (referring to her as "Madam Chair" in emails that bordered on obsequiousness and "boss" and "ma'am" in their text messages) (Doc. 31-1 at 23);

- Details how the Executive Director deferred to Presiding Commissioner Tips in enforcement issues, including seeking her permission to take actions, asking whether she wanted him to make contact with certain persons, whether and how to respond to inquiries, what statutory language to use, and whether he should issue or finalize enforcement documents (Doc. 31-1 at 23–24);

- Describes how Presiding Commissioner Tips closely directed the Executive Director's actions by, for example, personally editing enforcement letters, dictating wording of violations, directing the timing of enforcement actions, and approving line-by-line drafted administrator orders, regulatory notices, and enforcement-related guidance, including multiple cease-and-desist actions issued in the weeks leading up to March 26, 2026 (Doc. 31-1 at 24–25);

- Offers considerable detail about Presiding Commissioner Tips's close involvement in the events leading to the issuance of the March 26, 2025, cease-and-desist letter to EPIC— including describing direct communications with the Executive Director the day before the letter's insurance, an email from Presiding Commissioner Tips the afternoon before the letter's issuance forwarding an Attorney General press release regarding EPIC, and a flurry of activity the morning of March 26, 2026, in which Presiding Commissioner Tips told the Executive Director that she was coordinating with the Governor's Office regarding enforcement activities and the Executive Director confirmed he was awaiting her instructions (Doc. 31-1 at 25–27);

- Furnishes still more specific factual allegations about Presiding Commissioner Tips's behind-the-scenes close monitoring of TFSC's enforcement action against EPIC in the hours following the cease-and-desist letter's issuance—including being "bcc"ed by a TFSC staff attorney's email to another TFSC employee regarding the EPIC investigation (Doc. 31-1 at 27).

These allegations demonstrate Presiding Commissioner Tips's personal involvement in the

alleged constitutional violation at issue. But, as the plaintiff cannot add new factual allegations in

response to a motion to dismiss, an amended (or supplemental) pleading is the only proper

mechanism to submit this new information to the Court. In this situation, leave to cure should be

granted. *See*, *e.g.*, *Harrison v. Thompson*, 447 F.2d 459 (5th Cir. 1971) (holding that "[t]he

jurisdictional allegation was susceptible of cure by simple amendment" and [l]eave to amend in this particular should have been granted"); *Great Plains Tr. Co.*, 313 F.3d at 329 (noting that Circuit precedent support the premise that granting leave to amend is especially appropriate when the alternative to amendment is dismissal for failure to state a claim). Should leave be granted, the pending motion to dismiss will be rendered moot.

**B.     EPIC's First Amended Complaint contains sufficient allegations of fact to support its standing to sue Presiding Commissioner Tips.**

Even if the Court does not grant EPIC leave to amend, the motion to dismiss should still be denied. Presiding Commissioner Tips's motion to dismiss first challenges the Court's lacks subject-matter jurisdiction over EPIC's claims against her based on lack of standing. *See* Doc. 29 at 5–7. In the context of a motion to dismiss, "a suit will not be dismissed for lack of standing if there are sufficient 'allegations of fact'—not proof—in the complaint or supporting affidavits." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 65 (1987) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Here, Presiding Commissioner Tips argues that EPIC's First Amended Complaint fails to "establish the second causation element, which requires that its alleged injury [] be 'fairly traceable to the challenged action of [Ms. Tips], and not the result of the independent action of some third party.'" *Id.* at 5 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

"Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *see also LULAC v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011). "Unlike tort law, Article III standing causation imposes no stringent or inflexible standard." *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 236 (5th Cir.

2025). "Indeed, an indirect causal relationship will suffice for standing, and plaintiffs may satisfy the requirement by alleging a chain of causation between defendants' conduct and plaintiffs' injuries." *Id.* (internal quotations omitted). "It is often said that the defendant's conduct was one of multiple contributing causes." *Id.* "And the fact that the defendant is only one of several persons who caused the harm does not preclude a finding of causation sufficient to support standing." *Id.* at 236–37 (internal quotations omitted). "Even an uncertain or indirect causal connection may suffice at the pleading stage." *Id.* at 237.

The First Amended Complaint contains sufficient allegations to clear the "low causation bar at the standing stage." *See Est. of Parker*, 140 at 237. The pleading alleges that Presiding Commissioner Tips actively participated in TFSC's handling of EPIC's matter. Doc. 23 at 22. Admittedly, the First Amended Complaint does not contain as much detail about Presiding Commissioner Tips's active participation as does the proposed Second Amended Complaint. *Compare* Doc. 23 at 22–24, *with* Doc. 31-1 at 22–30. But this allegation paired with the others concerning her communications with the Executive Director and other Commission officials while the order was being prepared and enforced, plus Presiding Commissioner Tips circulating, among other things, a video suggesting that EPIC's planned development would breed terrorists, are sufficient to create the reasonable inference that the injury caused by the cease-and-desist letter is fairly traceable to her conduct. *See* Doc. 23 at 22.

The Fifth Circuit's *Jackson v. Wright* opinion is instructive. 82 F.4th 362, 367–68 (5th Cir. 2023). There, a professor sued eight members of the UNT Board of Regents for First Amendment retaliation. *Id.* at 365. "The Board defendants argue[d] that [the plaintiff] needed to allege specifically that they were personally and directly involved with the Journal or panel investigation" that caused his injuries. *Id.* at 369. "But all [the plaintiff] need[ed] to allege under Article III is that

his First Amendment injuries are 'fairly traceable' to the Board defendants—not that the Board defendants directly caused his injuries." *Id.* So too here. The motion to dismiss based on standing should be denied.

### C.    EPIC's First Amended Complaint contains sufficient allegations to state a claim against Presiding Commissioner Tips.

Detailed factual allegations are not required at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a motion to dismiss, the Court must construe the complaint "in the light most favorable to the [non-movant] and draw all reasonable inferences in the [non-movant's] favor." *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009). A plaintiff need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable," which is "not akin to a probability requirement." *Iqbal*, 556 U.S. at 678.

To state a § 1983 claim, EPIC must allege (1) a violation of a federal right, and (2) that the violation was committed by a person acting under color of state law. *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). The plaintiff must plead facts illustrating the defendant's participation in the wrong alleged. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986). A supervisory official is liable under § 1983 when she affirmatively participates in the acts causing the deprivation. *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008). EPIC's pleadings satisfy that standard. See Doc. 23 at 22–23 (alleging Presiding Commissioner Tips's involvement in the handling of EPIC's matter).

Presiding Commissioner Tips's arguments misapply the plausibility standard by attempting to convert it into a probability test and by seeking inferences in her favor. She notes, for example, that text messages expressing support for the notion that EPIC would "breed terrorists" were sent several weeks after the cease-and-desist order. Doc. 29 at 8. But it is entirely reasonable to infer

that such animus did not suddenly arise in the brief period between March 26 and May 9. See id. (citing Doc. 22-5). Accepting her view would require drawing inferences for the movant—exactly what *Severance* forbids at this stage. 566 F.3d at 501.

Nor do the allegations suggest that EPIC is asking the Court to impose vicarious liability. By statute, the Executive Director is "employ[ed] and supervise[d]" by the Commission, which sets the terms of his employment and determines his salary. TEX. OCC. CODE § 651.101(a). Presiding Commissioner Tips held the presiding officer role during the relevant period. Doc. 23 at 22. EPIC does not contend that she is liable because she oversaw the agency; EPIC alleges she had and exercised both *de facto* and *de jure* authority to direct the Executive Director's enforcement decisions, that she actively participated in TFSC's handling of EPIC's matter, and that she contemporaneously communicated animus against Muslims—the same animus that motivated the enforcement action. *See id.* at 22–23, 33–39.

Taking these allegations as true and drawing all reasonable inferences in EPIC's favor, the complaint plausibly alleges that Presiding Commissioner Tips personally participated in the constitutional violations by causing or directing TFSC's Executive Director to issue the cease-and-desist letter as part of a high-profile enforcement push involving multiple state agencies and aimed squarely at EPIC's religious exercise.

**D.    EPIC's First Amended Complaint contains sufficient allegations to overcome qualified immunity.**

Finally, Presiding Commissioner Tips invokes qualified immunity. To overcome qualified immunity, EPIC must "(1) allege facts that make out a violation of a constitutional right, and (2) show that the right at issue was clearly established at the time of the defendants' alleged

misconduct." *Espinal v. City of Houston*, 96 F.4th 741, 748–49 (5th Cir. 2024) (quotation omitted). This is a burden EPIC has met.

First, Presiding Commissioner Tips contends that EPIC "cannot overcome the first qualified immunity threshold" because it has not alleged her personal involvement in the constitutional violation. Doc. 29 at 11. But her motion never argues that the cease-and-desist letter itself complied with the First or Fourteenth Amendments. *See id*. at 5–12. Instead, she relies exclusively on the assertion that she cannot be liable because she did not sign the letter. The pleadings, however, permit (and therefore require) the reasonable inference that she personally and affirmatively participated in the chain of decisions that produced the cease-and-desist order, including directing, influencing, and approving the enforcement action that culminated in the Executive Director sending it to EPIC.

Presiding Commissioner Tips next argues that EPIC has not identified "binding precedent placing it 'beyond debate' that a state official is liable for the discriminatory enforcement action of another state official simply because the two shared private text messages evincing animus toward the same group." Doc. 29 at 12. That framing misunderstands both EPIC's claim and the qualified-immunity inquiry. EPIC does not allege that Presiding Commissioner Tips violated the Constitution by sending text messages reflecting animus toward Muslims. EPIC alleges that she violated the Constitution by using her authority and influence to cause the Commission to issue a cease-and-desist order suppressing EPIC's religious funeral rites because of that animus. The text messages create the reasonable inference that Presiding Commissioner Tips' actions with regards to TFSC's investigation and cease-and-desist letter were motivated by an intent to discriminate against EPIC based on its religious affiliation. They *evidence* a constitutional violation but are not the violation itself. Once the Court reasonably infers that Presiding Commissioner participated in,

or directed, the sending of the cease-and-desist letter, the question becomes whether *that* conduct—together with the reasonable inferences that can be drawn about her discriminatory intent—clearly violated the rights at issue.

Qualified immunity's second prong thus asks a different question than that posed by Presiding Commissioner Tips' motion, namely whether it was clearly established that the conduct at issue here—government suppression of religious rituals because of their religious nature—violated the First and Fourteenth Amendments. The inquiry is not whether a prior case involved identical facts or whether precedent expressly addressed the sufficiency of allegations showing personal involvement. It is whether, at the time, a reasonable official would understand that this kind of conduct is unconstitutional. The Supreme Court "do[es] **not** require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). Here, existing precedent in March 2025 was sufficiently clear to place the Presiding Officer Tips's Free Exercise and Equal Protection violations beyond debate.

Since the Supreme Court's holding in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, it has been a foundational principle that the Free Exercise Clause forbids government action that "targets religious beliefs as such." 508 U.S. 520, 533 (1993). A law or enforcement action is not neutral if its purpose is to suppress religious exercise, and such action fails at the threshold regardless of any asserted secular rationale. *Id.* at 533–34. No reasonable official in 2025 could believe it lawful to direct or orchestrate a cease-and-desist order against a mosque's funeral rites because they are Islamic rites.

Federal appellate precedent only reinforces this point. In *Islamic Center of Mississippi, Inc. v. City of Starkville*, the Court held that discriminatory treatment of a Muslim congregation violated

the Free Exercise Clause. 840 F.2d 293, 294 (5th Cir. 1988). The government may not favor one faith over another or burden a religious community because of its identity. *Id*. "'Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.'" *Id.* at 303 (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)). Here, Presiding Commissioner Tips can hold whatever private biases she wants about Islam, but it is beyond debate that shutting down EPIC's Muslim religious practice *because* of those biases, as has plausibly been alleged, violates the Free Exercise Clause.

In *Shrum v. City of Coweta*, the trial court denied qualified immunity to an individual-capacity official who deliberately interfered with his employee's Sunday worship (the employee was also a pastor at a local church). 449 F.3d 1132, 1135 (10th Cir. 2006). On appeal, the Tenth Circuit emphasized that the law was clearly established "that non-neutral state action imposing a substantial burden on the exercise of religion violates the First Amendment," *id*. at 1144, and held that qualified immunity could not attach where the plaintiff was singled out "because of" his religious commitments. *Id*. "[I]f [plaintiff's] factual allegations are correctly—that he was singled out because of [defendant's] knowledge of his religious commitment—then [defendant's] claim of qualified immunity must fail." *Id.*

The parallel to this case is obvious. EPIC alleges that Presiding Commissioner Tips caused TFSC's enforcement specifically to halt EPIC's Muslim funeral rites because of their religious character. To be clear, EPIC is not relying on *Shrum* as a source of clearly established law. But *Shrum* supports the proposition that Supreme Court precedent, including *Church of the Lukumi*, "clearly established that non-neutral state action imposing a substantial burden on the exercise of religion violates the First Amendment" and that facts alleged in this case overcome qualified immunity. *See id.* at 1145.

"The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated the constitutional rights." *Boyd v. McNamara*, 74 F.4th 662, 669 (5th Cir. 2023) (internal quotations omitted). "[D]istinctions between cases are thus relevant only if they make the applicability of prior precedent unclear." *Id.* Nothing about the precedent here is unclear. *Lukumi* has long held that the government may not suppress religious exercise because of its religious nature. *Starkville* confirmed that singling out a Muslim congregation for adverse treatment is unconstitutional. *Shrum* confirms that targeting an individual based on known religious practice violates clearly established law. These cases eliminate any doubt that the conduct alleged here—halting EPIC's Islamic funeral rites because they are Islamic—violates clearly established constitutional law. This violation is "beyond debate" based upon binding precedent that existed in March 2025. Presiding Commissioner Tips is therefore not entitled to qualified immunity.

Regarding the Equal Protection clause claim, if pleadings plausibly allege that the plaintiffs have been treated differently than someone who similarly situated except for the protected category (such as protected speech or religion), that allegation is sufficient to state an equal protection claim. *E.g.*, *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996) ("Appellants' second amended complaint alleges that they have been treated differently than similarly situated individuals. Accordingly, the district court erred by dismissing the equal protection claim at this stage of the litigation."). Even in the highly deferential context of criminal prosecutions, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *U.S. v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). The violation of the Equal Protection clause rests on showing that the

"government official's acts were motivated by improper considerations, such as race, **religion**, or **the desire to prevent the exercise of a constitutional right**." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000) (emphasis added).

Here, EPIC alleges that Presiding Commissioner Tips used her *de jure* and *de facto* authority as TFCS's Governor-appointed Presiding Officer to cause its Executive Director to issue a cease-and-desist letter to EPIC, ordering a mosque to stop its free exercise of religion (performing sacred funeral rites) precisely *because* they were Islamic. Doc. 23 at 22–23. According Presiding Commissioner Tips's text messages to the Executive Director, EPIC planned to "breed terrorists," Muslims are "taught hate," and Islam is fundamentally incompatible with American society. *See* Doc. 23 at 22–23. TFSC has taken no comparable enforcement action against secular entities or other organizations for analogous conduct. *Id.* at 34, 37. No similarly situated secular or non-Muslim entity has been subjected to a similar directive for engaging in analogous funeral or burial-related activities. *Id.* at 37. The allegations support the inference that her actions were "motivated by improper considerations such as race . . . or the desire to prevent the exercise of a constitutional right." *See Bryan*, 213 F.3d at 277.

Against this backdrop, Presiding Commissioner Tips's suggestion that no prior case is factually identical is irrelevant. "The touchstone of the [qualified immunity] inquiry is 'fair notice.'" *Boyd*, 74 F.4th at 669. For decades it has been "clearly established that a state violates the equal protection clause when it treats one set of persons differently from others who are similarly situated." *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000). In 1996, the Fifth Circuit recognized that "reasonable officials would have understood that [] alleged differential treatment denied [the plaintiffs] equal protection of the law." *See Rolf*, 77 F.3d at 828 (holding that "the district court erred by determining, at this stage in the litigation, that [the plaintiffs], in their

individual capacities, were entitled to qualified immunity"). No reasonable official in March 2025 would believe that Equal Protection Clause countenances the government treating a religious organization differently based on prejudice against its religion, particularly when the differential treatment involves shutting down religious activity. The case law was sufficiently clear to give fair notice of the constitutional violation.

Finally, EPIC notes that the Supreme Court has rejected any requirement for "materially similar" precedent where the constitutional violation is obvious. In *Hope v. Pelzer*, for example, the Court held that qualified immunity does not protect officials who violate "obvious" constitutional commands, even in the absence of a case with the same facts. 536 U.S. 730, 741 (2002). The Court explained that "general statements of the law are not inherently incapable of giving fair and clear warning," *id.*, and that officials can be on notice that their conduct is unlawful even in "novel factual circumstances." *Id.* at 741–42. Shutting down a religious institution's sacred practices because of hostility toward its faith is exactly the sort of obvious constitutional violation for which *Hope* denies shelter.[1]

---

[1] EPIC acknowledges that, in *Villarreal v. City of Laredo*, the Fifth Circuit declined to hold that First Amendment violation at issue was "obvious" because it did not arise under the Eighth Amendment, like *Hope* and its progeny did. 94 F.4th 374, 395 (5th Cir. 2024) (en banc) (vacated). Other circuits have not limited *Hope* and its progeny to the Eighth Amendment and have instead recognized that First Amendment violations can be clearly established because they are obvious. *See, e.g.*, *Díaz-Bigio v. Santini*, 652 F.3d 45, 50 (1st Cir. 2011); *Nagle v. Marron*, 663 F.3d 100, 115-116 (2nd Cir. 2011); *McGreevy v. Stroup*, 413 F.3d 359, 366 (3rd Cir. 2005); *Tobey v. Jones*, 706 F.3d 379, 391 n.6 (4th Cir. 2013); *MacIntosh v. Clous*, 69 F.4th 309, 399 (6th Cir. 2023); *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 798 (7th Cir. 2016); *Galvin v. Hay*, 374 F.3d 739, 746-47 (9th Cir. 2004); *Frasier v. Evans*, 992 F.3d 1003, 1021-22 (10th Cir. 2021); *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345-46 (11th Cir. 2013); *see also Cheeks v. Belmar*, 80 F.4th 872, 877 (8th Cir. 2023) (applying *Hope* to the Fourteenth Amendment). The *Villarreal* opinion was vacated by the Supreme Court. *Villarreal v. Alaniz*, 145 S. Ct. 368 (2024). But then the Fifth Circuit held that the vacated opinion was "superseded only to the extent" necessary to reconsider the substantive requirements of a First Amendment retaliation claim. *Villarreal v. City of Laredo*, 134 F.4th 273, 276 (5th Cir. 2025). While it is far from clear that the original *Villarreal* opinion categorically limits *Hope* and its progeny to Eighth Amendment claims, because at least

### III.    PRAYER

For all these reasons, EPIC respectfully asks the Court to deny Presiding Commissioner Tips's motion to dismiss.

Respectfully submitted,

**TERRAZAS PLLC**

1001 S. Capital of Texas Highway
Bldg. L, Suite 250
Austin, Texas 78746
512.680.3257

By:  /s/ *Eric A. Hudson*
Eric A. Hudson
State Bar No. 24059977
ehudson@terrazaspllc.com
Benjamin L. Dower
State Bar No. 24082931
bdower@terrazaspllc.com

**ATTORNEYS FOR PLAINTIFF**
**EAST PLANO ISLAMIC CENTER**

### CERTIFICATE OF SERVICE

I affirm that I have filed this application through the Western District of Texas's ECF system, serving a copy on all counsel of record in the process.

/s/ *Benjamin L. Dower*
Benjamin L. Dower

---

one judge on the Fifth Circuit has interpreted it that way, EPIC brings the precedent to the Court's attention to fulfill its duty of candor.