**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **EAST PLANO ISLAMIC**<br>**CENTER (EPIC),** | § <br> § <br> § <br> § <br> § | |
| *Plaintiff,* | § | |
| **v.** | § <br> § | **CIVIL ACTION NO. 1:25-cv-1085** |
| **TEXAS FUNERAL SERVICES**<br>**COMMISSION,** *et al.,* | § <br> § <br> § <br> § | |
| *Defendants.* | § | |

**DEFENDANTS KRISTIN TIPS' REPLY IN**
**FURTHER SUPPORT OF MOTION TO DISMISS**

Defendant Kristin Tips, through the Office of the Attorney General of Texas, files this reply in further support of her motion to dismiss EPIC's claims against her pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  D.E. 29 ("MTD").[1]

## I.    STATEMENT OF THE CASE

As expected, EPIC's response to Ms. Tips' MTD attempts to convert speculation and post hoc narrative into individual-capacity constitutional liability.  D.E. 38 ("Response").  But stripped of rhetoric, EPIC's FAC still alleges only one operative action that caused EPIC's asserted injury: the March 26, 2025 C&D Letter issued and signed by former Executive Director Scott Bingaman.  EPIC's Response does not identify any factual allegations showing that Ms. Tips caused, directed, approved, or even influenced that action.  Nor does EPIC cite to any case law holding that Ms. Tips' only alleged actions—namely, sending unrelated personal text messages to Mr. Bingaman weeks after the C&D Letter—are sufficient to establish standing, violate the Constitution, or overcome qualified immunity.

---

[1] All acronyms and capitalized terms herein have the same meaning as in Ms. Tips' MTD      .

The procedural posture further underscores EPIC's pleading deficiencies.  Immediately after Ms. Tips filed her MTD, EPIC moved for leave to amend its complaint *again* in order to "cure[] the putative pleading defects raised in the pending motion to dismiss."  D.E. 31 at 1.[2]  Then, unable to defend the sufficiency of the operative pleading, EPIC spends much of its Response arguing that the supplemental allegations in its proposed amendment are sufficient to salvage its claims against Ms. Tips.  D.E. 38 at 4-6.   But the FAC must be evaluated on its own terms, as filed.  And when the FAC's actual allegations are examined under controlling precedent, dismissal remains required.

## II.    ARGUMENT

### A.  EPIC cannot salvage standing.

Article III standing requires a plaintiff to plead facts indicating a causal connection between its injury and the defendant's conduct.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Even at the pleading stage, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* at 560; *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Calif. v. Tex.*, 593 U.S. 659, 675, (2021).

EPIC does not satisfy the causation element as to Ms. Tips.  The FAC repeatedly and expressly attributes EPIC's injury to a single act: the March 26, 2025 C&D Letter issued by former Executive Director Bingaman. FAC ¶¶ 46–48, 75.   EPIC alleges that "everything changed" when TFSC, "through its Executive Director," issued the C&D Letter, and that under the threat of civil and criminal enforcement, and EPIC "had no choice but to stop engaging in its religious funeral services." FAC at ¶¶ 48, 75. These allegations—coupled with the lack of any allegations that Ms. Tips initiated the enforcement action—foreclose any inference that Ms. Tips caused EPIC's injury.

EPIC's only argument to establish standing is that, under Article III, causation may be indirect. Response at 6-8.  But while proximate cause is not required to establish standing, a plaintiff must still

---

[2] Ms. Tips opposes EPIC's motion for leave to amend.

allege facts showing that each defendant's personal conduct "significantly contributed" to his injury. *Inclusive Louisiana v. St. James Parish*, 134 F.4th 297, 309 (5th Cir. 2025) (quotation omitted).  EPIC fails to meet this requirement because it does not allege that Ms. Tips personally contributed—much less *significantly* contributed—to the injury caused by Mr. Bingaman's C&D Letter.

EPIC's reliance on *Jackson v. Wright* is misplaced.  82 F. 4th 362 (5th Cir, 2023).  There, a professor (Johnson) sued members of the UNT Board of Regents for their alleged role in the university's allegedly retaliatory investigation into an article he wrote.  *Id.* at 365.  In determining that Johnson had standing to sue the board members, the Fifth Circuit relied on allegations that the board members had "direct governing authority over the UNT officials that are allegedly continuing to violate Jackson's First Amendment rights, *including authority to countermand the decisions of the subordinate UNT officials.*"  *Id.* at 368 (emphasis added).[3]  This veto power, the court held, was sufficient to establish causation for Article III purposes even without allegations that the board members were "personally and directly involved" in the investigation.  *Id.* at 369.

Here, by contrast, EPIC does not allege facts indicating that Ms. Tips had any authority over Mr. Bingaman, much less authority to veto Mr. Bingaman's C&D Letter to EPIC.  EPIC now cites to the Texas regulatory provision conferring TFSC with the authority to "employ" and "supervise" its Executive Director (*see* Response at 9 (citing TEX. OCC. CODE § 651.101(a)), but authority to employ and supervise is not the same as authority to veto decisions or direct contrary action.  EPIC's FAC makes it clear that it was Mr. Bingaman alone who sent the C&D Letter which allegedly caused its injuries.  Absent factual allegations that Ms. Tips had actual authority to direct or override that decision, her role as a TFSC member is not enough to impute Mr. Bingaman's actions on her.

---

[3] The Fifth Circuit considered the board members' authority as part of its *Ex parte Young* analysis, which it then carried over as directly pertinent to its standing analysis.  *Id.* at 369 (holding that Johnson had established standing "for the same reasons discussed in the preceding section [on *Ex parte Young*]" and noting that "[t]he traceability and *Ex parte Young* issues discussed above involve similar questions").

Nor can EPIC rely on Ms. Tips' general alleged animus toward Muslims or bald assertions that Ms. Tips "participated" in TFSC's handling of the EPIC matter. Courts routinely dismiss for lack of standing where causation allegations are conclusory or fail to bridge the gap between the defendant's conduct and the injury. *See, e.g., Pennie v. Obama*, 255 F. Supp. 3d 648, 661 (N.D. Tex. 2017); *Peters v. St. Joseph Servs. Corp.*, 74 F. Supp. 3d 847, 857 (S.D. Tex. 2015). Because the FAC does not plausibly allege facts indicating that Ms. Tips' conduct "significantly contributed" to the enforcement action that injured EPIC, EPIC lacks Article III standing to sue her.

**B. EPIC cannot salvage personal involvement.**

To establish Ms. Tips' liability under Section 1983, EPIC must allege facts indicating that she was "either personally involved in the constitutional violation or [that her] acts are causally connected to the constitutional violation alleged." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999). Because the alleged constitutional violations in this case all stem entirely from the C&D Letter and the threats made therein, EPIC must show an "affirmative link" between that letter and Ms. Tips's actions. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). EPIC fails to do so.

EPIC does not allege that Ms. Tips drafted, reviewed, approved, authorized, or transmitted the C&D Letter, which it admits was "formally signed and transmitted" by Mr. Bingaman. FAC ¶ 50. Instead, EPIC attempts to substitute allegations of animus for allegations of action. But even if the Court assumes that the cited text messages reflect religious bias, bias alone does not establish Section 1983 liability absent a causal link to the challenged governmental act. *Rizzo*, 423 U.S. at 371-72. And courts consistently reject attempts to impose individual liability based on mere endorsement or after-the-fact agreement with another official's conduct. *See, e.g., Minix v. Stoker*, 289 F. App'x 15, 17 (5th Cir. 2008); *Harry v. Colvin*, No. A-13-CA-490-LY, 2014 WL 12642577, at *2 (W.D. Tex. Apr. 21, 2014).

EPIC's reliance on Ms. Tips' status as a TFSC member fares no better. *See* Response at 9. As mentioned earlier, EPIC does not allege that Ms. Tips had statutory authority to issue or veto cease-

and-desist letters, and the cited regulatory provision confers no such authority. *See* TEX. OCC. CODE § 651.101(a). Nor does EPIC allege that Ms. Tips or the other TFSC members voted on, ratified, or even discussed the enforcement action. EPIC now claims in its Response that Ms. Tips "exercised both *de facto* and *de jure* authority to direct the Executive Director's enforcement" (Response at 9), but that allegation is both conclusory and nowhere to be found in its FAC.

And there's another problem. EPIC alleges that Mr. Bingaman acted "*ultra vires*" by issuing the C&D Letter (*see* FAC ¶¶ 55–56), which by definition means that he acted "without any authority whatsoever." *Apter v. Dep't of Health & Human Serv.*, 80 F.4th 579, 586 (5th Cir. 2023). If that's true, then how could Ms. Tips be responsible for the effects of the letter by virtue of *her* legal authority over Mr. Bingaman? EPIC can't have it both ways. Either Mr. Bingaman acted outside the scope of his authority in issuing the C&D Letter, in which case Ms. Tips' alleged authority over him is irrelevant, or Mr. Bingaman acted within the scope of his authority, in which case Ms. Tips' alleged authority might be relevant—if it weren't for Section 1983's prohibition of supervisory liability. *See Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987). Either way, Ms. Tips cannot be held liable.

### C. EPIC fails to overcome qualified immunity.

If the Court finds that EPIC failed to allege Ms. Tips' personal involvement in a constitutional violation, it must also uphold Ms. Tips' qualified immunity *See* MTD at 11 (citing cases).

As EPIC admits, the alleged constitutional violations in this case arise exclusively from the C&D Letter. *See* Response at 10 ("EPIC does not allege that [Ms.] Tips violated the Constitution by sending text messages reflecting animus toward Muslims. EPIC alleges that she violated the Constitution by using her authority and influence to cause [TFSC] to issue a cease-and-desist order."). However, as described above, EPIC never alleges facts indicating that Ms. Tips was involved in drafting the C&D Letter or that she had the authority to overrule Mr. Bingaman's decision to send it. This failure ends the qualified immunity analysis. *See Jimerson v. Lewis*, 94 F.4th 423, 428 (5th Cir. 2024).

The remainder of EPIC's discussion of qualified immunity (incorrectly) presumes Ms. Tips' personal involvement in the C&D Letter and argues that the C&D Letter was unconstitutional under clearly established law.  Response at 10-15.  While Ms. Tips did not undergo that analysis in her MTD because EPIC had not made the threshold showing of personal involvement, she will do so now to close the loop on qualified immunity if any doubt remains as to its applicability.

Even if the Court determines that EPIC's Proposed SAC adequately alleges Ms. Tips's involvement in a constitutional violation, qualified immunity would still preclude individual-capacity liability because TFSC's enforcement action against EPIC did not violate any *clearly established* constitutional right.  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation and alteration omitted).  "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (quotation omitted). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).[4]

EPIC cannot identify any binding precedent placing it "beyond debate" that TFSC's enforcement action against it violates the First Amendment's Free Exercise Clause or the Fourteenth Amendment's Equal Protection Clause.  EPIC's Response cites to various cases, but none are sufficiently analogous to overcome qualified immunity.

EPIC first relies on *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, which involved municipal ordinances that were facially and operationally crafted to suppress a specific religious

---

[4] EPIC cites to *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), an Eighth Amendment case, for the proposition that "qualified immunity does not protect officials who violate 'obvious' constitutional commands, even in the absence of a case with the same facts."  D.E. 38 at 15.  But, as EPIC admits, the Fifth Circuit has explicitly declined to extend this "obvious" exception outside the Eighth Amendment context. *Id.* at n. 1 (citing cases). Moreover, even if *Hope* applied to religion cases, EPIC's allegations hardly present one of the few "rare cases" in which the alleged constitutional violation is so obvious that analogous case law is not needed. *Garcia v. Bermea*, No. 23-50871, 2024 WL 3326088, at *1 (5th Cir. July 8, 2024).

practice, with explicit discriminatory exemptions and a legislative record demonstrating targeting. 508 U.S. 520, 534-42 (1993). The ordinances in *Lukumi* which the Supreme Court held violated the Establishment Clause bear little resemblance to a single cease-and-desist letter enforcing a generally applicable licensing statute. The *Lukumi* decision did not clearly establish that an enforcement action becomes unconstitutional whenever a plaintiff alleges religious animus, particularly where (as here) the challenged action lacks the structural features that drove the court's analysis.

EPIC next relies on *Islamic Center of Mississippi, Inc. v. City of Starkville*, 840 F.2d 293 (5th Cir. 1988). There, the Fifth Circuit reviewed a developed record showing that a city treated a Muslim congregation's land-use application differently from churches and gave effect to community hostility. *Id.* at 301-03. Although the zoning ordinances at issue were facially neutral, the plaintiff Muslim organization was able to prove a First Amendment violation by showing that churches in similar areas were not able subject to the same restrictions, and that it was the only religious group which was ever denied an exception to the ordinances. *Id.* at 296-303. Here, EPIC's FAC contains no allegation that TFSC is allowing non-Muslim organizations to perform the type of unlicensed funeral rites which prompted the C&D Letter, much less that EPIC is the only organization being denied an exception to TFSC's licensure requirements.[5] *Starkville* is therefore inapposite and insufficient to show a violation of clearly established law.

The remainder of the Fifth Circuit and Supreme Court cases cited by EPIC articulate general constitutional principles, but none comes close to clearly establishing that issuing a cease-and-desist letter under a neutral licensing statute, on the allegations here, violates the law. *See, e..g., Armstrong, Oyler v. Boles*, 368 U.S. 448 (1962), *Rolf v. City of San Antonio*, 77 F.3d 823 (5th Cir. 1996), *Bryan v. City*

---

[5] EPIC alleges "upon information and belief" that TFSC has not sent cease-and-desist letters to non-Muslim entities for engaging in analogous unlicensed funeral or burial-related activities (*see* Proposed SAC at ¶ 106), but that could just as easily be because no organization other than EPIC has engaged in such unlicensed activities. EPIC does not allege, as the plaintiff showed in *Starkville*, that non-Muslim groups are actually being allowed to conduct the same violative activity without any enforcement action being taken.

*of Madison*, 213 F.3d 267 (5th Cir. 2000), *Yates v. Stalder*, 217 F.3d 332 (5th Cir. 2000), *Boyd v. McNamara*, 74 F.4th 662 (5th Cir. 2023); *see generally al–Kidd*, 563 U.S. at 742 ("We have repeatedly told courts ... not to define clearly established law at a high level of generality.").

In sum, EPIC has not identified Supreme Court or Fifth Circuit precedent that clearly establishes "beyond debate" that issuing the March 26, 2025 C&D Letter under a neutral occupational licensing statute violated the Constitution.  Thus, even assuming personal involvement by Ms. Tips, EPIC cannot overcome qualified immunity.

## VI.    CONCLUSION

Defendant Kristen Tips respectfully request that the Court dismiss all of Plaintiff's claims against her pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

BRIANA M. WEBB
Chief, Law Enforcement Defense Division
Co-Counsel
Texas State Bar No. 24077883
Briana.webb@oag.texas.gov

/s/ *Michael J. Calb*
MICHAEL J. CALB
Assistant Attorney General
Attorney-In-Charge
Texas State Bar No. 24126986
Michael.Calb@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080

COUNSEL FOR DEFENDANT KRISTIN TIPS

## CERTIFICATE OF SERVICE

I, **MICHAEL J. CALB**, Assistant Attorney General, do hereby certify that on December 18, 2025, a true and correct copy of the above and foregoing has been served on all counsel of record via the Court's electronic filing system.

*/s/ Michael J. Calb*
**MICHAEL J. CALB**
Assistant Attorney General