**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**FILED**

December 22, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: ___Christian Rodriguez___

DEPUTY

| | |
|---|---|
| **EAST PLANO ISLAMIC CENTER (EPIC),** | § |
| *Plaintiff* | § |
| | § |
| **v.** | § |
| | § |
| | § |
| **TEXAS FUNERAL SERVICES** | § |
| **COMMISSION, TEXAS FUNERAL** | § |
| **SERVICES COMMISSION EXECUTIVE** | § |
| **DIRECTOR in their official capacity, and** | § |
| **KRISTIN TIPS in her individual capacity.** | § |
| *Defendants* | |

Civil Action No. 1:25-cv-1085

<u>**PLAINTIFF'S SECOND AMENDED COMPLAINT AND**</u>
<u>**REQUEST FOR PERMANENT INJUNCTION**</u>

East Plano Islamic Center ("EPIC") brings this action to vindicate its longstanding right to conduct religious funeral and burial rites in accordance with Islamic faith and tradition—rights that belong not only to EPIC, but to its congregants and the broader Muslim community it serves. According to EPIC and its members' sincerely held religious beliefs, when a Muslim dies, the local religious community is obligated to perform the Janaza prayer before burial. For years, EPIC has performed these communal prayers and related rites without charge, in full compliance with Texas law, which expressly permits religious organizations to conduct such rites so long as they do not engage in commercial funeral services for compensation.

That changed on March 26, 2025, when the Texas Funeral Service Commission ("Commission"), through its Executive Director but at the bequest of the Commission's Presiding Officer, issued an unlawful cease-and-desist letter ordering EPIC to halt its religious practices and referring the matter for criminal investigation. The Commission's actions forced EPIC to suspend sacred funeral rites, chilled its exercise of religion, and caused funeral homes to refuse to transport

---

*Plaintiff's Second Amended Complaint*
*and Application for Permanent Injunction*

remains to EPIC for religious services—effectively barring Muslim families from practicing their faith in the moments that matter most.

This lawsuit challenges the Commission's illegal overreach and the discriminatory conduct of Commissioner Kristin Tips, Presiding Officer of the Commission, ("Presiding Commissioner Tips") whose contemporaneous communications with the Executive Director revealed open hostility toward Islam and demonstrated animus toward EPIC's faith.   Indeed, Presiding Commissioner Tips was a driving force behind the Commission's actions against EPIC and wielded considerable *de jure* and *de facto* supervisory control over the Executive Director, both generally and specifically as it applies to the adverse actions taken against EPIC.  Together, these actions violate the Texas and United States Constitutions and exceed the Commission's statutory authority under Chapter 651 of the Texas Occupations Code.   EPIC seeks declaratory and injunctive relief to stop this unconstitutional interference, protect the religious liberty of its community, and ensure that no family is forced to abandon its faith in a time of grief because of state harassment masquerading as regulation.

<u>PARTIES</u>

**A.** **Plaintiff**

1. Plaintiff East Plano Islamic Center ("EPIC") is a not-for-profit tax-exempt organization that has been formed exclusively for educational, religious, and social purposes. EPIC is registered with the Internal Revenue Service under revenue code 501(c)(3). EPIC's vision is to "establish a model community that serves Muslims and society-at-large with excellence, tolerance, and unity" and its mission is to "provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibilities and contribute to the betterment of

society by following the principles of Quran and the noble life of Prophet Muhammad (peace be upon him)." **Ex. 1** (EPIC Constitution) at art. II.A.–B.[1]

**B.    Defendants**

2.    Defendant Texas Funeral Services Commission (the "Commission") is a public state agency.  The Commission "employ[s] and supervise[s] an executive director to manage the administrative affairs of the commission under [Chapter 651]." TEX. OCC. CODE § 651.101.  The Commission also employs clerical and technical assistants, and investigators.  *See id.* at §§ 651.102–.103.  By statute, "[t]he [C]ommission's offices are located in Austin, Texas" and the Commission "shall meet in regular session in Austin at least once per calendar quarter to transact business."  *Id.* at §§ 651.058–.059.  The Commission's office is in the George H.W. Bush State Office Building, 1801 Congress Avenue, Suite 11.800, Austin, Texas 78701.

3.    Defendant Executive Director of the Commission is named in their official capacity only.[2]  During the underlying events described herein, the Commission's Executive Director was Scott Bingaman.  But on June 18, 2025, at a regularly held session, the Commission terminated Mr. Bingaman from that position and, upon information and belief, no successor has been

---

[1] EPIC's Constitution, Committee By-Laws, and other policies and procedures are available online. EPIC, ABOUT EPIC, https://epicmasjid.org/about-epic/ (last accessed June 26, 2025).

[2] *Cf.* Tex. R. App. P. 7.2(a) ("When a public officer is a party in an official capacity to an appeal or original proceeding, and if that person ceases to hold office before the appeal or original proceeding is finally disposed of, the public officer's successor is automatically substituted as a party if appropriate. Proceedings following substitution are to be in the name of the substituted party, but any misnomer that does not affect the substantial rights of the parties may be disregarded. Substitution may be ordered at any time, but failure to order substitution of the successor does not affect the substitution."); *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) ("A suit against a state official in his official capacity is not a suit against the official personally, for the real party in interest is the entity.").

appointed as of the date of this filing.[3]  At a meeting held on July 3, 2025, Maria Haynes was appointed as the Commission's interim executive director.[4]

4.      Defendant Kristin Tips has served on the Commission for more than eight years and has served as its Presiding Officer since May 6, 2024.  She is named in her individual capacity only.

## JURISDICTION

5.      This Court has subject matter jurisdiction over this lawsuit because the suit involves federal and state law claims regarding a state administrative agency where the relief and attorney's fees sought are within the jurisdictional limits of this Court.

6.      Sovereign immunity does not deprive this Court of subject-matter jurisdiction over any claim asserted herein.  Sovereign immunity does not bar EPIC's *ultra vires* claims seeking prospective injunctive and declaratory relief against the Commission Executive Director in their official capacity.  *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009); *Hartzell*, 672 S.W.3d at 311, 319–20.  The verified facts alleged herein demonstrate actionable *ultra vires* conduct by this state official, placing EPIC's *ultra vires* claims comfortably within this well-recognized exception to sovereign immunity.

7.      Sovereign immunity does not bar EPIC's claims against Defendants under the Texas Constitution because they seek only prospective injunctive and declaratory relief.  *See City of Elsa v. MAL*, 226 S.W.3d 390, 381 (Tex. 2007) ("In this case we reaffirm . . . governmental entities may be sued for injunctive relief under the Texas Constitution."); *Hartzell v. S.O.*, 672

---

[3] See *Executive director of Texas Funeral Service Commission fired*, by Brianna Hollis, KXAN, posted on June 19, 2025 https://www.kxan.com/news/texas/executive-director-of-texas-funeral-service-commission-fired/ (last accessed June 26, 2025).
[4] https://www.houstonchronicle.com/politics/texas/article/funeral-commission-interim-director-upheaval-20421484.php

*Plaintiff's Second Amended Complaint*
*and Application for Permanent Injunction*                                                    Page 4 of 49

S.W.3d 304, 319–20 (Tex. 2023).  The verified facts alleged herein demonstrate actionable violations of the Texas Constitution.

8.    Sovereign immunity does not bar EPIC's claims under 42 U.S.C. § 1983 seeking prospective injunctive, declaratory, and individual capacity relief against the Commission Executive Director in their official capacity or Presiding Commissioner Tips in her individual capacity.  *See Ex parte Young*, 209 U.S. 123 (1908); *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  For constitutional claims alleged under 42 U.S.C. § 1983, "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc.*, 535 U.S. at 646.  State officials may be held liable in their individual capacities under Section 1983, and such suits are not barred by the Eleventh Amendment.  *See Hafer v. Melo,* 502 U.S. 21, 25–31 (1991) (holding that state officials may be held personally liable in damages under § 1983 in their individual capacities).

9.    In addition to all the waivers and exceptions listed above, by removing this case to federal court, Defendants waived whatever sovereign or Eleventh Amendment immunity from suit they might otherwise have possessed.  *See Meyers ex rel. Benzig v. Tex.*, 410 F.3d 236, 252–53 (5th Cir. 2005).

10.    Finally, qualified immunity cannot shield Presiding Commissioner Tips's religious discrimination.  By March 2025, it was clearly established that the Constitution forbids targeting religious exercise with animus.  The Supreme Court has long held that official action "that targets religious conduct for distinctive treatment" violates the Free Exercise Clause.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993).  It has likewise condemned government action marked by "clear and impermissible hostility" toward religion.  *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 634 (2018).  Selectively

enforcing a licensing rule to shut down a mosque's funeral rites—while permitting comparable secular or other religious activities—flouts those principles.  It also violates the Equal Protection Clause, for more than a century the Court has warned that laws enforced "with an evil eye and an unequal hand" to disfavor a particular group are unconstitutional.  *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.")  And intentional discrimination on the basis of religion is subject to the most exacting scrutiny.  *Larson v. Valente*, 456 U.S. 228, 246 (1982).  No reasonable official in 2025 could believe that ordering a mosque to cease its Islamic rites—particularly while expressing overt anti-Muslim animus—was lawful.  This is the kind of "obvious" constitutional violation for which qualified immunity does not apply.  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

## VENUE

11.    As originally filed, venue was proper in Travis County because, among other things, Travis County is Defendants' principal office in this state.  *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3); TEX. OCC. CODE § 651.058.  Post-removal, the U.S. District Court for the Western District of Texas, Austin Division, is the proper federal venue because its county composition includes Travis County.  *See* 28 U.S.C. § 124(d)(1).

## BACKGROUND

A.    **The Commission's Statutory Authority and Historic Practices**

12.    The Commission derives its existence and statutory authority from Chapter 651 of the Texas Occupations Code.  Per Chapter 651, the Commission oversees the issuance and

regulation of licenses for funeral directors and embalmers, TEX. OCC. CODE §§ 651.251–267, for provisional license holders, *id.* at §§ 651.301–306, for funeral and commercial embalmer establishments, *id.* at §§ 651.351–354, and for crematory businesses, *id.* at §§ 651.656. The Commission establishes standards for license-holders, *id.* at §§ 651.401–410, and prohibits activities such as fraudulent and deceptive acts, *id.* at §§ 651.151, .451–.461. The Commission has disciplinary authority over license-holders and may assess administrative penalties, subject to administrative procedures. *See id.* at §§ 651.501–.559. If the Commission wishes to stop a funeral establishment, an embalmer, or a funeral director from operating, it "may bring an action for appropriate injunctive relief." *Id.* at § 651.601.

13.     Critical to understanding the scope of the Commission's authority are the definitions of the terms used throughout Chapter 651. A "funeral establishment" is "(A) a ***place of business*** used in the care and preparation for burial or transportation of a dead human body; or (B) any other place in which a person engages in, or represents the person to be engaged in, the ***business*** of embalming or funeral directing." TEX. OCC. CODE § 651.001(8) (emphasis added). "Funeral directing," in turn, is defined as "acts associated with or arranging for the disposition of a dead human body, ***performed by a person for compensation***, from the time of first call until: (A) inurnment, interment, or entombment services are complete; or (B) the body is permanently transported out of this state." *Id.* at § 651.001(7) (emphasis added). And a "funeral director" is a person "who engages in ***for compensation***, or represents to the public ***as being engaged in for compensation***, the preparation, other than by embalming, of a dead human body for burial or other disposition." *Id.* at § 651.001(6) (emphasis added).

14.     That is not to say that the Commission has no statutory authority over individuals who are not receiving compensation or entities who are not running a business. Subchapter J of

Chapter 651, entitled "Prohibited Practices," includes many violations that "a person" might commit (not a "funeral director" or "funeral establishment"). TEX. OCC. CODE §§ 651.451–460. For example, "[a] person violates this chapter if the person: refuses to promptly surrender a dead human body to a person or agent authorized to make funeral arrangements for the deceased." *Id.* at § 651.456(2). For prohibitions that apply to "a person," the Commission's authority extends to any person who commit the violation.

15.    But other prohibitions apply specifically to "a funeral establishment" or "a person associated with a funeral establishment," and, in those instances, the prohibition only applies to an entity that meets the definition of a funeral establishment. *E.g.*, *id.* at § 651.460(b)(1) ("A funeral establishment violates this chapter if the funeral establishment fails to substantially comply with Section 651.351."); *id.* at § 651.454 ("A person associated with a funeral establishment violates this chapter if the person solicits business or offers an inducement to secure or attempt to secure business for the funeral establishment unless the solicitation is made under a permit issued under Chapter 154, Finance Code.").

16.    Under Chapter 651, "[a] funeral establishment may not conduct a funeral business unless it is licensed by the [C]ommission." TEX. OCC. CODE § 651.351(a). But an organization who does not meet the definition of funeral establishment does not need to be licensed. And a religious organization praying over a deceased person as a religious activity for which compensation is not sought, not advertised, and not accepted does not meet the definition of a funeral establishment. *See id.* at § 651.001(8).

17.    As the Commission has recognized for the better part of 40 years, "[t]he law allows a family or friends to prepare and bury a body so long as they do not receive compensation for services, file a death certificate and obtain a burial transit permit." **Ex. 2** (Letter dated 12/09/87).

"Texas law requires that an individual or establishment be licensed only if they are engaged in directing funerals or preparing bodies for compensation." *Id.* In 1987, the Commission's then-Executive Director told the Islamic Center of Greater Austin ("ICGA") that it "may prepare and bury members of [its] mosque without being licensed by this agency so long as they follow the guidelines above." *Id.*

18. In 2014, a Commission Staff Attorney again confirmed that "there is no requirement in the State of Texas that a hospital or health care facility release a deceased person to a Funeral Director." **Ex. 3** (Letter dated 12/17/14). "The Commission has consistently maintained the position that family members and religious organizations may pick up and transport the bodies of members in keeping with their religious beliefs." *Id.* "Religious organizations may receive the bodies and transport the deceased to perform their burial services without the need of contracting a Funeral Establishment or Funeral Director." *Id.*

**B.    EPIC's Mission**

19. EPIC's vision is to "establish a model community that serves Muslims and society-at-large with excellence, tolerance, and unity" and its mission is to "provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibilities and contribute to the betterment of society by following the principles of Quran and the noble life of Prophet Muhammad (peace be upon him)." **Ex. 1** (EPIC Constitution) at art. II.A.–B. Its stated objectives are (1) to "strive to work in harmony with other Muslim and non-Muslim civic organizations to enhance our collective future"; (2) to "provide a full spectrum of valuable services and resources to the community in a transparent and fair way, leveraging a team of dedicated volunteers"; (3) to "provide a safe and nourishing environment for people of all ages and backgrounds to connect, pray, learn, play, and grow in accordance with the Quran and tradition of Prophet Muhammad

(peace be upon him)"; and (4) to "inspire and develop the future generation of responsible Muslims in America." *Id.* at art. II.C. EPIC membership is open to all who (1) "[s]ubscribe to the vision, mission[,] and objectives of EPIC as referenced [] in Article II," (2) "[a]gree to work under the general guidance of the EPIC [Board of Directors] in accordance with the Constitution of EPIC," (3) "[a]pply to be a member of EPIC," and (4) "Live within the following zip codes: [list of zip codes]." *Id.* at art. VI.A.

## C.    EPIC's Sincerely-Held Religious Beliefs

20.    One of the sincerely-held religious beliefs held by EPIC and its Muslim membership is the collective obligation held by the religious community to perform proper Islamic funeral rites for the deceased. To that end, EPIC offers traditional, non-commercial Muslim funeral services and burials, especially for Muslim families unable to afford the services.

21.    Islam mandates specific funeral rites as a matter of religious obligation. "Proper burial including *salat al janazat* is one of the 5 cardinal duties of brotherhood in Islam." *Islamic Ethico-Legal Perspective On Embalming, Cryopreservation*, Autopsy & Dead Corpse Research (paper presented at a training workshop on medical ethics at Nairobi on 26th July 2008 by Professor Dr Omar Hasan Kasule Sr. MB ChB (MUK), MPH (Harvard), DrPH (Harvard)). The traditional Muslim rites include the ritual cleansing (Ghusl), shrouding, funeral prayer (salatul janazah), and burial in a dedicated Muslim cemetery. Muslims do not cremate, nor do they embalm their dead, which is considered "haram," *i.e.*, forbidden, as a desecration of the human body, which is sacred. Islam is similar to orthodox Judaism and the Baha'i Faith in this respect. Instead, a simple burial of the shrouded body is performed. Islamic religious law calls for prompt ritual cleansing, shrouding, prayer, and burial in which the integrity and dignity of the decedent's remains

are scrupulously maintained throughout.  After the burial, a condolence gathering is typically held within a day or two to support the grieving family.

22.    The economic cost of these religious rites for EPIC is very modest.  The Imam's services are donated as part of his ministry.  He is assisted in the cleansing and shrouding by a limited number of family members of the decedent and volunteers from the congregation. Transportation of the decedent's remains are coordinated using a proper person or entity.  Voluntary monetary contributions toward these costs by the family of the decedent and members of the Muslim community are encouraged and accepted, but contributions are never required as a condition of receiving the traditional cleansing, prayer, and burial services given.

23.    The Janaza prayer is an individual Sunnah (a teaching and practice of the Prophet Muhammad (peace be upon him)), but a *communal* obligation.  As Shaykh Dr. Yasir Qadhi explained in a video posted on EPIC's Youtube page in February 2022: "Some Muslims *must* take care of every Janaza in their community such that even if a stranger dies in a Muslim land, in a Muslim resident area—if a stranger dies, but we know he's a Muslim, dies [with] no relatives [and] no one [in the area]—the community is obligated in totality. . . *somebody* has to go and do Janaza and take care of this person.  It is a communal obligation." [5]

24.    In sum, it is an important part of EPIC's beliefs and the beliefs of its membership that the community come together to observe the Janaza prayer whenever a member of their religious community dies and seeks their assistance performing the requisite rites.

---

[5] Youtube, EPIC Masjid, *Whats is the Proper Procedure for the Janaza Prayer? | Q&A | Shaykh Dr. Yasir Qadhi*, https://youtu.be/xeOrQNir6es?si=KiLw2MK-Vhax-G7xd (last accessed June 28, 2025).  A general description of the proper procedure for the Janaza prayer according to Shaykh Dr. Yasir Qadhi begins at the timestamp 10:47.

**D.      EPIC's Religious Practices Regarding Deceased Members (2016–2025)**

25.      Because of the prompt burial requirements of Islamic law (ideally within 24 hours), and the importance of holding a Janaza prayer at a mosque in the interim, EPIC has attempted to support the emotional, religious, and financial needs of its members and those within its religious community as it relates to Islamic funeral rites, as well as providing critical logistical assistance during a difficult time for the loved ones of the deceased.  To be clear, EPIC does not own a cemetery and has never operated a funeral establishment.  But EPIC operates a mosque where members of the community may gather for the Janaza prayer and has, for years, worked with its membership, funeral establishments, and local cemeteries (such as the Farmersville Muslim Cemetery) to ensure at Muslims who have died receive the Janaza prayer prior to a timely burial.  For example, in 2016, when a high school student and member of EPIC's religious community unexpectedly passed away after a tragic accident, EPIC performed the funeral service (with Janaza prayer) before the deceased youth was buried in the Restland Cemetery in Richardson, Texas.[6]

26.      During the Covid-19 pandemic, EPIC would sometimes host the Janaza prayer in the EPIC Masi (mosque) parking lot, to ensure "social distancing":

---

[6] Friends Remember Wylie HS Student Who Died Jumping into Lake Lavon, NBCDFW, first published June 22, 2016 https://www.nbcdfw.com/news/local/search-for-missing-child-in-lake-lavon/229655/ (last accessed June 27, 2025).



**Janaza Prayer Today at EPIC Masjid Parking Lot**

We are deeply sadden to inform the community that Br. ▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ has passed away due to COVID complications. Inna Lillahi Wa Inna Alaihi Rage'oon.  Will of Allah SWT!

Janaza Prayer Today; 01/07/21 at the EPIC Masji Parking Lot after Dhuhr Prayer at 2:00 pm Insh'Allah.
EPIC Address: 4700 14th St. Plano 75074

*Everyone attending the Dhuhr Prayer at EPIC and Janaza Prayer must bring his own prayer rug and must wear mask*

**Subsequent Burial will be done at the Denton Cemetery**

Please keep the departed soul and his family in your prayers. May Allah SWT grant the departed soul the highest place in Jennah and grant the Sabr-e-Jamil  to the aggrieved family. انا لله  وَ انا اليه راجعؤن

With our Condolences, sympathies & Prayers::
The MIA Shura

27.     Just to pick one example among many, in February 2024, when a member of the religious community tragically passed away in a bike accident, the religious ceremony was conducted at the EPIC mosque with burial to follow at the Farmersville Muslim Cemetery (different location).  While EPIC helped organize the logistics and organized the community Janaza prayer, the burial itself was conducted by a funeral establishment and funeral director—not by EPIC.



28.     EPIC did not receive compensation for its services, it did not file a death certificate, it did not obtain the burial transit permit.  EPIC did not transport the deceased or dispose of the body.  And, as the Commission has long recognized, "[t]he law allows a family or friends to prepare and bury a body so long as they do not receive compensation for services, file a death certificate and obtain a burial transit permit."  **Ex. 2** (Letter dated 12/09/87).  Under Chapter 651, EPIC was not engaged in funeral service operations as a matter of law.

29.     Nevertheless, on March 26, 2025, the Commission's Executive Director issued a cease and desist letter to EPIC, "order[ing]" EPIC "to cease and desist funeral service operations" and "making a criminal referral to the Collin County District Attorney."  **Ex. 4** (Letter dated 03/26/25).  Understanding why this happened after years of EPIC performing the Janaza prayer without protest requires a little background.

### E.    Hysteria About "Sharia Law" Leads to a Witch Hunt

30.    In recent years, EPIC began planning "EPIC City," a 402-acre development near Joesphine, Texas.  The 402-acre site was purchased in September 2024, and is slated for a planned development with 1,000 homes, a mosque, a K-12 religious school, a senior living center, and retail space.  This development caught the attention of some misguided activists who began posting on social media, raising an alarm about the rise of the rise of "Sharia law" in Texas.  Persons affiliated with the RAIR Foundation USA (Rise Align Ignite Reclaim) sought to the alarm.  RAIR describes itself as a "grassroots activist organization comprised of everyday Americans leading a movement to reclaim our Republic from the network of individuals and organizations waging war on Americans, our Constitution, our borders and our Judeo-Christian values."[7]  One of the main targets in RAIR's self-described "war" are patriotic, law-abiding Muslim Americans, including EPIC's leadership and members.

31.    On February 14, 2025, the founder and editor-in-chief at the RAIR Foundation posted a 222-word long incendiary Tweet about EPIC (excerpted in part below):



_____

[7] RAIR Foundation USA, About Us, https://rairfoundation.com/about/ (last accessed on June 27, 2025).

32.     This Tweet, which received over 2.4 *million* views, expressed bigoted anti-Muslim sentiments, peddled in baseless alarmism about EPIC, and pressured Republicans to "speak out." A few weeks later, Republicans did.

33.     On February 24, 2025, responding to a Tweet by the same individual, Governor Abbot tweeted:



34.     On February 27, 2025, State Representative Jeff Leach sent a letter to Attorney General Ken Paxton stating that the proposed EPIC City Community real estate development "may seek to incorporate elements of Sharia law into its operations" and urging General Paxton to "initiate an immediate review and investigation."

35.     In late March 2025, the situation rapidly escalated.  State officials began a multi-pronged, highly publicized assault on EPIC based on its religious affiliation (Muslim).  This manifested as hysteria about Sharia law and accused law-abiding Muslim Americans of being a veritable "fifth column."

36.     On March 24, 2025, Governor Abbott tweeted:



37.    On March 25, 2025, Attorney General Paxton issued a Civil Investigative Demand

as part of an ongoing investigation into EPIC City, tweeting:



38.    On March 27, 2025, Governor Abbott issued a press release announcing that the Texas State Securities Board launched an investigation into EPIC and its affiliated entities for "potential failures to comply with applicable state and federal securities requirements."

39.    On March 28, 2025, Governor Abbott announced that the Texas Workforce Commission had opened an investigation into EPIC and any affiliated entities for potential discrimination in violation of the Texas Fair Housing Act.

40.    On March 31, 2025, Governor Abbott directed the Texas Rangers to open an investigation into EPIC and any affiliated entities for potential criminal activities, again issuing a press release to publicize his actions.

41.    On April 1, 2025, Governor Abbot tweeted again about EPIC and "Sharia law."



42.    That same day, the Texas Commission on Environmental Quality issued a letter to EPIC's President and Community Capital Partners LP's President noting that EPIC has not obtained all the authorizations and permits required from TCEQ prior to development instructing

them not to engage in any construction or pre-construction activities in violation of state law.  (Of course, EPIC had no intention of breaking ground without first obtaining the proper permits.).  On April 23, 2025, Attorney General Paxton issued two press releases indicating that it was "expanding its investigation into EPIC City, which is affiliated with East Plano Islamic Center ('EPIC'), by demanding documents from local city officials potentially tied to the real estate development" and from Plano Independent School District officials "after being made aware of potential connections between school board members and East Plano Islamic Center ('EPIC'), which is affiliated with EPIC City."

43.    It is unclear why Attorney General Paxton was concerned that a religious organization in the City of Plano with members living in the City of Plano would have ties to Plano city officials and Plano school district officials.  But it is telling that Attorney General Paxton announced the investigations by re-tweeting activists known for their virulent Islamophobia and anti-Muslim fear-mongering.





**44.** Indeed, as oft' re-tweeted founder and editor-in-chief at the RAIR Foundation would tellingly put it:



## F.    The Commission Issues a Cease-and-Desist Letter

**45.** It was during, and in furtherance of, this maelstrom that the Commission issued its cease-and-desist letter ("C&D Letter") to EPIC, having "determined that you are operating as a funeral home without an establishment license in violation of Tex. Occ. Code § 651.351." **Ex. 4** (Letter dated 03/26/25). To be clear, EPIC was not operating a funeral home without an establishment license. As discussed above, EPIC led community prayers over the deceased as an exercise of its sincerely-held religious beliefs. EPIC also coordinated with licensed funeral establishments to arrange for the transportation of the deceased to and from the mosque where these prayers were performed. But EPIC did not profit from these activities, nor was it in the

funeral business. Unfortunately, the Commission and its Executive Director singled out EPIC for disparate treatment because of its Muslim religious affiliation.

46. Indeed, so intent were Defendants on discriminating against EPIC based on its religious affiliation and the sincerely-held religious beliefs of its members, that the Executive Director declared that he was "making a *criminal* referral to the Collin County District Attorney." **Ex. 4** (Letter dated 03/26/25) (emphasis added).

47. Not only were the Executive Director's actions discriminatory, but they were also unsupported by his statutory authority. While the Commission has the general disciplinary power to "issue a reprimand, assess an administrative penalty, revoke, suspend, or probate the suspension of a license or provisional license, order a license holder to pay a refund under Section 651.603, or impose any combination of those penalties for a violation of this chapter or a rule adopted under this chapter," it may do so only "[a]fter a hearing as provided by [Subchapter K]." TEX. OCC. CODE § 651.501(a). The Commission did not provide a hearing as provided by Subchapter K. Moreover, nothing in Subchapter K authorizes the Commission to issue an order prohibiting a non-license-holder from operating. *See id.* §§ 651.501–.508. While the Commission may assess administrative penalties against a person regulated by Chapter 651 if the Commission determines that the person has violated Chapter 651, it may do so only after providing a hearing. *Id.* at §§ 651.551, .553–558. And even there, the penalty is a monetary fine, not an order prohibiting future operations. *Id.* at § 651.552. To stop a non-license-holder who is allegedly operating a funeral establishment from operating, the Commission must "bring an action for appropriate injunctive relief." *See id.* at § 651.601(a). Needless to say, the Commission did not pursue this legal option, likely because it would have been unable to obtain such relief if forced to meet its burden of proof in a court of law.

48.     As a result of Defendants' discriminatory and *ultra vires* conduct, March 26, 2025, was the last day EPIC has performed funeral rites for members of its religious community or host the communal Janaza prayer at its mosque without incurring further retaliation. As a result of Defendants' order, EPIC is unable to conduct this important religious service in its place of worship. The result has been that EPIC has seen 11 of its congregants pass without receiving funeral rites at their home mosque since March, with an unknown number facing a similar fate without intervention from this Court. Thus, EPIC has no choice but to initiate this litigation to vindicate its rights.

**G.     Presiding Commissioner Kristin Tips's Authority and Influence**

49.     Defendant Kristin Tips is a member and Presiding Officer of the Texas Funeral Service Commission and served in that capacity during the Commission's investigation of EPIC and issuance of the March 26, 2025 cease-and-desist order.

50.     By statute, the Executive Director is "employ[ed] and supervise[d]" by the Commission. TEX. OCC. CODE § 651.101(a). "The commission shall determine the terms and conditions of the executive director's employment and set the executive director's salary. . . ." *Id.* "In the event of the Executive Director's absence or if the Executive Director is unable to act, the Presiding Officer of the Commission may designate an Acting Executive Director to perform the Executive Director's duties." 22 TEX. ADMIN. CODE § 201.13(c). The Presiding Commissioner is a member of the commission appointed by the Governor. TEX. OCC. CODE § 651.057(a). The Presiding Commissioner "shall preside at all meetings of the commission, unless otherwise ordered, and shall exercise all duties and performances incident to the office of presiding officer." *Id.* § 651.057(c).

51.    In practice, Presiding Commissioner Tips was not a passive or ceremonial Chair of the Commission.  She exercised direct supervisory authority and operational control over Executive Director Scott Bingaman ("Bingaman"), including over enforcement priorities, investigative activity, cease-and-desist decisions, statutory interpretations, and agency communications.

52.    Presiding Commissioner Tips has served on the Commission for more than eight years and has served as its Presiding Officer since May 6, 2024, when she was appointed by Governor Abbott.  In contrast to Presiding Commissioner Tips' many years on the Commission, Bingaman had only been appointed Executive Director in September 2024, some six months prior to sending the C&D Letter at issue in this litigation.  Documents produced in discovery reveal that, prior to a falling out circa June 2025, Bingaman had an extremely deferential relationship with Presiding Commissioner Tips.  He typically referred to her as "Madam Chair" in emails and displayed a humble tone bordering on obsequiousness.  For example, on December 10, 2024, when submitting the Agency's recommended statutory changes, when addressing the "Madam Chair," Bingaman emphasized that "these are only recommendations.  Since policy rests with the Commissioner[]s, I only provide advice and consent at this point and am not beholden to any of the recommendations made in this document."  On multiple occasions, Bingaman also submitted draft orders to Presiding Commissioner Tips—and only her, not to the other Commissioners— prior to finalizing the orders.

53.    Bingaman repeatedly treated Presiding Commissioner Tips as his direct supervisor, referring to her as "boss" and "ma'am" in their text messages, seeking her permission before taking action, and expressly deferring to her judgment on enforcement issues. In multiple communications, Bingaman asked Presiding Commissioner Tips whether he was "able to

proceed," whether she wished him to make contact with various government officials and private parties, whether and how he should respond to inquiries, what statutory language he should use, and whether he should issue or finalize enforcement documents.

54.     Presiding Commissioner Tips did not merely provide general oversight. She personally edited enforcement letters, corrected statutory citations, dictated the wording of violations, directed the timing of enforcement actions, instructed Bingaman on when to coordinate with law enforcement, and approved—line-by-line—drafted administrative orders, regulatory notices, and enforcement-related guidance.

55.     Presiding Commissioner Tips also exercised personnel authority and operational leverage over Bingaman, directing human-resources decisions, badge renewals, access permissions, and internal agency reporting structures—further ensuring his subordination to her authority.

56.     Such was Presiding Commissioner Tips' influence over Bingaman, that just two months before sending the C&D Letter, Bingaman submitted a letter to the Governor at Presiding Commissioner Tips's direction.  This letter submitted requests for legislative change that the Executive Director later characterized as "self-serving" (for Presiding Commissioner Tips's personal business running a funeral home) and "misleading" in a letter to the full Commission sent in June 2025.[8]  Shortly after Bingaman submitted this letter to the Commission, he was fired from his position as Executive Director—effectively confirming Presiding Commissioner Tips'

---

[8] https://www.kxan.com/wp-content/uploads/sites/40/2025/07/0617-BINGAMAN-letter.pdf (last accessed on November 25, 2025).

influence over the Commission and that, during the relevant time period for *this* litigation, his prior deference to her was warranted.[9]

## H.    Presiding Commissioner Tips's Pre-C&D Letter Conduct Demonstrating Control

57.    Presiding Commissioner Tips was closely involved in the events leading and following the Executive Director's March 26, 2025 C&D Letter to EPIC.  Throughout early 2025, and including the period immediately surrounding the C&D Letter, Tips maintained near-daily, real-time supervisory communication with Bingaman via phone, text, and email. In these communications, Tips gave direction, instruction, edits, approvals, and strategic guidance on enforcement matters, draft orders, press releases, investigations, legislative responses, and interactions with regulated entities.

58.    In the weeks leading up to EPIC's C&D Letter, Presiding Commissioner Tips directly supervised and approved multiple cease-and-desist actions involving other entities (including MERI, mortuaries, anatomical facilities, and unlicensed operators).  For each such action, Presiding Commissioner Tips reviewed drafts, corrected statutory language, instructed on the timing of issuance, and directed the content of agency communications.  Bingaman did not issue cease-and-desist notices without her involvement.  This pattern shows that cease-and-desist determinations were an area in which Presiding Commissioner Tips exercised hands-on, operational authority, and that Bingaman routinely relied on and followed her direction when deciding whether, when, and how to issue cease-and-desist orders.

59.    While the Executive Director formally signed and transmitted the C&D Letter, Presiding Commissioner Tips actively participated in the Commission's handling of EPIC's matter.

---

[9] https://www.keranews.org/government/2025-07-28/texas-funeral-service-commission-fired-staff-allege-unethical-behavior-by-agency-head-kristin-tips (last accessed November 25, 2025).

She communicated directly with the Executive Director and other Commission officials during the same period the order was being prepared and enforced. On March 25, 2025, the day before the challenged EPIC enforcement action, Presiding Commissioner Tips and Bingaman were in direct communication regarding enforcement matters, including how to respond to an Attorney General letter, how to handle politically sensitive complaints, and how to manage lobbyist outreach and legislative pressure—all of which Bingaman expressly deferred to Presiding Commissioner Tips to resolve. During these discussions, Tips issued direct instructions regarding agency posture, messaging, and enforcement strategy. Indeed, at 4:32 PM the day before the Executive Director issued the C&D Letter to EPIC, Presiding Commissioner Tips forwarded a press statement from the Texas Attorney General regarding EPIC to Bingaman. No message was included in the body of this email, as no further context was needed for the correspondence. It was merely a small part of a larger ongoing conversation between the two officials about EPIC and the Commission's forthcoming actions against it.

60.     Presiding Commissioner Tips's involvement the day before the EPIC C&D Letter was not incidental. As with prior enforcement matters, Bingaman acted only after receiving Tips's guidance, approval, or direction. This operational pattern existed before, during, and after the EPIC-related events, and the March 25 communications were consistent with their established supervisory relationship.

61.     Indeed, on the morning of March 26, 2025, just hours before Executive Director Bingaman signed and sent the C&D Letter to EPIC, lobbyists contacted TFSC seeking to meet about "the moratorium and the cease-and-desist letters." Bingaman promptly alerted Presiding Commissioner Tips, who directed him to "hold tight," instructed him not to respond, and informed him she was coordinating with the Governor's office regarding the enforcement activity.

Bingaman confirmed he was awaiting her "instructions." Again, these communications demonstrate the control over the Executive Director that Presiding Commissioner Tips wielded on the very day that he sent the C&D Letter at issue in this case.

62. Later, but still on the same day that Executive Director Bingaman issued the C&D Letter to EPIC, a staff attorney sent an email to another Commission employee regarding the EPIC investigation, attaching a copy of the letter. The staff attorney "cc"ed the Executive Director but "bcc"ed Presiding Commissioner Tips. This communication is emblematic of the two officials' public and private roles as it relates to the Commission's actions against EPIC: with the Executive Director serving as the public face but with Presiding Commissioner Tips operating behind the scenes. It also shows how closely she was following (or, rather, directing) the Commission's actions with regards to EPIC.

63. Presiding Commissioner Tips's supervisory control, directive authority, and established pattern of influencing enforcement decisions created relationship, wherein Bingaman executed enforcement actions in reliance on, and in deference to, Presiding Commissioner Tips's input, expectations, and directives.

64. The issuance of the March 26, 2025 EPIC C&D Letter—purportedly signed by Bingaman—was the direct product of this supervisory dynamic. Bingaman acted under Presiding Commissioner Tips's ongoing oversight, direction, and approval concerning enforcement strategy and agency posture at the time.

## I.    Presiding Commissioner Tips's Discriminatory Motive

65. During this same period, Presiding Commissioner Tips circulated and endorsed materials expressing hostility toward Islam, including content asserting that Muslims are "taught hate" and that Islam promotes violence and inferiority compared to other religions. These

communications occurred in the same timeframe as the challenged EPIC enforcement decision and reflect Presiding Commissioner Tips's discriminatory animus toward Muslim religious practices, including those conducted by EPIC.

66.    EPIC's funeral-rite practices are an expression of Muslim religious belief. Tips's anti-Muslim statements, combined with her supervisory control over the enforcement process and direct involvement in enforcement decisions, plausibly demonstrate that her discriminatory motive proximately caused the decision to target EPIC's religious rites through the March 26 C&D Letter.

67.    Indeed, publicly released text messages between Presiding Commissioner Tips and Bingaman show that, at the very time the Commission was pursuing enforcement against EPIC, she circulated anti-Muslim materials, including a video suggesting EPIC's planned development would "breed terrorists," and affirmatively agreed with Bingaman's comment that it is "tough to be tolerant when taught hate."  *See* **Ex. 5** (KERA News Article).[10]

---

[10] Toluwani Osibamowo & Penelope Rivera, *Head of Texas Funeral Commission Shared Anti-Islam Media, Pictures of Muslim State Rep. in Texts*, KERA News (Aug. 16, 2025, 4:37 PM), https://www.keranews.org/government/2025-08-16/texas-funeral-service-commission-kristin-tips-anti-islam-media-scott-bingaman-suleman-lalani.



A message from Texas Funeral Service Commission Presiding Officer Tips, left, shows a graphic comparing Judaism, Christianity and Islam along with a link to a video by YouTuber Tal Oran. Scott Bingaman, then the executive director of the commission, responds with the message on the right.

68.    In those same exchanges, Presiding Commissioner Tips endorsed and agreed with Bingaman's comments suggesting that Muslims are "taught hate" and are inherently suspect. Presiding Commissioner Tips further distributed images and videos portraying Islam as incompatible with American society, including a photograph of a Muslim state legislator taking his oath of office on a Qur'an as if that were improper or disloyal. *Id.*

69.    These communications occurred while the Commission was deliberating how to address EPIC's religious funeral rites and immediately before and after the March 26, 2025 cease-and-desist order. Presiding Commissioner Tips's hostility toward EPIC's faith and her approval of disparaging comments about Islam demonstrate that the Commission's actions were motivated by religious animus rather than any legitimate regulatory concern.

70.    Taken together, these facts show that Presiding Commissioner Tips (1) exercised supervisory and operational authority over the Executive Director; (2) regularly directed the

content, timing, and substance of enforcement decisions; (3) was actively involved in enforcement-related deliberations the day before the EPIC C&D Letter; and (4) harbored animus toward Muslim religious practices of the kind EPIC conducts.  By taking a leading role in the Commission's actions against EPIC, Presiding Commissioner Tips personally contributed to and ratified the discriminatory treatment of EPIC's religious exercise.  Her conduct reflects purposeful targeting of a Muslim institution for adverse action, in violation of EPIC's constitutional rights. Accordingly, Presiding Commissioner Tips's actions were a moving force and proximate cause of the unconstitutional enforcement action against EPIC. The March 26, 2025 C&D Letter is fairly traceable to her conduct and influence.

**CAUSES OF ACTION**

**Count 1:**      *Ultra vires* **claim (against the Commission Executive Director)**

**71.**      EPIC incorporates the foregoing paragraphs as if fully restated herein.

**72.**      Sovereign immunity does not bar an *ultra vires* suit seeking prospective injunctive relief against a state official in their official capacity for acting unlawfully.  *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372–73 (Tex. 2009).  "To fall within this *ultra vires* exception, a suit . . . must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id.* at 372.  "An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017).  A government officers acts without legal authority if he exceeds the bounds of his granted authority or if his acts conflict with the law itself.  *Houston Belt & Terminal Railway Co. v. City of Houston*, 487, S.W.3d 154, 158 (Tex. 2016).

**73.** Here, by issuing the C&D Letter to EPIC on March 26, 2025, the Commission's Executive Director exceeded the bounds of the authority granted to him by Chapter 651. The Executive Director lacks statutory authority to prohibit EPIC from engaging in the religious practices in which it was engaged at the time of the C&D Letter for two distinct reasons. *First*, nothing in Chapter 651 authorizes the Commission to order non-license-holders from operating a funeral establishment without obtaining an injunction. *Second*, EPIC falls outside of the Commission's statutory authority altogether because it was not operating a "funeral establishment" as a matter of law. As shown by the verified facts, EPIC was not running a place of business and was not in the business of embalming or funeral directing. *See* TEX. OCC. CODE § 651.001(8). Indeed, funeral directing, by definition, is performed by a person for compensation. *See id.* at § 651.001(7).

**74.** EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to organization of religious rites for a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

75.      EPIC further asks this Court to issue a declaration pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code (the "Uniform Declaratory Judgment Act" or "UDJA"). "The stated purpose of the UDJA is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b). A declaratory judgment is appropriate where there is a justiciable controversy about the rights and status of the parties and the requested declaration will solve that controversy. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995). EPIC asks this Court to declare that its planned activities surrounding the performance of religious funeral rites are not funeral service operations and are not prohibited by Chapter 651.

**Count 2:      Violation of Texas Religious Service Clause under Article I, Section 6-a of the Texas Constitution (against the Commission and the Commission's Executive Director)**

76.      EPIC incorporates the foregoing paragraphs as if fully restated herein.

77.      "The people of Texas voted to amend the Texas Constitution in 2021 by adding a new clause," the Texas Religious Service Clause, which prohibits the state or a political subdivision of this state from "enact[ing], adopt[ing], or issu[ing] a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief." *Perez v. City of San Antonio*, 715 S.W.3d 709, 717 (Tex. 2025); TEX. CONST. art. I, § 6-a. Where it applies, the Religious Service Clause "categorically bars a governmental prohibition or limitation on religious services without regard to whether it passes strict scrutiny or any other test that balances the right against the government's interests." *Perez*, 715 S.W.3d at 723.

78.    As a state agency, the Commission is the state or a political subdivision of this state. EPIC is a religious organization established to, among other things, support and serve the propagation of a sincerely held religious belief.  Defendants' March 26, 2025 order prohibited or limited EPIC's religious services, including religious services conducted in a place of worship.  As such, the Religious Service Clause applies.  "When the Texas Religious Services Clause applies, its force is absolute and categorical, meaning it forbids governmental prohibitions and limitations on religious services regardless of the government's interest in that limitation or how tailored the limitation is to that interest. . . ."  *Perez*, 715 S.W.3d at 730.  Defendants' order violated this constitutional prohibition.

79.    EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

80.     EPIC further asks this Court to issue a declaration pursuant to the UDJA, declaring that its planned activities surrounding the performance of religious funeral rites are activities protected by the Texas Religious Service Clause.

**Count 3:        Violation of Freedom of Worship under Article I, Section 6 of the Texas Constitution (against the Commission and the Commission's Executive Director)**

81.     EPIC incorporates the foregoing paragraphs as if fully restated herein.

82.     Even before the enactment of the Religious Service Clause in 2021, "[t]he Texas Constitution [already] grant[ed] greater religious freedom than is provided for in the United States Constitution." *See Howell v. State*, 723 S.W.2d 755, 758 (Tex. App.—Texarkana 1986, no writ). The Texas Constitution recognizes that "[a]ll men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences." TEX. CONST. art. I, § 6. "No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion, and no preference shall ever be given by law to any religious society or mode of worship." *Id.* Indeed, "it shall be the duty of the Legislature to pass such laws as may be necessary to protect equally *every* religious denomination in the peaceable enjoyment of its own mode of public worship." *Id.* (emphasis added).

83.     Defendants' March 26, 2025 order and any future such actions taken to restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, violates EPIC's (and its members') freedom of worship under the Texas Constitution. As such, EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving

and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

84.     EPIC further asks this Court to issue a declaration pursuant to the UDJA, declaring that its planned activities surrounding the performance of religious funeral rites are activities protected by the Texas Freedom of Worship Clause under Article I, Section 6 of the Texas Constitution.

**Count 4:     Violation of Right to Free Exercise under the First Amendment of the United States Constitution brought under 42 U.S.C. § 1983 (against the Commission's Executive Director)**

85.     EPIC incorporates the foregoing paragraphs as if fully restated herein.

86.     "To state a section 1983 claim, 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)). Here, EPIC has alleged a violation of its right to free exercise secured by the First Amendment's Free Exercise Clause committed by the Commission's Executive Director while acting under color of state law. The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST., amend I. The Supreme

Court has long "held the [Free Exercise] Clause applicable to the States under the terms of the Fourteenth Amendment." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (citing *Cantwell v. Connecticut*, 310 U. S. 296, 303 (1940)).  The Free Exercise Clause of the First Amendment protects religious activities. *Id.* at 523.  Indeed, "[i]t does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

87.    "[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525. (quoting *Smith*, 494 U.S. at 525).  If the government acts pursuant to a seemingly neutral policy but a religious exercise is its "object," it fails the general applicability requirement.  *Id.* at 526.  Likewise, "[a] government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way' or if it provides 'a mechanism of individualized exemptions'" and does not extend such exemptions to cases of religious hardship. *Id.* (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)).  Should the plaintiff make this showing, the "Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* at 525.

88.    Here, the Commission's Executive Director has singled out EPIC's religious conduct while permitting secular conduct.    Upon information and belief, non-Muslim organizations are permitted to engage in the same activities as EPIC—just as EPIC itself engaged

in the activities for years without issue prior to Islamophobic concerns about "Sharia law" being raised. And the Executive Director lacks a compelling governmental interest for its order, which is also not narrowly tailored. For all these reasons, March 16, 2025 order's ongoing prohibition constitutes an ongoing violation of federal law (the First Amendment) and EPIC asks this Court for prospective injunctive relief.

89.    EPIC respectfully asks this Court to issue prospective injunctive relief prohibiting the Commission's Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate).

90.    EPIC further asks this Court to issue a declaration pursuant to the UDJA, declaring that its planned activities surrounding the performance of religious funeral rites are activities protected by the Free Exercise Clause of the First Amendment, as applied to the State of Texas through the Fourteenth Amendment.

**Count 5:     Violation of Violation of the Texas Religious Freedom Restoration Act—Against the Texas Funeral Service Commission**

91.     EPIC re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92.     The Texas Religious Freedom Restoration Act ("TRFRA") provides that a government agency may not substantially burden a person's free exercise of religion unless it demonstrates that imposing that burden on the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *See* TEX. CIV. PRAC. & REM. CODE § 110.003(a)–(b).  In other words, TRFRA mandates a strict scrutiny standard: the government cannot substantially interfere with religious exercise absent a compelling reason, pursued through the narrowest possible means. *See, e.g.*, *Barr v. City of Sinton*, 295 S.W.3d 287, 296–97 (Tex. 2009) (explaining that under TRFRA, once a substantial burden on religion is shown, the government must meet strict scrutiny).

93.     EPIC's practice of performing Islamic funeral rites for its congregants—including the washing, shrouding, prayer, and other burial preparations conducted according to Islamic faith—constitutes the "free exercise of religion" under TRFRA. These activities are carried out as a direct expression of EPIC's sincerely held religious beliefs and are central to the practice of the Islamic faith in EPIC's community. The Texas Funeral Service Commission's March 26, 2025 cease-and-desist order, issued through its Executive Director, substantially burdened EPIC's free exercise of religion by prohibiting EPIC from performing these essential religious rites at its own mosque. Under the cloud of this order (and the threat of civil or criminal penalties for non-compliance), EPIC had no choice but to stop engaging in its religious funeral services, thus impeding the congregation's ability to fulfill a fundamental religious obligation.

94.     The Commission's action in banning EPIC's religious funeral practices cannot withstand TRFRA's strict scrutiny test. Preventing a religious institution from carrying out time-

honored and sacred burial rites does not further any compelling governmental interest. There is no evidence of a genuinely compelling interest (such as public health or safety) that required completely shutting down EPIC's religious ceremonies, especially given that EPIC was not engaging in any secular funeral-home business activities (no embalming, no commercial services, etc.). Even assuming, arguendo, that the Commission had a compelling regulatory interest, the means chosen—an outright cease-and-desist order against all of EPIC's religious funeral rites— was far from the least restrictive means of furthering any such interest. Less restrictive alternatives were available (for example, collaboration with EPIC to ensure any health standards were met, or targeting only specific hazardous conduct if it existed), but the Commission instead imposed a total ban on EPIC's religious exercise. Because the Commission cannot show a compelling interest pursued through the least restrictive means, its action violates TRFRA. *See* TEX. CIV. PRAC. & REM. CODE § 110.003(b).

95.    By substantially burdening EPIC's sincere religious exercise without meeting the strict scrutiny requirements of TRFRA, Defendant Texas Funeral Service Commission has violated Texas law. Pursuant to TEX. CIV. PRAC. & REM. CODE § 110.005(a), a person whose religious exercise has been burdened in violation of TRFRA is entitled to seek appropriate relief against the government agency. EPIC accordingly seeks all relief available under TRFRA, including a declaratory judgment that the Commission's actions are unlawful and an injunction prohibiting the Commission (and its officers) from enforcing the cease-and-desist order or otherwise interfering with EPIC's religious funeral rites in the future. EPIC further seeks to recover its reasonable attorney's fees and costs, as authorized by TRFRA, and compensatory damages for the loss caused by the Commission's unlawful actions, to the extent permitted by TEX. CIV. PRAC. & REM. CODE § 110.005(a)(3)–(b) (providing for recovery of monetary damages up to the statutory cap of

$10,000 per controversy). Each of these forms of relief is necessary to fully protect EPIC's rights and to remedy the harm inflicted by the Commission's violation of TRFRA.

**Count 6:    Violation of the Free Exercise Clause of the First Amendment—Against Kristin Tips (Individual Capacity)**

96.    Plaintiff East Plano Islamic Center ("EPIC") re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

97.    The First Amendment to the United States Constitution, applicable to the States via the Fourteenth Amendment, provides that no law shall prohibit the free exercise of religion. U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  At all relevant times, Presiding Commissioner Tips was acting under color of state law in her capacity as Commissioner and Presiding Officer of the Texas Funeral Service Commission, making her a state actor subject to the First Amendment.

98.    During the same period in which the Texas Funeral Service Commission's Executive Director issued the March 26, 2025 C&D Letter to EPIC, Presiding Commissioner Tips—serving as a member of the Commission—engaged in text and email communications with the Executive Director that revealed overt hostility toward EPIC's Islamic faith.  **Ex. 5** (KERA News Article).  In those exchanges, Presiding Commissioner Tips circulated anti-Muslim propaganda and affirmed disparaging statements about Islam, reflecting animus toward EPIC's religious exercise.  These communications occurred contemporaneously with the Commission's enforcement action against EPIC, underscoring that the cease-and-desist was infected by discriminatory motive.

99.    The Texas Funeral Service Commission's March 26, 2025 cease-and-desist order was neither neutral nor generally applicable, but instead selectively targeted EPIC's religious

activity.   The order, issued through the Commission's Executive Director while Presiding Commissioner Tips was serving as a Commission member, expressly forbade EPIC's performance of Islamic burial rites on its property, even though those rites are religious in nature and not part of any commercial enterprise.  On information and belief, no comparable enforcement action was taken against secular entities or other organizations for analogous conduct.   Presiding Commissioner Tips, as a member and presiding officer of the Commission and in contemporaneous communications reflecting religious hostility, had personal involvement in and endorsed the discriminatory treatment of EPIC.  Indeed, as shown in this pleading's background section, Presiding Commissioner Tips affirmatively participated in the acts that caused the discriminatory and unconstitutional treatment of EPIC.  By singling out EPIC's religious funeral services for prohibition, the Commission, with Presiding Commissioner Tips's involvement, imposed a special disability on EPIC's religious exercise that was not imposed on similar non-religious conduct, thereby violating the Free Exercise Clause.

100.    The First Amendment forbids government officials from targeting religious practices for discriminatory treatment or from acting with hostility toward religion.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993) (striking down ordinances aimed at suppressing Santeria religious practices).   By prohibiting EPIC from performing its religious funeral rites, the Commission—through actions in which Presiding Commissioner Tips participated and which she endorsed—interfered with religious conduct in a way that was neither justified by a compelling interest nor narrowly tailored.   Presiding Commissioner Tips's considerable involvement, including contemporaneous communications evincing animus toward Islam, shows that the enforcement action was motivated by hostility toward EPIC's faith rather than any legitimate health or safety concern.  Such conduct, which

targets a religious institution's worship activities, strikes at the heart of what the Free Exercise Clause prohibits. *See also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731–32 (2018) (reaffirming that government officials must not act with hostility toward religion in enforcing facially neutral laws).

101.    At the time the Texas Funeral Service Commission, through its Executive Director, issued the March 26, 2025 cease-and-desist order, it was clearly established that government officials may not impose special burdens or bans on religious exercise absent a compelling justification. Decades of Supreme Court precedent have made clear that official action targeting religious conduct or stemming from animus toward a particular faith is unlawful. *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993). More recently, the Supreme Court reaffirmed that the Free Exercise Clause protects not just religious belief but religious practices, and that protection extends into public life. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-24 (2022) ("That the First Amendment doubly protects religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent."). In short, no law or directive aimed at halting a church's or mosque's religious rites could be squared with the First Amendment, a principle well established long before 2025.

102.    Given this clearly established law, no reasonable public official in Presiding Commissioner Tips's position could have believed that her conduct was lawful. Targeting a religious institution's worship practices with discriminatory animus or hostility—as alleged here— is patently unconstitutional. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 542 (finding that official action targeting a particular religion is "religious gerrymandering" forbidden by the First Amendment). Any objectively reasonable officer would have understood that ordering a mosque

to cease its fundamental religious ceremonies, under threat of legal sanction, violates EPIC's rights to free exercise of religion.  Presiding Commissioner Tips had fair warning that her actions infringed clearly established constitutional rights.

103.    By acting under color of state law to deliberately suppress EPIC's religious exercise, Presiding Commissioner Tips violated EPIC's rights under the Free Exercise Clause. Because those rights were clearly established and Defendant's conduct was objectively unreasonable, Presiding Commissioner Tips is not entitled to qualified immunity for this claim. Accordingly, pursuant to 42 U.S.C. § 1983, Presiding Commissioner Tips is liable to EPIC for the violation of its First Amendment rights, and EPIC is entitled to appropriate relief including declaratory relief, injunctive relief, and compensatory damages in an amount to be proven at trial.

**Count 7:    Violation of the Free Exercise Clause of the First Amendment—Against Kristin Tips (Individual Capacity)**

104.    EPIC re-alleges and incorporates by reference all preceding paragraphs as if fully restated herein.

105.    The Fourteenth Amendment to the U.S. Constitution guarantees to every person the equal protection of the laws. U.S. Const. amend. XIV, § 1.  This guarantee prohibits state officials from intentionally discriminating against individuals or groups on the basis of religion. Government action that targets a particular religious group or denomination for adverse treatment is presumptively unconstitutional and triggers strict scrutiny.  *See Larson v. Valente*, 456 U.S. 228, 246 (1982) (a law that discriminates among religions must be justified by a compelling governmental interest).  At all relevant times, Presiding Commissioner Tips acted under color of state law as Executive Director of the Texas Funeral Service Commission, making the Equal Protection Clause fully applicable to her conduct.

**106.** The March 26, 2025 cease-and-desist order, issued through the Executive Director of the Texas Funeral Service Commission, was directed exclusively at EPIC and its Muslim congregation, thereby treating EPIC differently from other institutions on the basis of religion. Upon information and belief, no similarly situated secular or non-Muslim entity was subjected to a similar directive for engaging in analogous funeral or burial-related activities. The order targeted the religious practices of EPIC's members—such as washing and shrouding the deceased and holding funeral prayers—precisely because those practices are religious. The context and effect of the order, combined with Presiding Commissioner Tips's contemporaneous communications reflecting hostility toward Islam and her central role during the issuance and enforcement of the order, indicate that she was personally involved in—indeed, that she affirmatively participated in the acts that caused—the discriminatory and unconstitutional treatment of EPIC, acting with purposeful religious animus or at least with an impermissible motive to single out EPIC's Islamic worship activities for restriction.

**107.** By intentionally singling out a Muslim religious institution for harsh enforcement of funeral regulations (while not taking comparable action against others), Presiding Commissioner Tips deprived EPIC of equal protection of the laws. This disparate treatment cannot be justified by any legitimate—let alone compelling—government interest. There is no evidence of any public health or safety issue that required shutting down EPIC's religious rites; indeed, EPIC's funeral practices involve no hazardous procedures and have long been carried out in coordination with licensed funeral homes. Even if Defendant had some valid regulatory concern, completely prohibiting EPIC's religious funeral services is far from the least restrictive means of addressing it. The unequal, religion-based classification embodied in Defendant's action fails even a basic rational basis review, and certainly cannot survive the strict scrutiny required for religious

classifications.  *See Larson*, 456 U.S. at 246.  Defendant's conduct, therefore, violated EPIC's right to equal protection by intentionally subjecting it to adverse treatment on account of religion.

108.   The constitutional right to be free from intentional religious discrimination by government officials was clearly established well before 2025.  A reasonable official in Presiding Commissioner Tips's position would have known that targeting a religious group or institution for disparate treatment is unlawful.  The Supreme Court has long made clear that official disfavor toward a particular religion or religious practice is an invidious form of discrimination that the Constitution forbids.  *See, e.g., Church of the Lukumi Babalu Aye*, 508 U.S. at 542 (striking down city ordinances that were "gerrymandered" to suppress one faith community).  In *Cruz v. Beto*, the Court noted that adherents of minority faiths must be given equal rights and opportunities to practice their religion as those of the majority faiths, underscoring that blatant religious discrimination has no place in government action.  405 U.S. 319, 321–22 (1972) (per curiam), *superseded by statute*, Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc–2000cc-5, as recognized in *Cutter v. Wilkinson*, 544 U.S. 709, 714–17 (2005).  These and other precedents had "clearly established" by the relevant time that an official may not selectively enforce laws or regulations to the detriment of a particular religious group.

109.   No reasonable official could believe that it is lawful to target a religious institution with discriminatory animus and treat it differently solely because of its religious character.  Any objectively reasonable public official would understand that arbitrarily shutting down a mosque's religious practices, when such practices are permitted for others or pose no harm, is a blatant violation of equal protection.  The March 26, 2025 cease-and-desist order was formally issued by the Commission's Executive Director, but Presiding Commissioner Tips—as described at length in the background—participated in, directed, and endorsed that discriminatory course of action.

Her conduct in supporting and facilitating the order was not only without legal justification, but it was also objectively unreasonable in light of clearly established law.  A person of ordinary competence in Presiding Commissioner Tips's position would have known that penalizing EPIC's Muslim congregation for practicing their faith would violate the Equal Protection Clause.

110.    By acting under color of state law to intentionally discriminate against EPIC on the basis of religion, Presiding Commissioner Tips violated EPIC's clearly established rights under the Equal Protection Clause.  Because her actions were undertaken with discriminatory intent and in contravention of well-settled constitutional principles, Presiding Commissioner Tips is not entitled to qualified immunity for this claim.  She may be held liable in her individual capacity under 42 U.S.C. § 1983.  EPIC accordingly seeks judgment holding Defendant liable for violating the Equal Protection rights of EPIC and its members, and awarding appropriate relief including compensatory damages, declaratory relief, and injunctive relief as permitted by law.

### ATTORNEY'S FEES

111.    EPIC retained counsel to represent it in this action.  An award of reasonable and necessary attorneys' fees and expenses would be equitable and just and is authorized by both Section 37.009 of the Uniform Declaratory Judgments Acts (as invoked for the claims under state law), 42 U.S.C. § 1988, and TRFRA.

### JURY DEMAND

112.    Plaintiffs demand a jury trial.

### REQUEST FOR PERMANENT INJUNCTION

113.    EPIC further respectfully requests that the Court set its request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against the Texas Funeral Service Commission and its Executive Director.

---

*Plaintiff's Second Amended Complaint*
*and Application for Permanent Injunction*                                              Page 46 of 49

**PRAYER**

114.    For these reasons, EPIC asks that the Court issue citation for the Commission and its Executive Director to appear and answer, and that EPIC be awarded a judgment for the following:

a.    Upon final trial, a Permanent Injunction enjoining the Commission and its Executive Director from enforcing the order contained in the letter issued on March 26, 2025 or taking other future actions that restrict EPIC's activities involved in, and attendant to, the performance of religious funeral services, including: operating a hotline or otherwise receiving and providing information to/from members within the religious community related to a deceased person; helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque; helping persons affiliated with the deceased wash and shroud the body; notify members of the community of the community prayers to be performed for the deceased; performing the funeral prayer (Janaza); and helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate);

b.    A Declaratory Judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code declaring that:

i.    EPIC has a constitutional and statutory right to conduct religious funeral rites for its members without compensation and without a license from the Commission;

    ii.   Defendants lack statutory authority under the Texas Occupations Code to prohibit EPIC from conducting religious funeral rites for its members without compensation;

    iii.   Prohibitions by Defendants that prevent EPIC from conducting religious funeral rites for its members without compensation violate the Texas Constitution and the United States Constitution;

c.   An award of compensatory damages against Defendant Kristin Tips in her individual capacity for violation of EPIC's rights under the First and Fourteenth Amendments, as enforced through 42 U.S.C. § 1983, in an amount to be determined at trial;

d.   An award of punitive damages against Defendant Kristin Tips in her individual capacity for her willful, malicious, and/or reckless disregard of EPIC's clearly established constitutional rights;

e.   An award of compensatory damages against the Texas Funeral Service Commission pursuant to TEX. CIV. PRAC. & REM. CODE § 110.005, up to the statutory cap;

f.   An award of reasonable attorney's fees and costs under 42 U.S.C. § 1988, TEX. CIV. PRAC. & REM. CODE § 37.009, TEX. CIV. PRAC. & REM. CODE § 110.005(d), and any other applicable law; and

g.   Such other and further relief to which Plaintiff may be justly entitled at law or in equity.

**Dated:** November 28, 2025

Respectfully submitted,

**TERRAZAS PLLC**

1001 S. Capital of Texas Highway, Bldg. L, Suite 250
Austin, Texas 78746
512.680.3257

By: /s/ *Draft*
Eric A. Hudson
State Bar No. 24059977
ehudson@terrazaspllc.com
Benjamin L. Dower
State Bar No. 24082931
bdower@terrazaspllc.com

**ATTORNEYS FOR EAST PLANO ISLAMIC CENTER**

In the Name of Allah, Most Gracious, Most Merciful
Constitution of

# East Plano Islamic Center (EPIC)

### ARTICLE I – EAST PLANO ISLAMIC CENTER

A. The name of the organization is East Plano Islamic Center.  Additionally, the organization is registered under the following assumed name and shall also be hereafter known as EPIC.

B. The Principal Office of EPIC is located in Collin County, Texas at the following address: 4700 14th Street, Plano, Texas 75074.

### ARTICLE II – VISION/MISSION/OBJECTIVES

A. Vision: Establish a model community that serves Muslims and society-at-large with excellence, tolerance, and unity.

B. Mission: Provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibilities and contribute to the betterment of society by following the principles of Quran and the noble life of Prophet Muhammad (peace be upon him)

C. Objectives: The objectives of EPIC are to:

1. Strive to work in harmony with other Muslim and non-Muslim civic organizations to enhance our collective future.

2. Provide a full spectrum of valuable services and resources to the community in a transparent and fair way, leveraging a team of dedicated volunteers.

3. Provide a safe and nourishing environment for people of all ages and backgrounds to connect, pray, learn, play, and grow in accordance with the Quran and tradition of Prophet Muhammad (peace be upon him).

4. Inspire and develop the future generation of responsible Muslims in America.

1

Exhibit 1

## ARTICLE III - ORGANIZATION

A.  EPIC is a not-for-profit organization, which qualifies as a tax-exempt entity under Section 501(c)(3) of the Internal Revenue Service Code.

B.  EPIC may maintain additional offices at such other places as the Board of Directors (BOD) may designate.  EPIC shall continuously maintain within the State of Texas a registered agent and a registered office at such place as may be designated by the BOD.

C.  EPIC shall comply with all local, state, and federal laws and will not carryout, perform, and allow any activities, which are not permitted, are prohibited by law, and are contrary to the vision, mission, and objectives of EPIC.  In addition, EPIC shall comply:

1.  As an organization which is exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1954, as currently in force or as amended.

2.  As an organization, contributions to which are deductible under Section 170(C)(2) of the Internal Revenue Code of 1954, as currently in force or as amended.

3.  With established Islamic guidelines, ethics in general, and this Constitution.

D.   EPIC will be governed by the following bodies:

1.  General Body: The General Body shall consist of all registered members of EPIC.  The General Body is the highest decision-making body, and its decisions are final, further referenced in Article X.  The purpose of the General Body is to assist the BOD to carry out the goals and activities of EPIC.

2.  Board of Directors: The BOD will be composed of seven (7) elected members to the office by the General Body under the provisions of this Constitution, further referenced in Article VII.  The BOD will be responsible for all the affairs of EPIC.  The BOD shall include the following executive positions:

   a.  President

   b.  Vice President

   c.  Secretary

   d.  Treasurer

2

Exhibit 1

## ARTICLE IV – DEFINITIONS

Words not specifically defined in this document, will have their ordinary and normal meaning.  The following words will have the following meanings assigned to them for purposes of interpreting this document:

1.  Board of Directors: *The elected governing body of EPIC, responsible to appoint, manage, oversee, guide, and direct the work of EPIC and to administer all matters associated with EPIC in accordance with Article II.*

2.  BOD: *Board of Directors*

3.  Calendar: *All calendar references in this document are to the Gregorian Calendar and not the Islamic Calendar.*

4.  Clergy: *A Sunni Muslim that is qualified in Islamic scholarship and is employed by EPIC as defined in Article XX.*

5.  Committee Member:  *A Sunni Muslim who actively participates in an EPIC Committee and has not missed three consecutive meetings without cause in last one year.*

6.  Constitution: *The Constitution of EPIC.*

7.  Eid al-Fitr: *Islamic Festival of breaking the fast that marks the end of the month of Ramadan.*

8.  Eid al-Adha: *Islamic Festival which falls on tenth (10th) day of the month of Dhu al-Hijjah of the Islamic Calendar.*

9.  EPIC: *East Plano Islamic Center*

10. EPIC Legal Counsel: *An Attorney or a Law Firm licensed to practice in Texas and hired to provide legal services to EPIC.*

11. General Body: *All members of EPIC.  It has the power to approve amendments and to elect members to the BOD.*

12. General Member: *Any Sunni Muslim who fulfills the requirements as outlined in Article VI.*

13. Hafidh: *A Sunni Muslim who has memorized the entire Qur'an.*

14. Halaqa: *A religious gathering or meeting for the study of Qur'an and Sunnah.*

15. Imam: *A Sunni Muslim male that leads a Muslim congregational prayer, a religious leader.*

3

Exhibit 1

16. Immediate Family: *Your spouse. Your or Your spouse's parents, children, children's spouses, siblings, grandparents, grandchildren, foster parent or foster children*

17. IRS: *Internal Revenue Service*

18. Jumu'ah: *Friday prayers.*

19. Madhab: *Islamic school of jurisprudence.*

20. Member in Good Standing: *A voting member of EPIC who has never had a Level III violation as per Article V(5).*

21. PBUH: *Peace be upon him*

22. Ramadan: *The ninth (9ᵗʰ) month of Islamic Calendar observed by Muslims as a month of fasting.*

23. Sunnah: *Traditions of the Prophet Muhammed (PBUH), including his sayings and practices.*

24. Sunni Muslim: *A person who believes in the oneness of Allah (SWT) and in the absolute and unqualified finality of the Prophet Muhammad (PBUH) and as the Last of all the Prophets. Sunni Muslims are viewed as connected to the authoritative Sunnah.*

25. Taraweeh: *Special evening prayers performed during the month of Ramadan*

26. Voting Member / Voter: Any Member of EPIC for the last six (6) months and eighteen (18) years of age or older.

27. Zakat al-Fitr: *Obligatory form of almsgiving towards the end of Ramadan by every able Muslim.*


## ARTICLE V – GENERAL RULES AND REGULATIONS

The following general rules will be applicable to the General Body, Board of Directors, all Committees, members of the General Body, Non-Members, Employees and Contractors of EPIC.

A. EPIC may accept any real or personal property from an individual or business through a gift, bequest, or trust. This property shall be held, administered, and if necessary, disposed of, in accordance with and pursuant to the provisions of this document. However, if any gift or bequest is conditioned or limited in a manner that requires the disposition of income or property that is inconsistent with this document and, specifically, inconsistent with ARTICLE III, above, then said property shall not be received or accepted by EPIC.

4

Exhibit 1

B. EPIC will carry, at a minimum, general liability insurance.  Members of the Board of Directors are advised to carry Directors and Officers Insurance as it relates to their service on the EPIC BOD.  In General, members of the BOD are legally accountable for their actions.  The BOD has legal and ethical duties that cannot be delegated to others.  Directors are required to act in good faith, with ordinary care, and in a manner that the Director believes to be in the best interest of EPIC.

C. The EPIC BOD and members of their immediate family will not receive salaries, compensation, or wages for their services, during the term of the BOD.

D. EPIC's property, funds, and facilities will only be used for their intended purposes and consistent with this document.  At no time shall EPIC property, funds and facilities be used in a manner that exceeds general body member privileges nor shall said property, funds or facilities be distributed to any member of the BOD that is inconsistent with this document.

E. All original legal documents pertaining to EPIC will be kept in a safe location.  The BOD shall have access to this location at all times.  Copies of such documents are kept on the premises of the principal office of EPIC or electronically.  Such documents may be made available to General Body members for inspection and review with prior notice of one (1) week.  Information considered to be private, including the employee contracts, names of the EPIC membership, donation amounts of the membership, addresses of members, phone numbers of members, and e-mail addresses of member cannot be divulged without the express written consent of the BOD and the individual member.

F. The official medium of communication at EPIC will be the English Language.

G. All members and non-members of EPIC will observe proper Islamic conduct and decorum in all proceedings and at all times within EPIC or at any EPIC event.  The following are specific policies of EPIC:

1. All communication, including, but not limited to, social media, emails, announcement, distributed literature, and interpersonal communications must be truthful, polite, tolerant, and respectful in accordance with Islamic guidelines. Name calling, personal attacks, false accusations, slandering, back-biting, racism, and gossiping is prohibited and will not be tolerated. If anyone observes such behavior, said person should inform the individual directly of his or her violation or should inform the BOD of the infraction.

2. Necessary and permissible communication within the prayer hall must be conducted in a soft and polite manner and voice.

3. Trade, business dealings, advertisements/marketing, and exchange of money are prohibited in the prayer hall.

4. It is the responsibility of parents and guardians to ensure that the children, including teenagers, comply with these guidelines.

5

Exhibit 1

5. Any of the above violations and/or communication or behavior that is violent, criminal, abusive, intimidating or that violates local, state, or federal laws is prohibited and will not be tolerated at EPIC. Said violation(s) may be grounds for expulsion or exclusion from EPIC premises and EPIC may, at its discretion, inform an appropriate law enforcement agency for all necessary action. Such actions are grounds for the BOD, in its discretion, to seek a Level I, Level II and/or Level III disciplinary action. The Levels are explained as follows:

   a. Level I – the offending individual will receive a written warning that the communication or conduct displayed is unacceptable and cannot be repeated in the future, as such communication or conduct violates these guidelines.

   b. Level II – the offending individual's membership privileges may be revoked, if the individual persists in violating these guidelines, after being warned as set forth in paragraph a, above. By revoking the individual's membership, the individual will be excluded from all meetings, events, or functions of EPIC for a period of six (6) months. A Level II violation will also cause a person to lose the status of being a Member of Good Standing. A person could be cited for Level II violation, without any Level I citation, if the person is proven to violate or attempt to violate election and balloting process.

   c. Level III – the offending individual will be referred to an appropriate law enforcement agency and EPIC may seek a restraining order if the offending individual continues to persist in the violations of these guidelines after Level I and Level II discipline has been imposed. The BOD may impose Level III discipline at their discretion, if there is a violation of the law or the offense is egregious enough to threaten the safety, well-being, and welfare of EPIC, or of EPIC members.

H. All disputes arising out of this document or connected to EPIC in any manner, shape or form, shall be limited to the exclusive jurisdiction of the Courts of Collin County Texas.

I. A member of the BOD, a volunteer, an employee, or a contractor who commits an act that is Islamically forbidden, is indicted, arrested or against whom a trial is pending in State or Federal Court can be suspended from his or her office until he or she is acquitted. If he or she is convicted, he or she shall be expelled from his or her office in accordance with this Constitution.


## ARTICLE VI – MEMBERSHIP

A. EPIC membership is open to all Sunni Muslims who:

1. Subscribe to the vision, mission and objectives of EPIC as referenced above in Article II

2. Agree to work under general guidance of the EPIC BOD and in accordance with the Constitution of EPIC.

6

Exhibit 1

3. Apply to be a member of EPIC.

4. Live in the following zip codes:  75074, 75075, 75080, 75081, 75082, 75044, 75002, 75094, 75048, 75044, 75098.

B. All membership applications will be submitted to the Board of Directors of EPIC.  The BOD shall approve a process by which applications for membership are reviewed.  The BOD through its process of reviewing applications, will approve applications within thirty (30) days of their receipt if prospective members have satisfied and fulfilled the requirements of membership.  EPIC Membership begins from the day the application for membership is made and expires annually on a date as determined by BOD.

C. The BOD, in keeping the interests of EPIC and its membership in mind, shall have the authority to involuntarily revoke the membership of a member or members of EPIC if they fail to meet the requirements of membership or, in accordance with the procedures set out in Article V(G), if they fail to comply with EPIC policies, guidelines and this Constitution.  A membership that has been revoked by the BOD cannot become eligible for EPIC Membership until six (6) months have passed since the date the membership was initially revoked.

D. Members of EPIC may voluntarily withdraw their membership as long as the member provides EPIC BOD thirty (30) day's written notice of their intention to withdraw as a member of EPIC.   Said notice shall provide a concise explanation of the reason behind their desire to withdraw from membership. A withdrawal of membership shall become effective once the notice is given to the BOD.  A membership interest that has been voluntarily withdrawn cannot be reinstated until six (6) months have passed since the effective date the membership was initially withdrawn.

E. The membership fee is a donation of $100.00 for families and $50.00 for individuals and this membership expires on the date set by BOD. The BOD may waive membership fees in their discretion for individuals and families facing hardship, which will be determined on a case-by-case basis.  A donation in any other fund other than as membership fee, would not renew membership. All members would have the same membership renewal date. The BOD has the discretion to change the membership fee and membership renewal date without requiring a change to the constitution.

### ARTICLE VII – ELECTIONS

A. The BOD shall use public and electronic communications to call for the formation of an ad-hoc Election Committee at least forty-five (45) days before the date of Election.

B. The Election Committee will consist of five (5) members in good standing of the general body who are not current BOD members and are Members in Good Standing.  All applicants must pass Criminal Background Check. If more than five (5) names apply to be a part of the committee, then all the names

7

Exhibit 1

shall be randomly and publicly drawn to determine the order of applicants and the first five (5) from that order would be selected to form the Election committee.  If a member of the election committee has a member of his/her immediate family running for a BOD position, then said election committee member must resign from this committee.  The Election Committee will elect, from within the committee, an Election Commissioner, who will lead the committee.

C.  If a member of the Election Committee resigns or is not able to continue, then the replacement candidate shall be decided by next in line process as determined in Article VII(B).

D.  The Election Committee shall work independently of the BOD. The BOD shall appoint a liaison to facilitate coordination between the Election Committee and the BOD.

E.  The BOD shall extend full support to the Election Committee in facilitation of elections. This includes providing needed access to EPIC facilities and resources, providing reasonable budget, providing security (if warranted), and fulfilling any other reasonable request that is needed for conducting the Elections.

F.  The BOD shall provide to the Election Committee the correct and complete list of all eligible voting members and their respective contact information within ten (10) days of the formation of Election Committee. The Election Committee would not be responsible for updating or correcting the Voters' list. BOD shall also validate whether a candidate is an active volunteer of EPIC as outlined in Article IX(A)(2).

G.  If the Election Committee is unable to fulfill its responsibilities, then the BOD may dissolve the Election Committee after consultation with EPIC Legal Counsel.

H.  If the Election Committee is deemed in violation of EPIC constitution and does not rectify these violations within three (3) days, then the BOD has the right to dissolve the Election Committee after consultation with EPIC Legal Counsel

I.  The Election Committee would be dissolved seven (7) days after the assumption of office by the new BOD.

J.  Election Committee shall consult with EPIC Legal Counsel for any interpretation and verification of compliance of the constitution.

K.  EPIC Legal Counsel shall be responsible for collecting, conducting, and providing the Criminal Background Check results to the Election Committee,

L.  Only an EPIC Voter that meets the requirements set forth in Article IX will be eligible to become a candidate in the elections for the EPIC BOD.

M.  Members in good standing, as defined by this document, for at least six (6) months are eligible to nominate members to the BOD and vote to elect nominees to the BOD.

8

**Exhibit 1**

N. Each candidate must be nominated by at least two (2) members in good standing as outlined in Article IV.

O. Members of Election Committee and EPIC full-time employees cannot nominate any candidate in BOD election.

P. A person cannot self-nominate himself or herself to be a candidate in the BOD elections.  A person cannot be nominated by a member of his or her immediate family.

Q. Elections will be conducted on third (3rd) Sunday of the month of January.

   1. Elections may be held at another time in the event an empty BOD position or positions need to be filled by election as mentioned in Article VIII(D).

   2. In the event the entire BOD resigns as mentioned in Article VIII(G), the election will be conducted within sixty (60) days from the date of resignation.

   3. Elections may be held on different date if Article VII(U)(6) or Article VII(U)(8) is invoked.

   4. BOD may decide to hold the elections on a different date due to Ramadan, Eid al-Fitr or Eid al-Adha falling around third Sunday of January of an election year. However, the elections must be held in the month of January or by second Sunday in February of the same year.

R. Voting on Election Day will be conducted in person.  The Election Committee will ensure that each member is entitled to only one vote and that it is his or her own vote.  No voting by proxy will be allowed.

S. Members who are unable to vote in person on Election Day may vote early by mail, by e-mail, or electronically until at least 24-hours before Election Day.  The Election Committee will verify the authenticity of all absentee ballots.

T. All complaints from the General Body against the Election Committee should be addressed to the Election Committee itself. In case of any escalation, the matter may be resolved as outlined in Article XIX.

U. The Election Committee shall:

   1. seek nominations for the BOD at least thirty (30) days prior to the Election Date.

   2. announce the final list of candidates at least fifteen (15) days prior to the Election Date.

9

Exhibit 1

3.  count all ballots (early voting ballots, absentee voting ballots and Election Day ballot) publicly, announce the results within 24 hours of the election publicly and document the election results after the final vote is cast.

4.  keep all voter identity records anonymous except absentee ballots.

5.  break a tie by publicly drawing the winner's name randomly from the contending names.

6.  ensure that all election positions are filled.  In the event, there are not enough candidates to fill all vacancies on the BOD, the Election Committee is empowered to extend or otherwise modify the election deadlines to ensure that at least seven (7) nominations are made for each of the BOD positions.

7.  transfer all ballots and all election related records to the new BOD, who will maintain all election ballots and records for a period of two (2) years.

8.  determine if conditions on Election Day warrant the postponement of the election due to reasons beyond the control of the Election Committee, such as inclement weather, community emergency, state or national emergency, force majeure or other reason determined in the discretion of the Election Committee that serves the best interest of EPIC and its membership. In the discretion of the Election Committee, said election can be postponed to the following week or to a time when said impediment to holding the election is no longer present and the election can be safely held.

## ARTICLE VIII – SERVING TERM OF THE BOARD

A.  The General Body will elect seven (7) members to the office of the BOD and each BOD member shall hold office for a term of two (2) years until their successors have been elected and qualified.  At the end of their term the BOD members will also be eligible to be nominated for re-election.

B.  A BOD member cannot serve more than two (2) consecutive terms. Any previous BOD member who served two (2) consecutive terms is eligible to re-run after at least one (1) term of not serving in the BOD.

C.  The term for the BOD shall begin on the third Sunday of the month of February immediately after the Election and shall end on the third Saturday of the month of February two years later.

1.  If BOD is formed by invoking Article VIII(G) then the new BOD term would start immediately after the elections. In this case, the BOD term would be at least one (1) year and not more than two (2) years and this term would expire on third Saturday of the month of February.

D.  In the event a BOD member vacates or is removed from office, the next in line candidate with the highest number of votes from the most recent election results, will be offered the position. If such

10

Exhibit 1

person is not available or declines the position, then the individual with the next highest number of votes will be offered the vacant position.  This process will continue in this manner until the vacancy or vacancies are filled.  To be eligible for the vacancy, the next in line candidate must have received at least thirty (30%) percent of the votes received by the candidate who had the highest vote totals. In the event the vacancy cannot be filled through this methodology, the BOD shall form a new election committee for a special election to fill the vacancy within sixty (60) days.

E.  If a vacancy to the BOD is filled by special election or by next in line methodology as outlined in Article VIII(D), the position that is filled will expire according to the term of then sitting BOD.

F.  No BOD member will hold more than one (1) executive position in the BOD.

G.  In case all the members of the BOD resign, and new BOD cannot be formed according to this constitution, then the outgoing BOD shall be liable to remain seated, until a new BOD election can be conducted. In case the outgoing BOD cannot remain seated and commence the new Election Process then all the leads of EPIC Committees shall

1.  Call for the formation of the Election Committee.

2.  Assure that new BOD Election would be held within sixty (60) days of the resignation of the old BOD.

3.  Run all EPIC affairs until new BOD is elected.

4.  Be deemed de facto provisional EPIC BOD until new BOD assumes office.

H.  The time immediately after the elections until the new BOD (or BOD-elect) assumes office is considered Transitionary Period. During the Transitionary Period, the outgoing or old BOD will continue to manage EPIC affairs. However, the new BOD (or BOD-elect) and the existing BOD (or outgoing BOD) will use this period to ensure that the financial responsibilities are properly transferred to allow for a smooth transition on the third Sunday of February. This will allow the new BOD to be copied on all BOD emails/communications and be present for all BOD meetings.

1.  The new BOD (or BOD-elect) will not have voting powers or signatory authority until they are seated on third Sunday of February.  However, the new BOD or the BOD-elect has the authority to choose their own officers and committee liaisons before the start of their term.

2.  If the new BOD is formed after invoking Article VIII(G) then there would not be any Transitionary Period.

## **ARTICLE IX – QUALIFICATIONS FOR THE BOARD MEMBERS**

11

Exhibit 1

A. All candidates for the Board of Directors must meet the following eligibility requirements:

1. Be a good, law-abiding resident and Sunni Muslim, who believes in the Quran and Prophet Muhammad (Peace and Blessing be upon him) as the last Prophet and his teachings as the guiding principles.

2. General Body member in good standing and an active member of at least one of the EPIC Committees for at least last one (1) year.

3. Must be a US Citizen.

4. Must pass the Criminal Background Check.

5. Must not have any immediate family member as EPIC full-time employee.

6. Must not have any immediate family member as member of Election Committee.

B. All candidates for the Board of Directors shall have the following qualifications:

1. Have good knowledge and understanding of Islam.

2. Be a practicing Sunni Muslim known for their Islamic manners and morals in the community and in organizational dealings.

3. Be devoted through time, dedication, and skills to the work of EPIC in a voluntary capacity to fulfill the mission, vision and objectives outlined in Article II, above.

4. Exhibit necessary leadership and communication skills and a lack of desire for title, but a strong desire to serve EPIC and, its members and to conduct its work.

5. Have the ability to present ideas in a balanced and egalitarian way and maintain ability to compromise when necessary.

6. The candidate for President will not hold or accept any office as Chairman, Chairman-Elect, President, President-Elect, Vice President, Secretary, and Treasurer in any other Islamic or Muslim Organization.

7. No BOD member may serve on the Board, Shura or other body of any other masjid while serving as BOD member of EPIC.

**ARTICLE X – RESPONSIBILITIES OF THE GENERAL BODY & INDIVIDUAL MEMBERS**

12

Exhibit 1

A. During the Election Process every two years, the General Body will have the responsibility to elect seven (7) members to the BOD for a two (2) year term to handle the business operations of EPIC in accordance with this document.

    1. If Special Election is called under Article VIII(D) then the General Body would be voting only for the number of vacant positions on the BOD.

B. An individual elected board member or the entire elected BOD can be impeached with the approval of two-thirds (2/3) majority of the quorum of the General Body present at a Special General Body meeting after satisfying the quorum requirements as provided in Article XVI.

C. Three-fourth (3/4) majority of the quorum of the General Body must approve the liquidation of any assets of EPIC, at location defined in Article I(B), that are valued in excess of $100,000.00 (ONE HUNDRED THOUSAND DOLLARS).

D. The General Body will ratify constitutional amendments per the provisions set forth in Article XVI and participate in and lead committees.

E. Individual members of the General Body, as well as non-members attending EPIC must safeguard EPIC's assets and facilities.

F. All members and non-member of the General Body will observe the Islamic Code of Conduct and Ethics in all proceedings and at all times, this includes, but is not limited to, meetings, programs within the EPIC premises and/or offsite EPIC events.

## ARTICLE XI – RESPONSIBILITIES OF THE BOARD OF DIRECTORS

A. The BOD will be responsible for:
    1. Administering the day-to-day affairs of EPIC, taking care of, and maintaining EPIC's facilities and properties, and managing finances and expenses as approved by the BOD.

    2. Performing such acts as may be necessary for achieving the goals vision and overall objectives of EPIC as defined in Article II.

    3. Implementing the decisions of the General Body and keeping it apprised of EPIC's activities, challenges, and accomplishments.

    4. Developing, planning, and implementing programs and activities, and providing policies and procedural guidelines for such programs and activities in accordance with generally accepted Islamic principles.

    5. Managing Human Resources for EPIC.

13

Exhibit 1

6.  Overseeing the work of all committees of EPIC.

7.  Safeguarding the assets and facilities of EPIC.

8.  Maintaining the EPIC members list and publishing said list when required.

B.  The BOD shall elect and appoint among themselves a President, a Vice President, a Secretary, and a Treasurer, which constitutes the Executive Committee. The directors by simple majority shall elect these positions.

C.  The BOD must maintain all records and documents of EPIC including but not limited to deeds of trust, donor's list, loan documents, member's lists and financial documents and records of EPIC.

D.  The BOD will ensure that EPIC is in compliance with all federal, state, and local laws, rules, and regulations. The BOD will ensure that all security and background checks are conducted for all volunteers, employees, and contractors working/volunteering at EPIC.

E.  The BOD will be responsible for all financial activities and financial compliance of EPIC, including accurate bookkeeping, preparing annual financial statements, tax filings, conducting fundraising, scheduling fundraisers, and overseeing other donations. The BOD will perform an audit of the EPIC operational account once every two (2) years.

F.  Expenses or Disbursements of funds greater than Two thousand five hundred dollars ($2,500) must be approved by the BOD. The BOD meeting minutes must reflect the approval of expenses or disbursements in excess of $2,500.

1.  The Social Services Committee's Financial Aid Team is authorized to approve and disseminate assistance to those in need up to Two thousand five hundred dollars ($2,500). Approved assistance of more than Two thousand five hundred dollars ($2,500) per month will require additional approval from BOD after Financial Aid team has properly evaluated the need and recommended approved. The policy applies to both one time and recurring assistance.

2.  Donations collected under special relief campaigns usually run by social services will have an automatic approval to distribute the full collection amount for said cause. Social services committee is responsible to provide proper documents for book-keeping as required by Treasurer's office.

3.  Recurring monthly or one-time donations to other organizations will also require BOD approval. Such requests are typically not handled by financial aid team.

4.  Zakat al-Fitr collections and distribution done by social services committee will not need any additional approval from BOD. The process will be overseen by social services liaison and reported to BOD as needed.

14

Exhibit 1

G.  The BOD will be responsible for representing EPIC in other organizations.

H.  The BOD is responsible for overall oversight, hiring, termination of employment and management of all EPIC employees.

I.  The BOD must publicize, through public announcements and electronic communications, and obtain bids to execute and award contracts.  The BOD must advertise to obtain bids for a period of at least fifteen (15) days.  The BOD will obtain three (3) bids for any project, if possible.  If three (3) bids are not available, the EPIC BOD will continue to move forward with the project.  For approval, all bids require majority approval by the BOD.  Any project at EPIC below Twenty-Five Thousand Dollars ($25,000) does not require a bid.

J.  All full-time job openings at EPIC shall be advertised through EPIC's electronic communications and public announcements and in such other places as the BOD, in its discretion, determines to be appropriate. The BOD will obtain at least three (3) candidates for any vacancy, if possible.

K.  The BOD is responsible for protecting and defending EPIC, its facilities, and resources.  The BOD, in consultation with the EPIC Legal Counsel, has the right to use all remedies available to it, in equity and in law to defend EPIC or to advance EPIC's claims in court or before a government body. The BOD is authorized to seek outside counsel to effectuate the defense of EPIC or advancement of Epic's claims before a court or other governmental body.

L.  BOD President

   1.  The President or his/her designated member of BOD will conduct and preside over meetings of the General Body and the BOD.

   2.  The President or his/her designated member of BOD will present an Annual Report to the General Body.

   3.  The President will implement all resolutions passed by the General Body.

   4.  The President will sign all documents on behalf of the BOD.

   5.  The President will implement all decisions made by the BOD.

   6.  The President may execute any deeds, contracts, or other instruments authorized by the BOD.

   7.  The President will delegate duties and responsibilities to other board members and Committee members for the review and approval of amendments to the Constitution.

   8.  The President must inform the Vice-President when he/she is unable to carry out the responsibilities.

15

Exhibit 1

M.  BOD Vice-President

1.  The Vice-President will automatically assume the responsibilities of the President when the President is out of town, sick, or unable to carry out the responsibilities listed above.

2.  The Vice-President performs any special assignments assigned and delegated by the President.

N.  BOD Secretary

1.  The Secretary will prepare the agenda for the General Body meeting in consultation with the President, and the BOD in general.

2.  The Secretary will prepare the agenda for the BOD meetings in consultation with the President, and the BOD in general.

3.  The Secretary will document the minutes of the General Body Meetings and the BOD meetings. These minutes will be made public within thirty (30) days of the date of the specific meeting.

4.  The Secretary will prepare a list of action items based on the decisions made and actions assigned in the General Body and BOD meetings.

5.  The Secretary will receive reports and meeting minutes for all committees and subcommittees from the heads of the committees.  The Secretary shall then report said reports and minutes to the BOD.

6.  The following items will always be a part of a regular BOD meeting, conducted by the Secretary:

    a.  The minutes from the previous BOD meeting will be read and approved by the sitting BOD.

    b.  The minutes and progress reports of the committees will be presented to the BOD at least once every two months.

    c.  Updates on action items covered between the current and previous meeting.

O.  BOD Treasurer

1.  The Treasurer will be responsible for the following:

    a.  Maintaining the records of all financial transactions of EPIC.

    b.  Collecting and depositing all funds received on behalf of EPIC.

    c.  Creating the annual budget and financial reports.

    d.  Mailing end-of-year donation receipts to all donors.

16

**Exhibit 1**

2. The Treasurer will ensure that all tax documents, legal documents, and other regulatory forms are filed on time and according to legal requirements to keep EPIC in good standing with local, state, and federal agencies.

3. The Treasurer, along with the entire BOD, have the ability to receive funds on behalf of EPIC from sources that are consistent with and comply with Article II above. The Treasurer will be responsible for soliciting the payment of money's due and payable to EPIC and will provide invoices all money due to EPIC.

4. The Treasurer will ensure the receipts issued for non-cash items will not exceed the fair market value of the item donated. The Treasurer will seek out an appraisal of said non-cash item in the event a dollar amount cannot be determined by agreement between the donor and EPIC. The cost of the appraisal shall be paid for by EPIC.

5. The Treasurer will distribute funds and make payments to discharge the obligations of EPIC to vendors, contractors and employees and pay other pre-approved expenses by any authorized means of payment, including, but not limited to check, electronic check, ACH, direct deposit, credit card, and the like.

6. The fiscal year of EPIC will begin on the first day of January and end on the last day of December of each year. At the end of the fiscal year, the Treasurer will prepare the financial statements showing income, expenses, assets, liabilities, and net worth of all EPIC accounts and make these statements public to the General Body of EPIC.

7. The Treasurer will prepare monthly statements of income, expenses, and budget forecasts.

8. The Treasurer will hand over all information pertaining to accounts, accounting books, software, and other tools to the succeeding Treasurer at the end of the term or upon leaving office.

### ARTICLE XII – MEMBER OF BOARD OF DIRECTOR REMOVAL

A. A director <u>shall</u> be removed by the BOD for the following reasons:

1. Any BOD member who is absent without prior notification to the rest of the BOD for five (5) consecutive meetings will automatically lose the legitimacy to serve and the vacancy so created will be filled in accordance Article VIII(D);

2. Any BOD member who engages in egregious financial misdealing, appropriation, embezzlement, or theft of EPIC property or financial resources;

17

Exhibit 1

3.  Any BOD member that is arrested, indicted, or convicted for a theft offense, fraud, embezzlement, and other such crimes that call into question the director's character for truth and honesty, for offenses related or unrelated to EPIC;

4.  Any BOD member that is arrested, indicted, or convicted for sexual misconduct or sex crimes involving a minor, an EPIC employee, contractor, or volunteer, and for offenses related or unrelated to EPIC;

5.  Any BOD member's failure to disclose a conflict of interest;

6.  Any BOD member's carries out his duties at EPIC under the influence of illegal drugs (including but not limited to marijuana, cocaine, heroin) or alcohol;

7.  Any BOD member's intentional disclosure of confidential information to unauthorized persons;

8.  Any BOD member's use of EPIC property or facilities for personal use and gain. In the event of self-dealing, which results in financial gain, said gain made by the director shall be forfeited and turned over to EPIC;

9.  Any BOD member's breach of their fiduciary duties to EPIC.

B.  A director may be removed by the BOD for the following reason:

1.  If it is in the judgment of five (5) members of the BOD that removal of a director will serve the best interests of EPIC. The removal of a board member will require a meeting of the remaining members of BOD. The meeting will have only one purpose, which is to consider the removal of the specific BOD member or members. The director(s) being removed from office shall be requested to attend the meeting. In case of disagreement on the decision of the director(s) removal, either or both parties have a right to seek arbitration as defined in Article XIX. The vacancy so created will be filled in accordance Article VIII(D).

C.  The BOD may seek whatever remedies available, in equity and law to it to protect EPIC, its facilities and its resources.

## ARTICLE XIII – RESPONSIBILITIES OF COMMITTEES AND SUBCOMMITTEES

A.  The BOD may appoint committees comprised of general body members in good standing with EPIC in order to accomplish the goals and objectives of EPIC in accordance with Article II.

18

Exhibit 1

B.  The activities of the committees and subcommittees shall remain in compliance with the EPIC Constitution.  If it is determined that a committee's activities are in non-compliance with the terms of this document, the BOD will have the right to intervene and rectify the problem.

C.  A committee or subcommittee will not have any authority to take action outside the scope of the authority delegated to it by the BOD.

D.  Committees and subcommittees will be composed of at least five (5) members, including a liaison from the BOD.  As an exception to this requirement, the board liaison for the Election committee is not a part of the committee.

E.  The goals of the committee or subcommittee will be provided by the BOD member(s) assigned as liaison(s) to the committee.  The committee members may suggest changes to the goals, but the BOD will provide final approval.

F.  Each committee must develop its yearly objectives in consultation with the BOD liaison(s).

G.  All committees must obtain BOD approval prior to any fundraising activities.

H.  The BOD will resolve disputes among committees of EPIC and adjudicate all conflicts referred to it.

I.  Any EPIC member can be a part of the committee.  However, only Members in Good Standing can lead a committee, can be its Secretary and vote for a lead or secretary.  Each committee should have an elected lead, or the board liaison assumes this role.  The role of committee secretary may be created at the discretion of the committee.

J.  Election process for leads/secretary must be in the presence of at least five (5) committee members and all members must be informed at least one (1) week in advance.

K.  If the election for the Committee lead and Secretary does not take place, the BOD liaison assumes the lead role within ninety (90) days after the incoming BOD takes office.

L.  The BOD liaison can make changes to the committee, its lead or secretary, whenever the BOD deems necessary

## ARTICLE XIV – RESPONSIBILITIES OF CONTRACTORS AND EMPLOYEES

19

Exhibit 1

A. The BOD may designate a person or persons to serve in defined capacity and under authority provided by the BOD to perform certain tasks, as an employee or contractor, to engage in certain functions or perform certain duties as prescribed by the BOD.

B. An employee, designated person, vendor (someone who conducts business with EPIC) contractor of EPIC shall not serve as a member of the Board of Directors.  Moreover, an employee, designated person, vendor, or contractor of EPIC cannot be an immediate family member of a member of the Board of Directors, as such a scenario could create a conflict of interest.

C. The BOD may remove any employee, designated person, vendor, or contractor at any time, with or without cause.

D. EPIC may provide compensation in amounts considered reasonable for services rendered by employees, vendors, and contractors.  Such amounts are to be fixed by the BOD.


## ARTICLE XV – FINANCES

A. The BOD will maintain non-interest-bearing accounts of EPIC at local banks in Texas.  The BOD may maintain as many accounts as are necessary at multiple banks in Texas.

B. The BOD will appoint a Certified Public Accountant (CPA) to audit EPIC accounts at least every two years.

C. The BOD can authorize a committee or a Project Committee to open separate accounts for certain defined purposes. All committees, including Project Committees collecting funds at EPIC must create an annual budget and submit to the BOD for approval.

D. The BOD will review and present the audited financial statements and records of EPIC, on a periodic basis, to ensure accuracy and integrity of the organization. The President and Treasurer of the BOD will assist and facilitate any such reviews and audits.

E. Whenever a BOD member, general body member, employee or contractor has a financial or personal interest, or has an immediate family member with a financial or personal interest in any matter coming before the BOD, the affected person shall:

   1. Fully disclose the nature of the interest; and

   2. Withdraw from discussion, lobbying, and voting on the matter. Any transaction or vote involving a potential conflict of interest shall be approved only when a majority of disinterested BOD members determine that it is in the best interest of EPIC to do so. The minutes of meetings at which such votes are taken shall record such disclosure, abstention, and rationale for approval.

20

**Exhibit 1**

F.  Fundraising Policies and Guidelines:

1.  For fundraisers conducted after Jumu'ah, the fundraising organization shall makeup the average running total collection after the Jumu'ah prayer for EPIC. EPIC also reserves the right to a hosting fee. The amount will be decided by the EPIC BOD on a case-by-case basis.

2.  EPIC allows only one (1) fundraising opportunity per calendar year for requesting organizations. Exceptions to this policy can be made during emergencies and for calamities that require immediate relief, rehabilitation, and humanitarian assistance.

3.  All fundraising requests and schedules on EPIC premises must be pre-approved by the EPIC BOD. To obtain permission for fundraising, all organizations and individuals must submit an online or written fundraising request to the EPIC BOD.

4.  EPIC allows fundraisers for only approved 501-(c)(3) non-profit organizations.

5.  All organizations will be vetted by the BOD prior to being authorized to fundraise at EPIC.

6.  BOD has to make public the criteria for prioritizing organizations seeking fundraising at EPIC.


## ARTICLE XVI – MEETINGS AND QUORUM

A.  General Body Meetings

1.  The BOD will call for General Body meetings twice every calendar year: first one during the first half of the calendar year and second one during the second half of the calendar year. The duration between the any two General Body Meetings would be minimum of three (3) months. The notification of the meeting will be sent to all General Body members along with the Venue, Date, and Time at least seven (7) days in advance.

2.  The President of the BOD or his/her designated BOD member will chair all General Body meetings, moderate the discussions, and deliver the concluding remarks. At these meetings, the President, BOD, and its committees will present the annual reports, including budget and financial reports, to the General Body.

3.  EPIC members would be allowed to ask questions during General Body Meetings.

4.  In the absence of the President, and in case when there is no designated BOD member by the President, the Vice President will chair the meeting and the Vice-President will present the President's Report.

21

Exhibit 1

5. Two-third (2/3) majority of the votes would constitute passing of a resolution at a General Body Meeting.

B.  Special General Body Meeting(s)

1. In case of a dispute or concern, the concerned EPIC member(s) shall try to resolve it with the BOD. If the matter is not settled after discussions with the BOD, only then the concerned members(s) have an option to seek a Special General Body meeting.

2. The BOD will call for a Special General Body meeting if five (5) percent of voting members of the General Body sign a petition for presenting, discussing, and voting on prepared written resolution(s). The Secretary will share the written resolution(s) electronically or in hardcopy format with the General Body members at least seven (7) days in advance.

3. In this meeting, the General Body members seeking a resolution will have a selected representative for presenting the prepared written resolution(s).

4. The President of the BOD or his/her designate will chair the Special General Body meeting and moderate the discussion on the resolution(s).

5. The BOD may also call for a Special General Body meeting to seek General Body consensus on important matters related to EPIC.

6. Two-third majority of the votes would constitute passing of a resolution at Special General Body Meetings.

7. The BOD will call a Special General Body meeting if a call for dissolution is made pursuant to Article XVII.

C.  Quorum for all General Body Meetings

1. The quorum for the General Body Meeting is not required, if there is no voting involved in that meeting.

2. Ten percent (10%) of the voting members of the General Body will constitute a quorum for the General Body meetings. However, Fifteen percent (15%) percent of the General Body voting members will constitute the required quorum for a Special General Body Meeting called for any amendment to the constitution under Article XVIII. Similarly, Twenty-five percent (25%) of the voting members of the General Body will constitute a quorum for a Special General Body meeting called to impeach an individual board member or the entire BOD under Article X(B)

22

Exhibit 1

3. Meetings adjourned for lack of quorum must be reconvened within a reasonable time, not exceeding seven (7) days. However, Special General Meeting called to impeach an individual board member or the entire BOD or amend the constitution cannot be reconvened because of lack of quorum.

4. Five percent (5%) of voting members of the General Body will constitute a quorum for the reconvened meeting. No written notification of such meeting is required. However, the venue, date, and time for the reconvened meeting will be determined before the adjournment of the original general body meeting.

D. BOD Meetings

1. The BOD will meet at least twice (2) a month. The meetings will be announced and open to General Body members in good standing with EPIC.

2. Any or all directors may participate in a BOD meeting using any virtual means through which all persons participating in the meeting are able to communicate with one another, and such participation shall constitute presence in person at the meeting.

3. Minutes of the BOD meetings will be recorded and maintained. Summary of the BOD meeting minutes will be made available to the General Body members of EPIC by the Secretary for review within thirty (30) days after the approval of meeting minutes.

4. A majority of the BOD members may request the Secretary to call an emergency meeting. All BOD members will be informed of said emergency meeting by the Secretary.

5. Majority decision(s) of the BOD will always prevail. The Act of a majority of the directors present at a meeting at which quorum is present shall be the act of the Board.

6. The President can cast tie-breaker vote.

7. A decision reached by the BOD cannot be modified, changed, or altered by any individual BOD member(s).

8. Any action required or permitted to be taken by the Board may be taken without a meeting if all directors consent in writing or electronically to the adoption of a resolution authorizing the action. The resolution and the written consents thereto shall be filed with the minutes of the proceedings of the BOD.

E. Quorum for BOD Meetings

1. A simple majority of the number of directors shall constitute a quorum for the transaction of business.

23

Exhibit 1

2. A quorum of at least five (5) members of the BOD is required for the following BOD actions:

   a. The hiring and firing of full-time employees

   b. The Financial decisions of over $25,000.00

   c. The calling of a General Body Meeting by the BOD

   d. The removal of BOD member.


## ARTICLE XVII – DISSOLUTION OF EPIC

A. At least Seventy-Five percent (75%) of the voting members of the General Body will request the BOD in writing to call for a meeting to dissolve EPIC. The BOD will call for a meeting within eight (8) weeks from the requested date. At least seventy-five percent (75%) of the voting members of the General Body must be present and two-thirds (2/3) votes of the voting members of the General Body present are required to dissolve EPIC.

B. Upon dissolution of EPIC, no part of EPIC's earnings or assets shall inure to the benefit of any of its members, employees, or contractors. The Board of Directors will dispose of all assets of EPIC after paying or making provision for the payment of all liabilities of EPIC. In order to keep all the remaining assets locally where the members at large may benefit, the residual assets of EPIC shall be distributed to one or more Islamic Organizations which themselves are exempt as organizations described in Section 501(c)(3) and 170(c)(2) of the Internal Revenue Code of 1954, as amended, or in accordance with federal, state, or local government for exclusive public purpose.


## ARTICLE XVIII – AMENDMENTS

A. This Constitution cannot be repealed or replaced.

B. Following cannot be amended:
   1. Article II
   2. Definition of Imam, Sunnah and Sunni Muslim as described in Article IV

C. This constitution may be altered, changed, or amended at a Special General Body meeting specifically called for this purpose. Thirty (30) days of written notice and an agenda including the text of the proposed constitutional amendments as well as the text of any existing provisions proposed to be altered or amended, must be made available to the EPIC General Body members via the EPIC Board of Directors. Only EPIC BOD can call for a Special General Body Meeting for seeking any amendment

24

Exhibit 1

to the constitution. The Annual Meeting of the General Body may also be utilized for this purpose provided that the members are notified in advance (as specified in this article).

D.  Fifteen (15%) percent of the General Body voting members constitute the required quorum for an amendment to the constitution.

E.  Any amendment to the Constitution must be approved by a two-thirds (2/3) majority of the voting members present at the meeting.

F.  Constitutional amendment requests from the General Body must be made in writing to the BOD.

G.  For Amendments proposed by the General Body and the BOD, the BOD may appoint a Constitution Committee to review the proposed written amendments.  The committee will provide written recommendations to the BOD.

## ARTICLE XIX – MEDIATION AND ARBITRATION

A.  Any interpersonal or organizational disputes between individual members or nonmembers of EPIC that happens within EPIC premises and/or at an EPIC event may be resolved by the BOD.

B.  If the BOD fails to resolve the dispute, an Independent Arbitration Committee will be established by the BOD.

C.  The Arbitration Committee will consist of three (3) members from the EPIC General Body, plus two (2) members consisting of Imams or resident scholars in the Dallas-Fort Worth Metro area.

D.  The parties in the dispute will agree on the arbitrators within fifteen (15) days.  If the parties are unable to agree on the arbitrators, the arbitrator would be EPIC Legal Counsel.

E.  The Arbitration Committee may solicit assistance from other National Muslim organizations, if deemed necessary.

F.  The decision(s) of the Arbitration Committee will be final and binding upon all members and non-members of EPIC.

G.  The members of the Board of Directors or the Arbitration Committee will not be individually liable for their collective decisions and actions.

## ARTICLE XX – EPIC CLERGY

A.  EPIC Clergy includes but not limited to the Resident Imam, Scholars, Youth Director, etc.

B.  The Clergy shall be an at will employee of EPIC.

25

Exhibit 1

C.  The Clergy may serve as an advisor to the BOD on all religious matters.

D.  Qualifications and Selection Criteria for members of EPIC Clergy are as follows:

   1.  Must be Sunni Muslim who follows the Qur'an and Sunnah according to the methodology of Ahl-as-Sunnah wal-Jama'ah.

   2.  Must have a comprehensive understanding of Islam with at least a bachelor's degree in Islamic Studies and adequate knowledge of the four Sunni Madhabs, including their differences.

   3.  Must have extensive experience delivering Jumu'ah khutbahs (sermons), as well as lectures, halaqahs, and general Islamic-knowledge classes to Muslims of all ages and ethnicities.

   4.  Must hold moderate views, present ideas in a balanced and egalitarian way, and practice soft approach with people.

   5.  Must have excellent English communication skills and be able to communicate with American Muslims of all ethnicities and age groups, especially the youth.

   6.  Desirable to be a Hafidh and has experience leading the Taraweeh prayers.

   7.  Desirable to have experience in media and outreach to clear misconceptions and stereotypes about Islam and Muslims and to present Islamic beliefs and practices to people of other faiths.

E.  Any member of Clergy employed full-time by EPIC cannot have another full-time employment position, while employed with EPIC.

_____

26

**Exhibit 1**



TEXAS FUNERAL SERVICE COMMISSION
8100 CAMERON RD  BLDG B  SUITE 550  AUSTIN TEXAS 78753 • (512) 834 9992

LARRY A FARROW
Executive Director

December 9, 1987

Mr. Abdul Wahidi
403 Buttercup Creek Blvd., Unit M-1
Cedar Park, TX  78613

Dear Mr. Wahidi:

Texas law requires that an individual or establishment be licensed only if they are engaged in directing funerals or preparing bodies for compensation. The law allows a family or friends to prepare and bury a body so long as they do not receive compensation for services, file a death certificate and obtain a burial transit permit.

The Islamic Center of Greater Austin may prepare and bury the members of their mosque without being licensed by this agency so long as they follow the guidelines listed above. I am enclosing a copy of our current statute as well as a copy of the 1986-87 version. Please pay particular attention to the information highlighted on pages 47-67 of the second booklet.

Prior to actually preparing bodies at your mosque I would strongly suggest that you contact the city regarding any zoning restriction that might be applicable.

Please call me if you have any questions.

Very truly yours,

Larry A. Farrow
Executive Director

LAF/kab

cc:  Austin Mosque

| C Ray Burchette Secretary | William I Stephenson Chairman | James P Hunter, III Vice Chairman | |
| --- | --- | --- | --- |
| John W Amey | James B Broussard | George A Parker | Donald Taft | Henry E Thomas Sr | Margaret Ward |

**Exhibit 2**

December 17, 2014

Dear Ms. Kahn,

I am writing to confirm our conversation today in which staff of the Commission informed you that your organization may receive the bodies of deceased members of the organization and perform their burial services without the need of a licensed Funeral Establishment or Funeral Director.

As we mentioned in our phone conversation, there is no requirement in the State of Texas that a hospital or health care facility must release a deceased person to a Funeral Director. The Commission has consistently maintained the position that family members and religious organizations may pick up and transport the bodies of members in keeping with their religious beliefs. Religious organizations may receive the bodies and transport the deceased to perform their burial services without the need of contracting a Funeral Establishment or Funeral Director.

If you should have any problems in the future, please inform the establishment that there is no law in Texas requiring that a licensed Funeral Director must pick up a deceased person. There are many "Mortuary Service" or transport companies that are not required to be licensed that pick up deceased persons from hospitals on a regular basis. You should not be required to contract with and pay a Funeral Establishment and Funeral Director to pick up and transport the deceased person to perform the funeral services and burial in keeping with your religious beliefs.

Staff of the Commission has discussed these issues with members of the Islamic Society of Houston. I would suggest that you contact them to see how they have been able to work with hospitals and health care providers in the Houston area.

Please note the definitions in Texas Occupations Code Section 651.001 and the requirements in the statue and rules to ensure that you are not violating the law. Receiving compensation of any kind would be a clear violation of the law because your organization is not licensed as a Funeral Establishment pursuant to Texas Occupations Code Section 651.251 and 651.351.

If any hospital or health care facility wants to contact the staff of the Commission they may call us for clarification of the Commission's position.

Sincerely,


Kyle E. Smith
Staff Attorney
Funeral Service Commission                                          Texas

**Exhibit 3**

Toll Free: (888) 667-4881
Tel: (512) 936-2474
www.tfsc.texas.gov



Physical Address:
1801 Congress Ave
Suite 11-800
Austin, Texas 78701

## Texas Funeral Service Commission

March 26, 2025

East Plano Islamic Center
4700 14th St.,
Plano, TX 75074

Via Email: funeral.services@epicmasjid.org        Via CM: 9214 8901 9403 8307 0634 96

---

**Re:    Cease & Desist**

---

Dear East Plano Islamic Center,

The Texas Funeral Service Commission has determined that you are operating as a funeral home without an establishment license in violation of TEX. OCC. CODE § 651.351.

Effective immediately, you are ordered to cease and desist funeral service operations.

Based in part on this determination, the Texas Funeral Service Commission is also making a criminal referral to the Collin County District Attorney. *See, e.g., id.* § 651.602. Please email my attorney at legal@tfsc.texas.gov with any questions.

Sincerely,

Scott Bingaman
Executive Director
Texas Funeral Service Commission

**Exhibit 4**

# Head of Texas funeral commission shared anti-Islam media, pictures of Muslim state rep in texts

KERA | By **Toluwani Osibamowo**, **Penelope Rivera**

Published August 16, 2025 at 4:37 PM CDT
Updated August 16, 2025 at 8:48 PM CDT





*Screenshot / Texas Senate Website*

Texas Funeral Service Commission Presiding Officer Kristin Tips and then-Executive Director Scott Bingaman testify together at a Senate Health and Human Services Committee meeting April 16, 2025.

At 11:04 p.m. on May 20, amid the Texas Funeral Service Commission's probe into a North Texas mosque accused of operating as a funeral home without a license, the head commissioner of Texas' funeral regulator Kristin Tips sent then-executive director Scott Bingaman a graphic made by the Shirion Collective, a self-described pro-Israel "surveillance network."

It compared the tenets of Judaism and Christianity to the rules of Islam and Muslim countries, without context: that the Quran states non-Muslims are "subhuman," and that touching the holy book as a non-Muslim, "can mean death," according to text messages obtained by KERA News and first reported by the *Houston Chronicle.*

With it, Tips shared a link to a May 9 video by YouTuber Tal Oran in which he criticized a clip from an unnamed podcast discussing EPIC City, the East Plano Islamic Center's

<span style="color:red">**Exhibit 5**</span>

planned development in Collin County. Oran said the proposed community — which developers have said will not exclude non-Muslims — would breed "terrorists."



5/20/25, 11:04 PM

https://youtu.be/MSAfi2r-Uew

Not a fan… tough to be tolerant when taught hate

*Screenshot*

A message from Texas Funeral Service Commission Presiding Officer Tips, left, shows a graphic comparing Judaism, Christianity and Islam along with a link to a video by YouTuber Tal Oran. Scott Bingaman, then the executive director of the commission, responds with the message on the right.

Gov. Greg Abbott had praised TFSC's decision to investigate EPIC two months prior. It became one of five state investigations into the mosque, spurred by the negative attention the EPIC City plan attracted online earlier this year, primarily in right-wing circles.

All Texas Funeral Service Commission board members, including Tips, are Abbott appointees. Bingaman joined TFSC as executive director, the top staff position, in September.

"Not a fan… tough to be tolerant when taught hate," Bingaman replied to the graphic and YouTube link.

"Agreed!" Tips wrote back. "Look what happened last Thursday at literally the 11th hour to appeal the Land takeover lol through Cemetery", seemingly referring to a bill Tips and her husband Robert "Dick" Tips supported that would no longer allow cemeteries to be established within city or county limits.

Earlier messages from Tips to Bingaman imply State Rep. Suleman Lalani, D-Sugar Land, informally voted against that bill. Lalani voted it out of committee, according to meeting minutes, but it failed to pass in the last days of the legislative session.

**Exhibit 5**

Tips then shared an image of Lalani in the Capitol and a screenshot of Lalani's Instagram post the day he took the oath of office in January, which he did with his hand on a Quran as opposed to Christian lawmakers' usual choice of a Bible. Lalani became one of the first Muslim state lawmakers in Texas when he was elected in 2022.



*Screenshot*

Tips' texts, left, seemingly refer to House Bill 2673, a bill Tips and her husband Robert "Dick" Tips supported that would no longer allow cemeteries to be established within city or county limits. Kristin Tips attributes its failure to Lalani.

Tips also shared a link to the May 6 episode of the Chad Prather Show, where the conservative political commentator questioned whether EPIC City and the Texas Legislature's recognition of "Pakistan Day" this year indicated a "slow and steady creep of cultural replacement" pushing out Judeo-Christian roots. The messages show no response from Bingaman.

When KERA reached out to Tips for comment, she gave the phone to a person who said in Spanish that she was Tips' daughter. Tips declined to comment, the person said. KERA News also reached out to Lalani and Abbott's office and will update this story with any response.

## Anti-Muslim sentiment in Texas

EPIC sued the commission in early July to resume its funeral and burial services. The suit alleged TFSC had no grounds to investigate the mosque, and the commission was violating EPIC's religious rights.

Exhibit 5

Weeks later, TESC walked back some of its claims but stated the investigation into EPIC is ongoing. A spokesperson for Abbott said at the time the governor's office was unaware of the letter when KERA News reached out for comment.

Bingaman, when reached for comment on this story, referred KERA News to his attorney, who could not immediately be reached by phone Saturday.

The newly revealed texts come amid a growing climate of anti-Muslim sentiment in Texas. Most recently, the chairman of the Tarrant County Republican Party, Bo French, targeted Democratic state House Rep. Salman Bhojani, who represents parts of Arlington, Euless and Bedford.

In several posts on X, French called Bhojani an "anti-American democrat", said he was trying to "further jihad," and called on federal officials to denaturalize and deport the lawmaker, who is originally from Pakistan — which French referred to in his posts as, "the same place Osama Bin Laden hid".

French later asked his followers if the law should be changed to "forbid foreign born people from holding any elected office."

Bhojani said he's seen an uptick in openly anti-Muslim rhetoric since President Donald Trump made controversial comments on Muslims and restricted travel from predominantly Muslim countries during his first term. He's not surprised about the texts between Tips and Bingaman, he said, but government officials need to be held accountable for their speech.

"When you're in the government, whether you're elected or appointed, you should be held to a higher standard," Bhojani said in an interview with KERA News Saturday. "You should be not insinuating this kind of hate amongst your peers and executive director."

French also reposted tweets from Amy Mek, founder of the conservative outlet Rise Align Ignite Reclaim foundation, which posts anti-Muslim content and has been characterized as an anti-Muslim hate group by the Southern Poverty Law Center.

Mek's previous posts on EPIC City sparked backlash against the development. Mek accused EPIC of promoting Sharia law, while spouting negative rhetoric about Islam.

Following those posts and the ensuing controversy online, Abbott and Attorney General Ken Paxton announced state investigations into the project. Abbott referred to EPIC City

Exhibit 5

as a "sharia city."

EPIC City is a planned 402-acre development in unincorporated Collin and Hunt counties that would be roughly 40 miles northeast of Dallas near the city of Josephine, and would include a new mosque, more than 1,000 single and multi-family homes, a K-12 faith-based school and other amenities.

In addition to the claims EPIC is operating as an unlicensed funeral home, Abbott and Paxton allege without evidence that the EPIC City project could discriminate against non-Muslims in violation of the Texas Fair Housing Act. They also claim the project could cause potential financial harm to investors and may be violating Texas consumer protection laws.

Abbott also launched a criminal investigation into the project. He and Paxton have provided little to no evidence of wrongdoing.

Bhojani called state officials' approach to investigating EPIC discriminatory and unconstitutional.

"Throughout the state of Texas and throughout the country, there are so many developments that are led by Muslims and they're next to a mosque, and all they want to do is practice their faith in peace and just doing their American values, displaying that and just being contributing citizens of the United States," he said.

## 'Rein her in'

Bingaman worked with Tips in January to send the governor's office a list of rules and regulations seen as harming small businesses in the funeral industry that the commission wanted to be repealed. TFSC wanted state lawmakers to overturn a Texas Supreme Court decision that allows relatives of the dead to recover damages for a funeral provider's alleged mishandling of the body.

The ruling allowed for lawsuits that "place unbearable financial strain on family-owned small businesses, driving insurance premiums and deductibles to unsustainable levels," Bingaman wrote. The provision appeared in the first version of Republican Sens. Tan Parker and Lois Kolkhorst's Senate Bill 2721, which ultimately didn't pass.

In a letter to commissioners right before he was fired in June, Bingaman alleged that Tips failed to tell him that capping non-economic damages in funeral home lawsuits

Exhibit 5

and other proposed measures would benefit her and her husband's own funeral business, Mission Park Funeral Chapels, Cemeteries, and Crematories. He raised concerns multiple times — including with the governor's office — that Tips was unlawfully using TFSC staff and resources to advocate for bills in the Legislature that would benefit her, according to the lawsuit challenging his firing.

Bingaman's messages to Tips, however, indicate some initial willingness to defend the cap on funeral home lawsuit damages. In an email the afternoon of May 5, *San Antonio Express-News* writer Patrick Danner asked TFSC why it was "advocating for caps on liability for funeral home blunders and how that squares with its mission of protecting the public," according to a copy of the email attached to Bingaman's lawsuit.

Bingaman texted Tips letting her know Danner's email required an urgent response before the publication of his story.

"I know the answer but hope you could add a little more detail other than protecting small mom and pop funeral homes that are being targeted by (personal) injury attorneys and frivolous lawsuits," Bingaman wrote.

5/5/25, 2:01 PM

Email sent to you requires urgent response
We have till noon tomorrow to respond

SA Express News inquiry about our letter in JAN sent to OOG and why we are advocating for liability caps on funeral homes

I know the answer but hope you could add a little more detail other than protecting small mom and pop funeral homes that are being targeted by pers injury attorneys and frivolous lawsuits

*Screenshot*

Bingaman texted Tips shortly after a *San Antonio Express-News* reporter reached out about the commission's support of a bill that would put a cap on damages awarded in lawsuits against funeral homes.

Bingaman had voiced his worries about getting too involved with lobbyists to Tips before this, the texts show. Mike Toomey, a lobbyist representing the Texas Hotel and Lodging Association, reached out to Bingaman in March asking for the two of them and association president Scott Joslove to meet and discuss TFSC's recently imposed moratorium on transferring cadavers and anatomical specimen out of state.

Bingaman felt there was something "substantially wrong" with this kind of meeting, he told Tips.

"I don't enact policy. I only execute on it so I don't know what good this will do for him to meet with me cause I'm just going to tell him no".

<span style="color:red">**Exhibit 5**</span>

Attorney Christopher Burnett, who Bingaman hired in May, told KERA News he and fellow staff attorney Sarah Sanders warned Bingaman it wasn't right for a commissioner to use their position to lobby. Bingaman then brought the concerns about Tips' behavior to Abbott's budget and policy advisor Alex Aragon, Burnett said, and the response from the governor's office was to "rein her in."

"I heard it," Burnett said. "'Rein her in, you need to talk to her.' So, the governor's office put the burden on Bingaman to try and stop Tips from doing all her nonsense, right? And so, Scott had a conversation with her, and apparently it did not go well."

Sanders said she witnessed this and personally spoke to the governor's office about Tips, but staff began ignoring Bingaman's calls. She called on Abbott to take action.

"The people suffering from this are the people of Texas," Sanders said. "Because every time you go into a funeral home and something goes wrong and you feel like something isn't done about it, it's because of this dysfunction."

In a meeting July 21, commissioners said they fired Bingaman for his "lack of candor" and poor communication and leadership. That same day, Burnett and Sanders were fired.

The lawyers said they weren't given cause but alleged it was because of their backing of Bingaman's claims against the commission. TFSC sued the attorneys over their public accusations and for allegedly recording conversations among staff, but the commission dropped that suit less than a week later without prejudice, meaning it could be filed again.

*This story has been updated with comments from State Rep. Salman Bhojani.*

*Got a tip? Email Toluwani Osibamowo at* tosibamowo@kera.org *or Penelope Rivera at* privera@kera.org.

*KERA News is made possible through the generosity of our members. If you find this reporting valuable, consider* making a tax-deductible gift today *Thank you.*

**Tags**

| Government | Texas Funeral Service Commission | Islam | EPIC |

| Funeral homes | funeral |



Exhibit 5



## Toluwani Osibamowo

Toluwani Osibamowo covers law and justice for KERA News. She joined the newsroom in 2022 as a general assignments reporter. She previously worked as a news intern for Texas Tech Public Media and copy editor for Texas Tech University's student newspaper, The Daily Toreador, before graduating with a bachelor's degree in journalism. She was named one of Current's public media Rising Stars in 2024. She is originally from Plano.

See stories by Toluwani Osibamowo



## Penelope Rivera

Penelope Rivera is KERA's Breaking News Reporter. She graduated from the University of North Texas in May with a B.A. in Digital and Print Journalism.

See stories by Penelope Rivera

## Related Content



### Texas funeral commission sues ex-staffers over public accusations, allegedly recording conversations

August 12, 2025



### Ex-staffers spoke out against the Texas funeral commission. Then came the cease-and-desists

August 7, 2025

Exhibit 5



## Fired Texas funeral commission staffers allege unethical behavior, retaliation by agency head

July 28, 2025

Exhibit 5