UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **EAST PLANO ISLAMIC CENTER (EPIC),** § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION NO. 1:25-cv-1085 |
| § | |
| **TEXAS FUNERAL SERVICES COMMISSION,** *et al.*, § | |
| § | |
| *Defendants*. § | |

**DEFENDANT KRISTIN TIPS' MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant Kristin Tips, through the Office of the Attorney General of Texas, files this motion to dismiss Plaintiff East Plano Islamic Center ("EPIC")'s Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In support, Ms. Tips offers the following:

**I.    STATEMENT OF THE CASE**

This lawsuit challenges a March 26, 2025 cease-and-desist letter issued by Scott Bingaman, former Executive Director of the Texas Funeral Services Commission ("TFSC"), requiring EPIC to halt unlicensed funeral-related activities. In its original state court pleading, EPIC sought equitable relief from TFSC and its current Executive Director in his official capacity. After removal to federal court, EPIC amended its complaint to add individual-capacity Section 1983 claims—but not against the obvious candidate. Instead of naming Mr. Bingaman, who issued the cease-and-desist letter, EPIC named Kristin Tips, a TFSC member with no personal involvement in the enforcement action.

Because personal involvement is a prerequisite for standing, Section 1983 liability, and overcoming qualified immunity, Ms. Tips filed a motion to dismiss EPIC's First Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  D.E. 29.  And because qualified immunity is a complete bar to suit, Defendants filed a motion to stay all discovery.  D.E. 30.  Before the Court could rule on either motion, however, EPIC sought leave to amend its complaint *again*, purportedly to "cure[] the putative pleading defects raised by the pending motion to dismiss."  D.E. 31 at 1.  The Court granted EPIC leave to amend, denying Ms. Tips' motion to dismiss and Defendants' motion to stay "without prejudice subject to refiling."  D.E. 45 at 10.

As described below, EPIC's Second Amended Complaint—D.E. 46 ("SAC")—suffers from the same fatal pleading defects as its predecessor, and thus should be dismissed on the same grounds asserted in Ms. Tips' original motion.  Specifically, even accepting all new allegations as true, EPIC's SAC fails as a matter of law to establish (1) an injury directly traceable to any conduct by Ms. Tips sufficient to confer standing, (2) personal involvement sufficient to state a claim under Section 1983, or (3) a violation of clearly established law sufficient to overcome qualified immunity.

## II.     SUMMARY OF ALLEGATIONS

TFSC is a statutorily created body which issues and regulates licenses for funeral directors, funeral establishments, embalmers, and crematories.  SAC ¶ 12.  Among other functions, TFSC has disciplinary authority over license-holders and may assess administrative penalties, subject to administrative procedures.  *Id.*  TFSC is comprised of seven members (including a presiding officer), appointed by the governor, who are responsible for electing an Executive Director.  TEX. OCC. CODE. §§ 651.051(a), 601.057, 651.101.  At relevant times, Mr. Bingaman was TFSC's Executive Director and Ms. Tips was a TFSC member and its presiding officer.  SAC ¶¶ 3, 49.

EPIC is a non-profit organization which, among other functions, conducts Islamic funeral rites for the deceased.  *Id.* at ¶¶ 20-25.  EPIC asserts that it does not operate as a funeral establishment because it does not receive compensation for funeral-related services, file death certificates, obtain burial transit permits, transport bodies, or dispose of human remains. *Id.* at ¶ 28.

On March 26, 2025, Mr. Bingaman issued a letter informing EPIC that it was "operating as a funeral home without an establishment license in violation of TEX. OCC. CODE § 651.351"and ordering it to "cease and desist funeral service operations." SAC Ex. 4 ("C&D Letter"). Mr. Bingaman's C&D Letter also stated that the matter was being referred to the Collin County District Attorney for potential criminal enforcement. *Id.* Since receiving the C&D Letter, EPIC has ceased performing funeral rites for its congregants, at least 11 of whom have passed away so far. SAC ¶ 48.

EPIC asserts that Mr. Bingaman sent the C&D Letter not as a legitimate exercise of TFSC's enforcement authority, but rather as a targeted response to EPIC's planned "EPIC City" development, and as part of a broader "witch hunt" by lawmakers against Muslims in Texas *Id.* at ¶¶ 30-47. Although EPIC admits that the C&D Letter was "formally signed and transmitted" by Mr. Bingman, it alleges that Ms. Tips is nonetheless liable for its effects on two bases.

First, EPIC asserts that, as TFSC's presiding officer, Ms. Tips "wielded considerable *de jure* and *de facto* supervisory control over [Mr. Bingaman], both generally and specifically as it applies to the adverse actions taken against EPIC." SAC at p. 2. To support this conclusion, EPIC alleges that Ms. Tips (i) forwarded or commented on materials relating to EPIC and broader "Sharia law" rhetoric and expressed concern about potential political fallout if TFSC failed to act with respect to EPIC; (ii) gave Mr. Bingman "direction, instruction, edits, approvals, and strategic guidance on enforcement matters, draft orders, press releases, investigations, legislative responses, and interactions with regulated entities"; (iii) "directly supervised and approved multiple cease-and-desist actions involving other entities"; (iv) responded to a general (not-EPIC-specific) lobbyist inquiry on the day the C&D Letter was sent by telling Mr. Bingman to "hold tight" and instructing him that she was "coordinating with the Governor's office regarding the enforcement activity"; and (v) the same day, was "bbc'ed" on an email to another TFSC employee regarding the [EPIC] investigation." *Id.* at ¶¶ 51-64. Critically, however, EPIC does not allege that Ms. Tips possessed statutory authority to issue enforcement

letters, initiate criminal referrals, or unilaterally direct (or veto) enforcement actions. Nor does EPIC allege that Ms. Tips actually directed Mr. Bingaman to issue or enforce the C&D Letter.

Second, EPIC alleges that Ms. Tips shared the underlying animus against Muslims which prompted issuance of the C&D Letter. *Id.* at ¶¶ 65-70. As evidence of this, EPIC relies solely on a KERA News article which describes uncontextualized private text messages from Ms. Tips to Mr. Bingaman and editorializes their potential meaning. SAC Ex. 5. In one exchange, Ms. Tips shared a YouTube video commenting on the EPIC City development and a graphic comparing Jewish, Christian, and Islamic beliefs. *Id.* Mr. Bingaman responded "not a fan . . . tough to be tolerant when taught hate," and Ms. Tips wrote back in agreement. *Id.* In another exchange, Ms. Tips shared a photograph of Suleman Lelani, the only state legislator who voted against a bill and her husband supported which would no longer allow cemeteries to be built within city or county limits, commenting "you can guess who." *Id.*[1] EPIC construes these exchanges as occurring "in the same timeframe as the challenged EPIC enforcement decision" (SAC ¶ 65), but every screenshot in the KERA News article is date-stamped in May 2025, several weeks *after* Mr. Bingaman issued the C&D Letter On March 26, 2025. SAC Ex. 5. EPIC does allege that Ms. Tips made any *public* statements evincing animus towards EPIC or Islam, or that she took any official action based on such animus.

EPIC asserts seven claims in its SAC, *all* of which are premised on Mr. Bingaman's C&D Letter and its resulting inability to perform funeral rites for its congregation. SAC ¶¶ 71-110. EPIC's first five claims—which remain from its original pleading—seek declaratory and injunctive relief from TFSC and its current Executive Director in his official capacity for alleged *ultra vires* conduct and violations of the United States Constitution, Texas Constitution, and the Texas Religious Freedom Restoration Act. *Id.* at ¶¶ 71-95. EPIC's sixth and seventh claims—which were added in its First

---

[1] The KERA News article emphasizes that Rep. Lelani is Muslim, and that the photograph shows him being sworn in on a Quran, but neither Rep. Lalani's religion nor the presence of the Quran are mentioned in the screenshotted text messages between Ms. Tips and Mr. Bingaman. SAC Ex. 5.

Amended Complaint and remain unchanged in its SAC—seek damages from Ms. Tips in her individual capacity under 42 U.S.C. § 1983 for alleged violations of the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause. *Id.* at ¶¶ 96-110.[2]

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal for lack of subject-matter jurisdiction. In determining whether subject-matter jurisdiction exists, a court "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *CleanCOALition v. TXU Power*, 536 F.3d 469, 473 (5th Cir. 2008) (quotation omitted).

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal when an opposing party fails to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 662 at 678. Thus, while the Court must accept all factual allegations as true, the Court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Iqbal*, 556 U.S. at 679.

## IV. ARGUMENT

### A. EPIC lacks standing to sue Ms. Tips because its injuries are not fairly traceable to her alleged actions.

---

[2] EPIC's two claims against Ms. Tips are both labeled as First Amendment free exercise claims, but the latter is clearly an equal protection claim and will be treated as such herein.

The Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). Standing, like other jurisdictional requirements, is not subject to waiver and demands "strict compliance." *Id.* at 819; *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996). To have standing, the plaintiff must satisfy three elements: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Gov. of Tex.*, 562 F.3d 735, 745 (5th Cir 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

Here, EPIC fails to establish the second causation element, which requires that its alleged injury must be "fairly traceable to the challenged action of [Ms. Tips], and not the result of the independent action of some third party." *Id.* at 560.

EPIC's only alleged injury in this case—the suspension of funeral rites for its congregants—flows exclusively from the C&D Letter issued by Mr. Bingaman and the chilling effects thereof. *See* SAC ¶ 29 (alleging that it was Mr. Bingaman who personally "issued" the C&D Letter), ¶ 45 (alleging that it was "[TFSC] and [Mr. Bingman]" who "singled out EPIC for disparate treatment"), ¶ 46 (alleging that it was Mr. Bingaman who personally "declared that **he** was making a *criminal* referral to the Collin County District Attorney") (first emphasis added), ¶ 47 (alleging that "not only were [Mr. Bingman]'s actions discriminatory, but they were also unsupported by **his** statutory authority") (emphasis added), ¶ 48 (alleging that the date Mr. Bingaman sent his C&D Letter was "the last day EPIC has performed funeral rites."), ¶ 93 (alleging that, "[u]nder the cloud of [Mr. Bingaman's C&D Letter] (and the threat of civil or criminal penalties for not-compliance), EPIC had no choice but to stop engaging in its religious funeral services").

EPIC summarily alleges that Ms. Tips wielded control over Mr. Bingaman's decision-making and was "the driving force" behind the enforcement action (*id.* at p. 2, ¶ 61), but unsupported conclusory allegations of this type cannot establish standing. *See*, *e.g.*, *Peters v. St. Joseph Servs. Corp.*, 74 F.Supp.3d 847, 857 (S.D. Tex. 2015) (dismissing claim for lack of standing when allegations of causation were "conclusory and fail[ed] to account for the sufficient break in causation caused by . . . third parties"); *Pennie v. Obama*, 255 F. Supp. 3d 648, 661 (N.D. Tex. 2017) ("Plaintiffs offer only conclusory allegations that the alleged threats were a result of Defendants 'acting in concert.' Such boilerplate allegations of causation are inadequate to demonstrate causation.").

Ms. Tips' only alleged actions were (1) sending text messages to Mr. Bingaman allegedly evincing anti-Muslim bias,[3] (2) approving *other* enforcement actions, (3) "maintain[ing] near-daily, real-time supervisory communication with Bingaman via phone, text, and email" in which she "gave direction, instruction, edits, approvals, and strategic guidance on enforcement matters, draft orders, press releases, investigations, legislative responses, and interactions with regulated entities;" (4) telling Mr. Bingaman, on the day the C&D Letter was sent, that she was "coordinating with the Governor's office regarding the enforcement activity;" and (5) being "bcc'ed" on an email from a staff attorney regarding the EPIC investigation. SAC ¶¶ 57-62, 65-67.

At most, these alleged actions perhaps show Ms. Tips' knowledge and support of the enforcement action against EPIC. But they do not establish a causal link between Ms. Tips and Mr. Bingaman's actual decision to issue the C&D Letter which caused EPIC's injuries. And, without that causal link, EPIC lacks Article III standing to sue Ms. Tips. *See*, *e.g.*, *Zamarripa v. Farrakhan*, No. 3:16-

---

[3] None of these messages mention TFSC's enforcement action against EPIC, however, much less indicate Ms. Tips' explicit involvement therein. SAC ¶¶ 65-69. Moreover, while EPIC describes these private exchanges as occurring "immediately before and after the March 26, 2025 cease-and-desist letter" (*id.* at ¶ 69), the KERA News article cited by EPIC as the source of its information only mentions messages sent in May 2025, weeks *after* Mr. Bingaman sent the C&D Letter. SAC Ex. 5. Even if the private messages could show that Ms. Tips harbored animus towards Muslims (which is hardly as obvious as EPIC insinuates), they cannot show a causal link between those messages and the C&D Letter sent by Mr. Bingman weeks earlier which caused its injuries.

cv-3109, 2019 WL 1015095, at *6 (N.D. Tex. Jan. 15, 2019), *rec. adopted*, 2019 WL 1014938 (N.D. Tex. Mar. 4, 2019) ("In the absence of an injury fairly traceable to [Defendant], Plaintiff cannot satisfy the second requirement for Article III standing, and his claims against him should be dismissed for lack of subject matter jurisdiction.")

### B. EPIC fails to allege Ms. Tips' personal involvement in a constitutional violation.

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). To establish individual liability under Section 1983, the plaintiff "must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999); *see also Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976) (requiring an "affirmative link" between the plaintiff's injury and the conduct of the defendant). The plaintiff must "specify the personal involvement of each defendant . . . [and] cannot make generalized allegations, nor can he support a claim based on any vicarious liability theory." *Murphy v. Kellar*, 950 F.2d 290, 292 n.7 (5th Cir. 1992) (quotation omitted).

Here, just Ms. Tips' lack of personal involvement in the enforcement action against EPIC deprives EPIC of standing to sue her, so too does it defeat EPIC's constitutional claims against her.

The gravamen of EPIC's claims is that Mr. Bingaman's C&D Letter and the threat of criminal penalties therein were discriminatory and forced EPIC to stop performing religious funeral rites for its congregants. *See* SAC at ¶ 99 (alleging that the C&D Letter violated the Free Exercise Clause because it "selectively targeted EPIC's religious activity"), ¶ 106 (alleging that the C&D Letter violated the Equal Protection Clause because it "was directed exclusively at EPIC and its Muslim congregation, thereby treating EPIC differently from other institutions on the basis of religion."). Thus, for Ms. Tips to be liable, EPIC must show an "affirmative link" between that letter and Ms. Tips's actions. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). EPIC's attempts to establish that link all fail.

First, EPIC argues that Ms. Tips is liable for the effects of Mr. Bingaman's C&D Letter because of "her contemporaneous communications with the [Mr. Bingaman] reflecting hostility toward Islam." SAC p. 2, ¶¶ 65-69, 99, 100, 106. As explained in the standing context, however, EPIC fails to establish any causal connection between its injuries and Ms. Tips' text messages or any religious animus which might be imputed therefrom. For one thing, the messages were sent in May 2025, weeks *after* Mr. Bingaman sent the C&D Letter, meaning they could not have possibly induced the enforcement action. SAC Ex. 5. Even setting that aside, though, nothing in the messages concern EPIC's alleged operation of an unlicensed funeral establishment or the C&D Letter, much less Ms. Tips' personal involvement in Mr. Bingaman's decision to initiate the enforcement action.[4] And even assuming Ms. Tips' messages could somehow plausibly be interpreted as "endorsing" Mr. Bingman's enforcement action against EPIC without even mentioning it, mere endorsement of allegedly unconstitutional acts by others is similarly insufficient to establish liability. *See Minix v. Stoker*, 289 F. Appx. 15, 17 (5th Cir. 2008) ("Minix contends that Assistant Warden Clay violated his constitutional rights by endorsing the improper acts of other defendants. This claim fails because Minix has not shown that Clay was personally involved in the acts of which he complains.").

Second, EPIC makes generalized assertions of Ms. Tips' participation in TFSC's affairs and insinuates that she was micromanaging Mr. Bingaman's actions in various ways. SAC ¶¶ 51-64. Specifically, EPIC alleges that Ms. Tips (ii) gave Mr. Bingman "direction, instruction, edits, approvals, and strategic guidance on enforcement matters, draft orders, press releases, investigations, legislative responses, and interactions with regulated entities"; (iii) "directly supervised and approved multiple cease-and-desist actions involving other entities"; (iv) responded to a general (not-EPIC-specific)

---

[4] The only message which even mentions EPIC is a YouTube video link Ms. Tips shared with Mr. Bingaman on May 20, 2025 criticizing the EPIC City project. SAC Ex. 5. Even if sharing this link could be construed as Ms. Tips agreeing with the viewpoints expressed therein, which is a long shot, it does not follow that Ms. Tips agreed with (much less influenced) Mr. Bingaman's decision to issue the C&D Letter two months prior.

9

lobbyist inquiry on the day the C&D Letter was sent by telling Mr. Bingman to "hold tight" and instructing him that she was "coordinating with the Governor's office regarding the enforcement activity"; and (v) the same day, was "bbc'ed" on an email to another TFSC employee regarding the [EPIC] investigation." But, critically, EPIC does *not* allege that Ms. Tips drafted, reviewed, approved, authorized, transmitted, or enforced the C&D Letter, which it admits was "formally signed and transmitted" by Mr. Bingaman. *Id.* ¶ 59. Absent such allegations, EPIC cannot establish Ms. Tips' liability for the alleged injuries caused by the C&D Letter. *See Anderson,* 184 F.3d at 443; *Harry v. Colvin*, No. A-13-CA-490-L, 2014 WL 12642577, at *2 (W.D. Tex. Apr. 21, 2014) (dismissing complaint which lacked "any allegations that the Commissioner was directly or personally involved in [the challenged agency decision]").

Finally, EPIC relies on Ms. Tips' mere status as TFSC's presiding officer to establish liability. While EPIC alleges that Ms. Tips' position allowed her to exercise "direct supervisory authority and operational control over [Mr. Bingman]" (*id.* at ¶ 51), the regulations governing TFSC confer no such authority on an individual TFSC member. *See generally* TEX. OCC. CODE Ch. 651. Nor does EPIC allege that Ms. Tips had legal authority to issue enforcement letters, initiate criminal referrals, or bind the TFSC unilaterally. No—only Mr. Bingman had that authority, and only he could be properly sued in his individual capacity for the effects of yielding that authority. EPIC's inexplicable decision to sue Ms. Tips in lieu of Mr. Bingaman should preclude it from obtaining an individual-capacity reward.

And there's another problem. EPIC alleges that Mr. Bingaman acted "*ultra vires*" by issuing the C&D Letter (*see* SAC ¶¶ 72–73), which by definition means that he acted "without any authority whatsoever." *Apter v. Dep't of Health & Human Serv.*, 80 F.4th 579, 586 (5th Cir. 2023). If that's true, then how could Ms. Tips be responsible for the effects of the letter by virtue of *her* legal authority over Mr. Bingaman? EPIC can't have it both ways. Either Mr. Bingaman acted outside the scope of his authority in issuing the C&D Letter, in which case Ms. Tips' alleged authority over him is irrelevant,

or Mr. Bingaman acted within the scope of his authority, in which case Ms. Tips' alleged authority might be relevant—if it weren't for Section 1983's prohibition of supervisory liability. *See Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987). Either way, Ms. Tips cannot be held liable.

In sum, neither Ms. Tips' private text exchanges, nor her alleged involvement in *other* enforcement actions, nor her position as TFSC member are sufficient—independently or combined—to impute her individual liability under Section 1983. *See Hicks v. Tarrant Cnty. Sheriff's Dep't*, 352 F. Appx. 876, 877 (5th Cir. 2009) ("Hicks failed to allege that [the Commissioners] were personally involved in the alleged constitutional violations. . . Therefore, the district court did not err when it dismissed Hicks's claims against the Commissioners in their individual capacities.").

### C. EPIC fails to overcome qualified immunity.

Qualified immunity shields state officials sued in their individual capacities from both suit and liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The scope of qualified immunity is broad—it "protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once qualified immunity has been asserted, the burden shifts to the plaintiff to show that it does not bar recovery. *See Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). To meet this burden, the plaintiff must both "(1) allege facts that make out a violation of a constitutional right, and (2) show that the right at issue was clearly established at the time of the defendants' alleged misconduct." *Espinal v. City of Houston*, 96 F.4th 741, 748–49 (5th Cir. 2024) (quotation omitted). "In essence, a plaintiff must allege facts sufficient to demonstrate that no reasonable officer could have believed his actions were proper." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

Here, EPIC's Proposed SAC fails to overcome the first qualified immunity threshold because, as described above, it fails to allege Ms. Tips' personal involvement in any constitutional violation. *See Jimerson v. Lewis*, 94 F.4th 423, 428 (5th Cir. 2024) ("A plaintiff seeking to overcome qualified immunity must specifically identify each defendant's personal involvement in the alleged wrongdoing.")

(quotation omitted); *Youmans v. Torres*, 828 F. Appx. 212, 213 (5th Cir. 2020) ("Youmans's complaint failed to allege sufficient facts showing Sheriff Torres's personal involvement in the alleged constitutional violation and negating the sheriff's defense of qualified immunity."); *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (describing personal involvement as "a prerequisite" to overcoming qualified immunity); *Walters v. Livingston*, No. A-12-CA-1072, 2014 WL 4546819, at *11 (W.D. Tex. Sept. 12, 2014), *aff'd*, 642 F. Appx. 416 (5th Cir. 2016) ("[T]he defendants [plaintiff] sues lack the requisite personal involvement to overcome their qualified immunity protection.").

But even if the Court determines that EPIC's Proposed SAC adequately alleges Ms. Tips's involvement in a constitutional violation, qualified immunity would still preclude individual-capacity liability because TFSC's enforcement action against EPIC did not violate any *clearly established* constitutional right. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation and alteration omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (quotation omitted). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).[5]

EPIC cannot identify any binding precedent placing it "beyond debate" that TFSC's enforcement action against it violates the First Amendment's Free Exercise Clause or the Fourteenth Amendment's Equal Protection Clause. EPIC's SAC and response to Ms. Tips' prior motion to dismiss cite to various cases, but none are sufficiently analogous to overcome qualified immunity.

---

[5] EPIC cites to *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), an Eighth Amendment case, for the proposition that Ms. Tips committed "the kind of 'obvious' constitutional violation for which qualified immunity does not apply." SAC ¶ 10. But, as EPIC admitted in its motion for leave to amend, the Fifth Circuit has explicitly declined to extend this "obvious" exception outside the Eighth Amendment context. D.E. 37 at 15 n. 1 (citing cases). Moreover, even if *Hope* applied to religion cases, EPIC's allegations hardly present one of the few "rare cases" in which the alleged constitutional violation is so obvious that analogous case law is not needed. *Garcia v. Bermea*, No. 23-50871, 2024 WL 3326088, at *1 (5th Cir. July 8, 2024).

EPIC first relies on *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, which involved municipal ordinances that were facially and operationally crafted to suppress a specific religious practice, with explicit discriminatory exemptions and a legislative record demonstrating targeting. 508 U.S. 520, 534-42 (1993). The ordinances in *Lukumi* which the Supreme Court held violated the Establishment Clause bear little resemblance to a single cease-and-desist letter enforcing a generally applicable licensing statute. The *Lukumi* decision did not clearly establish that an enforcement action becomes unconstitutional whenever a plaintiff alleges religious animus, particularly where (as here) the challenged action lacks the structural features that drove the court's analysis.

EPIC next relies on *Islamic Center of Mississippi, Inc. v. City of Starkville*, 840 F.2d 293 (5th Cir. 1988). There, the Fifth Circuit reviewed a developed record showing that a city treated a Muslim congregation's land-use application differently from churches and gave effect to community hostility. *Id.* at 301-03. Although the zoning ordinances at issue were facially neutral, the plaintiff Muslim organization was able to prove a First Amendment violation by showing that churches in similar areas were not able subject to the same restrictions, and that it was the only religious group which was ever denied an exception to the ordinances. *Id.* at 296-303. Here, EPIC's Proposed SAC contains no allegation that TFSC is allowing non-Muslim organizations to perform the type of unlicensed funeral rites which prompted the C&D Letter, much less that EPIC is the only organization being denied an exception to TFSC's licensure requirements.[6] *Starkville* is therefore inapposite and insufficient to show a violation of clearly established law.

The remainder of the Fifth Circuit and Supreme Court cases cited by EPIC articulate general constitutional principles, but none comes close to clearly establishing that issuing a cease-and-desist

---

[6] EPIC alleges "upon information and belief" that TFSC has not sent cease-and-desist letters to non-Muslim entities for engaging in analogous unlicensed funeral or burial-related activities (*see* SAC at ¶ 106), but that could just as easily be because no organization other than EPIC has engaged in such unlicensed activities. EPIC does not allege, as the plaintiff proved in *Starkville*, that non-Muslim groups are actually being allowed to conduct the same violative activity without any enforcement action being taken.

letter under a neutral licensing statute, on the allegations here, violates the law.  *See*, *e.g.*, *Armstrong, Oyler v. Boles*, 368 U.S. 448 (1962), *Rolf v. City of San Antonio*, 77 F.3d 823 (5th Cir. 1996), *Bryan v. City of Madison*, 213 F.3d 267 (5th Cir. 2000), *Yates v. Stalder*, 217 F.3d 332 (5th Cir. 2000), *Boyd v. McNamara*, 74 F.4th 662 (5th Cir. 2023); *see generally al–Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.").

In sum, EPIC has not identified—and *cannot* identify—Supreme Court or Fifth Circuit precedent that clearly establishes "beyond debate" that issuing the March 26, 2025 C&D Letter under a neutral occupational licensing statute violated the Constitution.  Thus, even assuming personal involvement by Ms. Tips, EPIC cannot overcome qualified immunity

## VI. CONCLUSION

Defendant Kristen Tips respectfully request that the Court dismiss all of Plaintiff's claims in against her pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**BRIANA M. WEBB**
Chief, Law Enforcement Defense Division
Co-Counsel
Texas State Bar No. 24077883
Briana.webb@oag.texas.gov

*/s/ Michael J. Calb*
**MICHAEL J. CALB**
Assistant Attorney General
Attorney-In-Charge
Texas State Bar No. 24126986
Michael.Calb@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080

**COUNSEL FOR DEFENDANT KRISTIN TIPS**

## CERTIFICATE OF SERVICE

      I, **MICHAEL J. CALB**, Assistant Attorney General, do hereby certify that on January 5, 2026, a true and correct copy of the above and foregoing has been served on all counsel of record via the Court's electronic filing system.

                                               */s/ Michael J. Calb*
                                               **MICHAEL J. CALB**
                                               Assistant Attorney General