**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **EAST PLANO ISLAMIC CENTER (EPIC),** | § § § | |
| *Plaintiff,* | § § § | |
| v. | § § | **CIVIL ACTION NO. 1:25-cv-1085** |
| **TEXAS FUNERAL SERVICES COMMISSION,** *et al.,* | § § § § | |
| *Defendants.* | § § | |

**DEFENDANT KRISTIN TIPS' REPLY IN FURTHER SUPPORT OF HER MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant Kristin Tips, through the Office of the Attorney General of Texas, files this reply in further support of her motion to dismiss the claims against her in EPIC's SAC.  D.E. 47 ("MTD").[1]

## I.      STATEMENT OF THE CASE

As expected, EPIC's response to Ms. Tips' MTD attempts to convert speculation and post hoc narrative into individual-capacity constitutional liability.  D.E. 51 ("Response").  But stripped of rhetoric, EPIC's SAC still alleges only one operative action that caused EPIC's asserted injury: the March 26, 2025 C&D Letter issued and signed by former Executive Director Scott Bingaman.  EPIC's Response does not identify any factual allegations showing that Ms. Tips caused or directed that action.  Nor does EPIC cite to any other alleged actions by Ms. Tips which establish standing or violate the Constitution.  And even assuming *arguendo* that EPIC adequately pled Ms. Tips' personal involvement, EPIC fails to overcome her qualified immunity because it cannot cite to any case clearly establishing that TFSC's enforcement action violated the First or Fourteenth Amendments.

---

[1] All acronyms and capitalized terms herein have the same meaning as in Ms. Tips' MTD     .

## II.   ARGUMENT

### A.   EPIC cannot salvage standing.

Article III standing requires a plaintiff to plead facts indicating a causal connection between its injury and the defendant's conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Even at the pleading stage, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560; *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Calif. v. Tex.*, 593 U.S. 659, 675, (2021).

EPIC does not satisfy this causation requirement. The SAC repeatedly and expressly attributes EPIC's injury to a single act: the March 26, 2025 C&D Letter issued by former Executive Director Bingaman. SAC ¶¶ 46–48, 93. EPIC's only argument to establish standing is that, under Article III, causation may be indirect. Response at 7-9. But while proximate cause is not required, a plaintiff must still allege facts showing that defendant's personal conduct "significantly contributed" to his injury. *Inclusive Louisiana v. St. James Parish*, 134 F.4th 297, 309 (5th Cir. 2025) (quotation omitted). EPIC fails to meet this requirement because it does not allege that Ms. Tips personally contributed— much less *significantly* contributed—to the injury caused by Mr. Bingaman's C&D Letter.

To be sure, EPIC alleges that Ms. Tips took *some* supervisory actions, including on the day the C&D Letter was issued. SAC ¶¶ 51-64. But none of these actions tie her directly to the issuance of that letter. For example, EPIC alleges that Ms. Tips forwarded an Attorney General press statement about EPIC the day before the letter was issued, but forwarding a press statement is not issuance, authorization, approval, or direction of an enforcement action. The SAC's assertion that "no further context was needed" and that the email was "part of a larger ongoing conversation . . . about EPIC and the [TFSC]'s forthcoming actions against it" (*id.* at ¶ 59) is nothing more than conclusory gloss. Likewise, the SAC alleges that Mr. Bingaman agreed to "await[] her instructions" in response to a March 26, 2025 lobbyist inquiry about cease-and-desist letters generally (*id.* at ¶ 61), but EPIC does

not plead what Ms. Tips' "instructions" were or whether they concerned the action against it. Traceability cannot not arise from unspecified "instructions" untethered to injury.

EPIC's reliance on *Jackson v. Wright*, 82 F. 4th 362 (5th Cir. 2023) is misplaced. There, a professor (Johnson) sued members of the UNT Board of Regents for their alleged role in the university's allegedly retaliatory investigation into an article he wrote. *Id.* at 365. In determining that Johnson had standing to sue the board members, the Fifth Circuit relied on allegations that the board members had "direct governing authority over the UNT officials that are allegedly continuing to violate Jackson's First Amendment rights, *including authority to countermand the decisions of the subordinate UNT officials*." *Id.* at 368 (emphasis added).[2] This veto power, the Fifth Circuit held, was sufficient to establish causation for Article III purposes even without allegations that the board members were "personally and directly involved" in the investigation. *Id.* at 369.

Here, by contrast, EPIC does not allege facts indicating that Ms. Tips had authority to veto Mr. Bingaman's C&D Letter to EPIC. EPIC now cites to the Texas regulatory provision conferring TFSC with the authority to "employ" and "supervise" its Executive Director (*see* Response at 4 (citing TEX. OCC. CODE § 651.101(a)), but authority to employ and supervise is not the same as authority to veto decisions or direct contrary action . EPIC's SAC makes it clear that it was Mr. Bingaman alone who sent the C&D Letter which allegedly caused its injuries. Absent factual allegations that Ms. Tips had actual authority to direct or override that decision, and that she *actually* exercised that authority, her authority as TFSC's presiding member is not enough to impute Mr. Bingaman's actions on her.

EPIC argues that the C&D Letter is merely one portion of a broader anti-Muslim campaign in which Ms. Tips was personally involved. Response at 4. But Article III traceability is defendant-

---

[2] The Fifth Circuit considered the board members' authority as part of its *Ex parte Young* analysis, which it then carried over as directly pertinent to its standing analysis. *Id.* at 369 (holding that Johnson had established standing "for the same reasons discussed in the preceding section [on *Ex parte Young*]" and noting that "[t]he traceability and *Ex parte Young* issues discussed above involve similar questions").

specific.  See *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Even if EPIC plausibly alleged that Ms. Tips was hostile to EPIC, it still must plead facts showing that Tips, in particular, caused EPIC's injury, and her shared hostility with those who actually caused her injury is not enough to satisfy this standard.

### B.  EPIC cannot salvage personal involvement.

To establish Ms. Tips' liability under Section 1983, EPIC must allege facts indicating that she was "either personally involved in the constitutional violation or [that her] acts are causally connected to the constitutional violation alleged."  *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).  Because the alleged constitutional violations in this case all stem entirely from the C&D Letter and the threats made therein, EPIC must show an "affirmative link" between that letter and Ms. Tips's actions.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976).  EPIC fails to do so.

EPIC does not allege that Ms. Tips drafted, reviewed, approved, authorized, or enforced the C&D Letter, which it admits was "formally signed and transmitted" by Mr. Bingaman.  SAC ¶ 59. Instead, EPIC attempts to substitute allegations of animus for allegations of action.  But even if the Court assumes that the cited text messages reflect religious bias, bias alone does not establish Section 1983 liability absent a causal link to the challenged governmental act.  *Rizzo*, 423 U.S. at 371-72.  And courts consistently reject attempts to impose individual liability based on mere endorsement or after-the-fact agreement with another official's conduct.  *See, e.g., Minix v. Stoker*, 289 F. App'x 15, 17 (5th Cir. 2008); *Harry v. Colvin*, No. A-13-CA-490-LY, 2014 WL 12642577, at *2 (W.D. Tex. Apr. 21, 2014).

Tellingly, EPIC's Response tries to zoom out 20,000 feet, framing Ms. Tips' *general* involvement in TFSC's affairs, coupled with her animus against Muslims, as personal involvement in the *specific* enforcement action against it.  *See* Response at 11 ("[Ms. Tips] used her *de jure* and *de facto* authority to direct enforcement decisions, actively participated in the handling of EPIC's matter, coordinated with the Governor's Office as part of a multi-agency enforcement effort targeting EPIC and its religious exercise, and contemporaneously expressed anti-Muslim animus directed at EPIC.").

EPIC then tries to lower the standard by arguing there is no "formalistic pleading requirement" to allege that Tips "drafted, reviewed, approved, authorized, transmitted, or enforced" the C&D Letter. *Id.* That misses the point. While Rule 8 pleading does not demand magic words, it does demand facts. Moreover, the Fifth Circuit's supervisory-liability principles do not allow Section 1983 liability to be imposed based on role, influence, or generalized oversight—there must be personal involvement or acts causally connected to the specific alleged violation.

Because it is forbidden under Section 1983, EPIC disclaims any reliance on *respondeat superior* or other form of vicarious liability. *See Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987); Response at 11 ("[Ms. Tips] incorrectly asserts that EPIC seeks to impose liability based solely on [her] status as presiding officer."). But that is precisely what EPIC is relying on. Without any facts linking Ms. Tips directly to the issuance of the C&D Letter, EPIC points to Ms. Tips' alleged general "supervisory control" and "legal authority" over Mr. Bingaman at the time the C&D Letter was issued. SAC ¶ 63. As described in Ms. Tips' MTD, neither Ms. Tips' role alone, her unrelated actions, nor her alleged animus towards Muslims—independently or combined—are sufficient to show personal involvement. MTD at 8-11. Absent factual allegations establishing an affirmative link between Ms. Tips' own actions and the issuance or enforcement of the C&D Letter, EPIC's claims against her fail.

### C. EPIC fails to overcome qualified immunity.

EPIC's failure to plead Ms. Tips' personal involvement forecloses any further qualified immunity analysis. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (describing personal involvement as "a prerequisite" to overcoming qualified immunity); *Jimerson v. Lewis*, 94 F.4th 423, 428 (5th Cir. 2024) ("A plaintiff seeking to overcome qualified immunity must specifically identify each defendant's personal involvement in the alleged wrongdoing."). But even assuming *arguendo* that Ms. Tips was personally involved in the enforcement action which allegedly caused EPIC's injury, her qualified immunity remains intact because that enforcement action did not violate any constitutional

right, much less any *clearly-established* constitutional right.  *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015).[3]

### 1.    EPIC does not allege a clearly established free exercise violation.

"The protections of the Free Exercise Clause pertain if the [state action] at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 533 (1993). "Although a [state action] targeting religious beliefs as such is never permissible," a facially neutral state action can still violate the Free Exercise Clause if it nevertheless "targets religious conduct for distinctive treatment."  *Id.* at 533-35.  "The government does not impermissibly regulate religious belief, however, when it promulgates a neutral, generally applicable law or rule that happens to result in an incidental burden on the free exercise of a particular religious practice or belief."  *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 135 (5th Cir. 2009); *see also Mahmoud v. Taylor*, 606 U.S. 522, 526, (2025) ("[T]he government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable.").

EPIC argues that the C&D Letter, despite not mentioning EPIC's Muslim affiliation, violated the Free Exercise Clause because it effectively "forbade EPIC's performance of Islamic burial rites on its property" and "*on information and belief*, no comparable enforcement action was taken against secular entities or other organizations for analogous conduct."  SAC ¶ 99 (emphasis added).  But even accepting those allegations as true, EPIC fails to overcome Ms. Tips' qualified immunity because it cannot identify factually-analogous precedent that would have made it "beyond debate" that issuing such a letter violated the First Amendment.  *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

---

[3] EPIC argues that it should win on the first prong of qualified immunity because Ms. Tips's MTD "does not meaningfully engage with whether the alleged conduct complies with the First or Fourteenth Amendments" and instead "assum[es] constitutional validity."  Response at 13.  This gets the burden framework backwards. Once qualified immunity has been asserted, it is EPIC's burden to overcome the first prong by stating a viable claim, not Ms. Tips' burden to specifically identify every defect in EPIC's claim.  *See Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).  Plus, Ms. Tips *does* "meaningfully engage" with the more important threshold question; namely, whether there is a valid link between *her* alleged conduct and EPIC's injuries.  MTD at 8-11.

All of EPIC's cases are inapposite.  First, EPIC relies on *Lukimi*, which involved facially-discriminatory municipal ordinances that were operationally crafted to suppress a specific religious practice and riddled with exemptions demonstrating targeting.  508 U.S. 520, 534-42 (1993).  Second, EPIC relies on *Islamic Center of Mississippi, Inc. v. City of Starkville*, which involved a Muslim organization being denied an exception to zoning ordinances which were routinely granted to churches and other religious groups.  840 F.2d 293, 296-303 (5th Cir. 1988).  Third, EPIC relies on *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, which involved statements by commissioners during an administrative proceeding about a baker's religiously motivated refusal to create a cake for a same-sex wedding and differential treatment of comparators in that adjudicatory context.  584 U.S. 617 (2018).

In contrast to the state actions in *Lukimi*, *Starkville*, and *Masterpiece Cakeshop*, the C&D Letter is facially neutral (asking EPIC to cease all "funeral service operations" as opposed to merely religious services) and EPIC identifies no concrete comparator or established pattern of differential treatment from which targeting might be inferred.  Rather, EPIC's only allegations are that TFSC members harbored anti-Muslim animus, and that the enforcement action against it was premised on that animus.  But no case cited by EPIC or to Ms. Tips' knowledge has found a Free Exercise Clause violation on allegations (or evidence) of animus alone.  EPIC's qualified immunity on this claim remains intact.

### 2.    EPIC does not allege a clearly established equal protection violation.

The Equal Protection Clause requires essentially that all similarly situated persons be treated alike.  *Stefanoff v. Hays County*, 154 F.3d 523, 525–26 (5th Cir. 1998) (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996)).  Religion is a "suspect class" under the Equal Protection Clause, and thus any religion-based distinction in treatment must be "narrowly tailored to further a compelling state interest."  *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000).  However, before even reaching that question, the plaintiff "must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal

7

treatment stemmed from a discriminatory intent." *Bowlby v. City of Aberdeen*, 681 F.3d 215, 227 (5th Cir. 2012); *see also Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999).

EPIC's failure to identify a comparator dooms its equal protection claim against Ms. Tips. EPIC alleges "on information and belief that no comparable enforcement action was taken against secular entities or other organizations for analogous conduct" (SAC ¶ 99), but that could just as easily be because no organization other than EPIC has engaged in such unlicensed activities. Nowhere in its SAC does EPIC otherwise indicate that similar behavior is being tolerated by others. Absent allegations that TFSC is turning a blind eye to non-Muslim organizations, EPIC cannot establish the difference in treatment necessary to sustain its claim. *See, e.g., James v. Jiles*, No. 1:22-CV-00149, 2022 WL 4923347, at *4 (W.D. Tex. Oct. 3, 2022), *aff'd*, No. 22-51038, 2023 WL 5165580 (5th Cir. Aug. 11, 2023) (holding that officials were entitled to dismissal of equal protection claim on qualified immunity grounds because plaintiff failed to identify a similarly-situated comparator who received different treatment); *Rountree v. Dyson*, 892 F.3d 681, 685 n. 11 (5th Cir. 2018) (same).

Even if EPIC could state a viable claim without a comparator, which it cannot, it would still fail to overcome Ms. Tips' qualified immunity because it cannot identify any factually-analogous case which clearly established that the C&D Letter violated the Equal Protection Clause. EPIC cites to several cases for broad equal protection principles (*see* Response at 3-4, 17-18), but none of them would have been enough to put Ms. Tips on notice that her actions were unconstitutional. *See Mullenix*, 577 U.S. at 12 ("The dispositive question [for qualified immunity's second prong] is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (quotation omitted).

Obviously worried about the absence of any case on point, EPIC attempts to dissuade the Court from considering the second prong of qualified immunity at all. According to EPIC, "'once the plaintiff has adequately pleaded intentional discrimination under § 1983' based on a suspect

distinction such as sex, race, or religion, 'she has pleaded a violation of clearly established law so [qualified immunity] is foreclosed at this stage of the proceeding." Response at 18 (quoting *Jackson v. Duff*, 161 F.4th 343 (2025)). This is a flagrant misrepresentation of the *Jackson* case, which held only that well-pled claims of intentional discrimination on the basis of *race or sex* in the context of *public employment* are sufficient to satisfy both prongs of the qualified immunity analysis. 161 F.4th at 349.[4] Outside of this narrow context, the rule is to always address both prongs separately: "[T]o succeed in opposition to [qualified immunity] asserted in a Rule 12(b)(6) motion to dismiss, *even where plaintiff adequately pleads the violation of a federal right*, plaintiff still must adequately plead that defendant's conduct was objectively unreasonable in light of clearly established law." *Id.* at 349 (emphasis added). And when the Court does so here, the correct result is that Ms. Tips' qualified immunity remains intact.

## VI.   CONCLUSION

For the reasons in her MTD and herein, Ms. Tips respectfully request that the Court dismiss all of EPIC's claims against her pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

---

[4] *Jackson* is further distinguishable. First, unlike the plaintiff there, EPIC has *not* pleaded a viable equal protection claim because, as mentioned, it fails to identify a similarly-situated comparator. Second, whereas the plaintiff in *Jackson* "averred that each defendant individually caused her alleged constitutional harm," 161 F.3d at 349, EPIC fails to allege any personal involvement by Ms. Tips in the enforcement action which caused its injury.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

BRIANA M. WEBB
Chief, Law Enforcement Defense Division
Co-Counsel
Texas State Bar No. 24077883
Briana.webb@oag.texas.gov

/s/ Michael J. Calb
MICHAEL J. CALB
Assistant Attorney General
Attorney-In-Charge
Texas State Bar No. 24126986
Michael.Calb@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2080

COUNSEL FOR DEFENDANT KRISTIN TIPS

CERTIFICATE OF SERVICE

I, MICHAEL J. CALB, Assistant Attorney General, do hereby certify that on January 23, 2026, a true and correct copy of the above and foregoing has been served on all counsel of record via the Court's electronic filing system.

/s/ Michael J. Calb
MICHAEL J. CALB
Assistant Attorney General

10