**FILED**

June 24, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Christian Rodriguez_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EAST PLANO ISLAMIC CENTER (EPIC), | § § § | NO. 1:25-CV-1085-DAE |
| *Plaintiff,* | § § § | |
| vs. | § § § | |
| TEXAS FUNERAL SERVICES COMMISSION, and TEXAS FUNERAL SERVICES COMMISSION EXECUTIVE DIRECTOR, in their official capacity, and KRISTIN TIPS, | § § § § § § | |
| *Defendants.* | § § | |

ORDER DENYING DEFENDANT TIPS'S MOTIONS TO DISMISS

Before the Court is Defendant Kristin Tips's ("Tips") Motion to Dismiss (Dkt. # 47), filed on January 5, 2026. Plaintiff East Plano Islamic Center ("Plaintiff" or "EPIC") filed a Response in Opposition to Tips's Motion on January 16, 2026. (Dkt. # 51.) Tips filed a Reply on January 23, 2026. (Dkt. # 52.) The Court finds these matters suitable for disposition without a hearing. After careful consideration of the filings and the relevant law, the Court, for the reasons that follows, **DENIES** Defendant Tips's Motion to Dismiss (Dkt. # 47).

BACKGROUND

East Plano Islamic Center ("EPIC") brings this action to vindicate its right to conduct religious funeral and burial rites in accordance with Islamic faith and tradition.  (Dkt. # 46 at 1.)  EPIC is a nonprofit Islamic organization in Plano, Texas, formed to "provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibility and contribute to the betterment of society by following the principles of Quran and the noble life of Prophet Muhammed (peace be upon him)."  (Id. at 2–3, 50.)  One of the sincerely held religious beliefs of EPIC and its Muslim membership is the collective obligation held by the religious community to perform proper Islamic funeral rites for the deceased.  (Id. at 10.)  Islamic religious law calls for prompt ritual cleansing, shrouding, prayer, and burial in which the integrity and dignity of the decedent's remains are scrupulously maintained throughout.  (Id.)  To that end, EPIC offers traditional, non-commercial, Muslim funeral services and burials; especially for Muslim families unable to afford the services.  (Id.)  EPIC assists Muslim families by arranging and facilitating religious funeral services (washing, shrouding, and performing the Janaza prayer) in partnership with licensed funeral providers.  (Id. at 11, 12, 13.)

Chapter 651 of the Texas Occupations Code regulates the funeral industry in Texas, requiring licensure for persons or entities that engage in the

2

business of funeral directing or operating a funeral establishment.  See Tex. Occ. Code §§ 651.001(7)–(8), 651.351(a).  "Funeral directing" is defined as "acts associated with or arranging for the disposition of a dead human body, performed by a person for compensation, from the time of first call until … inurnment, interment, or entombment services are complete."  Tex. Occ. Code § 651.001(7). The Texas Funeral Services Commission ("TFSC") is tasked with enforcing these provisions and derives its existence and statutory authority from Chapter 651.  See Tex. Occ. Code Chapter 651.

On March 26, 2025, TFSC issued a cease-and-desist letter (the "C&D Letter") to EPIC, ordering it to immediately halt what the Commission alleged were unlicensed funeral service operations.  (Id. at 14, 78.)  Specifically, the C&D Letter accused EPIC of operating as a funeral home without an establishment license, in violation of Texas Occupations Code § 651.351.  (Id.)  The letter additionally notified EPIC that TFSC was referring the matter for criminal investigation to the Collin County District Attorney.  (Id.)  The C&D Letter did not include which specific practices EPIC was engaging in that were alleged to be in violation of the Occupation Code.  (See id.)  Instead, EPIC was given TFSC's attorney's email to reach out to if it had "any questions."  (Id.)  EPIC alleges it was not running a place of business and was not in the business of embalming or funeral directing.  (Id. at 31.)

3

To comply with the C&D Letter, EPIC ceased its religious funeral rites, resulting in at least eleven congregants being buried without receiving the Janaza prayer at their mosque.  (Id. at 22.)  EPIC contends that the TFSC's action violates both state and federal constitutional and statutory protections for religious exercise, as well as exceeds its statutory authority.  (Id. at 30–46.)  EPIC points to TFSC's prior affirmations that religious organizations could perform burial-related rites so long as they were not doing so for profit.  (Id. at 8–9, 76, 77.)

On July 2, 2025, EPIC filed its Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction in the 250th District Court of Travis County.  (Dkt. # 1-3 at 5.)  After TFSC removed the case to federal court, EPIC again filed a Motion for TRO on July 11, 2025.  (Dkt. # 4.)  The day before the TRO was set for hearing, TFSC issued a letter purporting to clarify the scope of its prior C&D Letter.  (Dkts. ## 12, 12-1.)  Because the clarification addressed the narrow question of emergency relief raised in EPIC's TRO application, the hearing was cancelled.  (Id.; see also Dkt. # 14.)  EPIC later amended its complaint to add individual-capacity Section 1983 claims against Defendant Tips for her alleged involvement in the issuance of the C&D Letter.  (Dkts. ## 23, 46.)  Although the C&D Letter was formally signed and issued by TFSC Executive Director Scott Bingaman ("Bingaman"), EPIC alleges that Tips exercised direct supervisory authority and operational control over

4

Bingaman and was personally involved in the enforcement action against EPIC, to be later discussed in greater detail. (See id. at 22–27.)

On January 5, 2026, Tips filed a Motion to Dismiss Plaintiff's Second Amended Complaint. (Dkt. # 47.) On January 16, 2026, EPIC filed a Response in Opposition. (Dkt. # 51.) On January 23, 2025, Tips filed a Reply.[1] (Dkt. # 52.)

LEGAL STANDARD

Defendant Tips moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. # 47 at 1.)

I.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for "lack of subject–matter jurisdiction." When evaluating a Rule 12(b)(1) motion, the Court may dismiss a suit "for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Freeman v. United States, 556 F.3d 326, 334 (5th Cir. 2009) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).

---

[1] The Court notes that Defendants TFSC and TFSC Executive Director filed a separate Motion to Dismiss on April 30, 2026. (Dkt. # 55.) Because the motion was not fully ripe until May 21, 2026—four months after Defendant Tips's—the Court finds it more efficient to address the motions separately and will consider the remaining motion in due course.

Where "the defense merely files a Rule 12(b)(1) motion, the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981). In such a case, "review is limited to whether the complaint is sufficient to allege the jurisdiction." Id. The "plaintiff bears the burden of proof that jurisdiction does in fact exist." Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001); Hitt v. City of Pasadena, 561 F.2d 606, 608 (5th Cir. 1977).

## II.  Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court "accepts all well–pleaded facts as true, viewing them in the light most favorable to the plaintiff." In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). The Supreme Court has explained that a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

6

draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

The tenet that a court must accept as true all allegations contained in a complaint is inapplicable to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 556 U.S. at 678 (internal quotations and citations omitted).  Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations."  Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to the (1) facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201.  Walker v. Beaumont Indep. Sch. Dist., 938 F.3d 724, 735 (5th Cir. 2019).

DISCUSSION

Defendant Tips puts forth three main arguments in support of her motion.  (Dkt. # 47.)  She argues that EPIC fails to sufficiently allege: "1) an injury

directly traceable to any conduct by Ms. Tips sufficient to confer standing,
2) personal involvement sufficient to state a claim under Section 1983, and 3) a
violation of clearly established law sufficient to overcome qualified immunity.  (Id.
at 2.)  The Court will address each argument in turn.

I.   Article III Standing

"Article III of the Constitution limits the jurisdiction of federal courts
to 'Cases' and 'Controversies.'"  Murthy v. Missouri, 144 S. Ct. 1972, 1985
(2024).  "A proper case or controversy exists only when at least one plaintiff
'establishes that [he or she] has standing to sue.'"  Id. at 1986 (quoting Raines v.
Byrd, 521 U.S. 811, 818 (1997)).  A plaintiff establishes standing by sufficiently
alleging: "(1) an 'injury in fact' that is 'concrete and particularized' and 'actual or
imminent'; (2) is fairly traceable to the defendant's actions; and (3) is likely to be
redressed by a favorable decision."  Barilla v. City of Houston, 13 F.4th 427, 431
(5th Cir. 2021) (citing Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560–61 (1992)).
The Court may decide whether to dismiss a claim for lack of standing based on
"(1) the complaint alone; (2) the complaint supplemented by undisputed facts
evidenced in the record; or (3) the complaint supplemented by undisputed facts
plus the court's resolution of disputed facts."  Kling v. Hebert, 60 F.4th 281, 284
(5th Cir. 2023) (quoting Ramming v. United States, 281 F.3d 158, 161 (5th Cir.
2001)).

8

Tips argues that EPIC fails to allege the second causation element. (Dkt. # 47 at 6.)  She contends that the only alleged injury was caused exclusively by the C&D Letter issued by Bingaman.  (Id. at 6.)  Further, any allegations that Tips wielded control over Bingaman's decision-making and was the "driving force" behind the letter are conclusory.  (Id. at 7.)  At most, she argues, her alleged actions show her knowledge and support of the action against EPIC, but do not establish a causal link between her conduct and the issuance of the C&D Letter which ultimately caused the injury.  (Id.)  EPIC, on the other hand, argues that Tips's motion improperly heightens the pleading standard.  (Dkt. # 51 at 7–8.)  EPIC stresses that it need only show that its injuries are "fairly traceable" to Tips's conduct, which may include an indirect causal connection that "plausibly contributed to the injury."  (Id.)

While the injury cannot be the result of an independent action of some third party not before the court, standing exists if the injury is produced by the determinative or coercive effect of a defendant's actions upon the actions of someone else.  See Bennett v. Spear, 520 U.S. 154, 168–69 (1997).  In order to be fairly traceable, the defendant's actions must contribute to the injury, but they do not have to be the sole cause of the injury.  See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 558 (5th Cir. 1996).  Additionally, "[a]t the pleading stage, 'general factual allegations of injury resulting from the defendant's

9

conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" Gen. Land Off. V. Biden, 71 F.4th 264, 272 (5th Cir. 2023) (citation modified) (quoting Lujan, 504 U.S. at 561).

EPIC alleges that "Tips exercised direct supervisory authority over Bingaman's enforcement decisions, dictated enforcement language and timing, reviewed and edited draft cease-and-desist orders, and did not permit such orders to issue without her involvement or approval." (Id. at 8 (citing Dkt. # 46 at 22–27).) EPIC offers detailed, time-anchored facts that allege: Tips's heavy involvement in past enforcement matters; her direct control over Bingaman and his deference to her authority; and communications leading up to the issuance of EPIC's C&D Letter. (Id.) These alleged communications include forwarding Bingaman Ken Paxton's press release statement about EPIC, instructing Bingaman to await her instruction as she coordinated with the Governor's office regarding TFSC's C&D Letters, and Tips being "bbc"ed on an email regarding the EPIC investigation which EPIC alleges is "emblematic of the [Tips and Bingaman's] public and private roles as it relates to [TFSC's] actions against EPIC[.]" (Id.) Tips responds primarily by contesting inferences and highlighting what is *not* alleged (no signature, no direct drafting, no explicit directive language). (Dkt. # 47 at 10.)

10

Tips is correct that EPIC's pleadings require the Court to make inferences in EPIC's favor.  However, at the pleading stage, all reasonable inferences should be drawn in the plaintiff's favor.[2]  Morgan v. Swanson, 659 F.3d 359, 370 (5th Cir. 2011) (en banc).  Thus, the Court finds that at the pleading stage, EPIC has alleged sufficient facts regarding Tips's supervisory and coercive control over Bingaman, her involvement in enforcement actions, and communications involving EPIC leading up to the issuance of the C&D Letter to suggest plausible traceability between her conduct, the C&D Letter, and EPIC's alleged injury.[3] Further discovery and a fuller review of the evidence at a later stage will reveal the full extent of Tips's control and influence in the decision to issue a C&D Letter to EPIC.  Additionally, the alleged injury—the suspension of funeral rites for EPIC's congregants—is undoubtedly fairly traceable to the C&D Letter which demanded that EPIC "cease and desist funeral service operations," and informed EPIC that TFSC was making a criminal referral.  (See Dkt. # 46 at 78.)

---

[2] The Court recognizes that this standard applies to a motion to dismiss for failure to state a claim.  However, this language and the Court's analysis aligns with the same lenient standard applied at the pleading stage to standing, discussed above, and qualified immunity, to be discussed later.

[3] Tips frames her motion to also argue that her lack of personal involvement in a constitutional violation is a separate ground for dismissal.  (Dkt. # 47 at 8–11.) The Court need not repeat its discussion and, for the reasons discussed above, finds that EPIC's allegations allow for the reasonable and direct inference that Tips was personally involved in the issuance of the C&D Letter.

II.   Qualified Immunity

As a state official sued in her individual capacity, Tips invokes qualified immunity.  (Dkt. # 47 at 11.)  When sued under Section 1983, government officials sued in their individual capacities are entitled to qualified immunity.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  Once a defendant has raised the issue of qualified immunity, the burden shifts to the plaintiff to rebut the defense, but all inferences are drawn in the plaintiff's favor.  Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010).  "[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity."  Kelson v. Clark, 1 F.4th 411 (5th Cir. 2021) (quoting Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012)).

The two ultimate elements that EPIC must show are 1) there has been a violation of a constitutional right, and 2) that right was clearly established at the time of the alleged violation.  Pearson v. Callahan, 555 U.S. 223, 232 (2009).

A.   Constitutional Violation

Tips does not explicitly argue that, if the allegations are taken as true, her conduct did not violate EPIC's constitutional rights.  (See Dkt. # 47.)

12

Regardless, the Court finds that targeting an organization's religious funeral rites for prohibition while allowing similar rites by others and departing from long-standing TFSC practice violates EPIC's Free Exercise and Equal Protection rights, as will be discussed below in greater detail.  Rather, Tips argues that EPIC fails to overcome the defense of qualified immunity because it fails to allege Tips's personal involvement in any constitutional violation.  (Id. at 11; Dkt. # 52 at 6 n.3.) Tips is correct that "a plaintiff seeking to overcome qualified immunity 'must specifically identify each defendant's personal involvement in the alleged wrongdoing.'"  Jimerson v. Lewis, 94 F.4th 423 (5th Cir. 2024) (quoting Thomas v. Humfield, 32 F.3d 566, 1994 WL 442484, at *5 (5th Cir. 1994)), cert. denied, 145 S. Ct. 1220, 221 L. Ed. 2d 284 (2025).  In accordance with the Court's above finding, after drawing all inferences in favor of EPIC, the Court again finds that EPIC has sufficiently alleged Tips's oversight and control over Bingaman and her personal involvement in the chain of decisions leading to the ultimate C&D Letter at issue.

> B.    Clearly Established Right

Tips next argues that EPIC fails to overcome qualified immunity because TFSC's enforcement action against EPIC did not violate any clearly established constitutional right.  (Id. at 12.)  To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a

13

reasonable official would understand that what she is doing violates that right.

Brown v. Miller, 519 F.3d 231, 236 (5th Cir. 2008).  The "right must be defined

with specificity," not "at a high level of generality."  City of Escondido, Cal. v.

Emmons, 586 U.S. 38, 42 (2019).  "The unlawfulness of the defendant's actions

must have been readily apparent from sufficiently similar situations, but it is not

necessary that the defendant's exact act have been illegal."  Pearson, 623 F.3d at

253 (citing Miller, 519 F.3d at 236–37.)  "An official's actions must be judged in

light of the circumstances that confronted him, without the benefit of hindsight."

Pearson, 623 F.3d at 253 (citing Graham v. Connor, 490 U.S. 386, 396–97 (1989)).

Essentially, the pleadings must demonstrate that no reasonable official could have

believed her actions were proper.  Babb v. Dorman, 33 F.3d 472, 477 (5th Cir.

1994).

      EPIC alleges underlying constitutional violations of the First

Amendment Free Exercise Clause and its Fourteenth Amendment Equal Protection

rights.[4]  (Dkt. # 46 at 40, 43.)

---

[4] EPIC's Second Amended Complaint labels the seventh cause of action as a
violation by Tips of the First Amendment Free Exercise Clause.  (Id. at 43.)
Because this is duplicative of the prior cause of action against Tips and the
substance of the allegations discuss the Equal Protection clause, the Court assumes
the cause of action is meant to allege a violation under the Fourteenth Amendment.

1. <u>Free Exercise Clause</u>

The First Amendment to the United States Constitution, applicable to the States via the Fourteenth Amendment, provides that no law shall prohibit the free exercise of religion.  U.S. Const. amend. I; <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 303 (1940).  "These provisions, made applicable to the states by the due process clause of the fourteenth amendment, forbid government to burden the free exercise of any religion or to favor one religion over another."  <u>Islamic Ctr. of Mississippi, Inc. v. City of Starkville, Miss.</u>, 840 F.2d 293, 294 (5th Cir. 1988).  EPIC relies on several cases to support its proposition that the "clearly established rule is not that any allegation of animus suffices, but that the State may not target a religious community or suppress religious practice through enforcement actions that depart from neutrality because of hostility toward religion."  (Dkt. # 51 at 17.)  Tips rebuts each case by examining the cases at a more granular level and flagging differences between the cited cases and the present situation.  (<u>See</u> Dkts. ## 47 at 12–14; 52 at 6–7.)

EPIC primarily relies on <u>Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.</u>, 508 U.S. 520 (1993), in which the Supreme Court applied strict scrutiny to strike down city ordinances aimed at suppressing Santeria religious practices.  (<u>See</u> Dkts. ## 46 at 41–43; 51 at 14–17.)  In <u>Church of Lukumi</u>, the Supreme Court made clear that "the protections of the Free Exercise Clause pertain

15

if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Id. at 532. Further, "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." Id. at 534. In determining the government's neutrality, the Court considered "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." Id. at 540. EPIC also discusses Masterpiece Cakeshop v. Colorado C.R. Comm'n, which "reaffirmed that the governmental authorities must act in a manner neutral toward religious beliefs and that the Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." 584 U.S. 617, 638 (2018) (finding that the Colorado Civil Rights Commission's treatment of the plaintiff's administrative case violated his free exercise of religion by showing "clear and impermissible hostility" toward his religious beliefs). (Dkt. #52 at 16; see also Dkt. # 46 at 42.)

Tips attacks Church of Lukumi as being inapposite because the municipal ordinances challenged therein "were facially and operationally crafted to suppress a specific religious practice, with explicit discriminatory exemptions and a legislative record demonstrating targeting." (Dkt. # 47 at 13 (citing Church of Lukumi, 508 U.S. at 534–42.) This, Tips argues, "bear[s] little resemblance to a

16

single cease-and-desist letter enforcing a generally applicable licensing statute." (Id.)  Tips also differentiates the present case from Masterpiece Cakeshop by again stressing the Fifth Circuit's consideration of comparators and differential treatment, which Tips argues is absent here.  See 584 U.S. at 636.  (Dkt. # 52 at 7.) Lastly, Tips invokes Islamic Ctr. of Mississippi, Inc. v. City of Starkville, Miss. to again highlight the absence of any allegations that non-Muslim organizations have been allowed to perform the type of unlicensed funeral rites which prompted the C&D Letter.  840 F.2d 293, 296–303 (5th Cir. 1988).  (Dkt. # 47 at 13.)  In contrast to the above cases, Tips argues that the present "C&D Letter is facially neutral (asking EPIC to cease all 'funeral service operations' as opposed to merely religious services) and EPIC identifies no concrete comparator or established pattern of differential treatment from which targeting might be inferred."  (Dkt. # 52 at 7.)

The Court does not find Tips's argument minimizing the impact of a "single" C&D Letter as compared to the city ordinance present in Church of Lukumi to be persuasive.  "Although the free exercise test is typically framed in terms of analyzing a 'law,' its analysis can be applied to [Tips's] actions as a governmental authority."  World Wide St. Preachers Fellowship v. Town of Columbia, 245 F. App'x 336, 344 n.6 (5th Cir. 2007).  The C&D Letter demanded that EPIC halt its funeral service operations and referred EPIC for criminal

17

investigation.  (Dkt. # 46 at 78.)  If, taking EPIC's allegations as true, Tips and the TFSC did so with impermissible hostility towards EPIC's religious practices, then such conduct is no less unconstitutional than that in Church of Lukumi simply because of the procedures by which the government authorities targeted religion.

However, the focus of Tips's argument is that EPIC fails to identify a comparator and relies on binding precedent at too high a level of generality.  (Dkt. # 47 at 12–14.)  Tips is correct that each of the above cited cases is premised, in part, on the court's finding that the government authority did not treat other religious or secular organizations with the same disfavor or animus.  EPIC alleges "on information and belief that no comparable enforcement action was taken against secular entities or other organizations for analogous conduct."  (Dkt. # 46 at 41.)  Tips argues that this information-and-belief allegation "could just as easily be because no organization other than EPIC has engaged in such unlicensed activities."  (Dkt. # 52 at 8.)  However, "information-and-belief pleading is accepted in the Fifth Circuit and throughout the federal courts."  League of United Latin Am. Citizens v. Abbott, 604 F. Supp. 3d 463, 497 (W.D. Tex. 2022) (citing Johnson v. Johnson, 385 F.3d 503, 531 n.19 (5th Cir. 2004)).  Additionally, taking the pleadings as true, EPIC has not engaged in any unlicensed activities and has continued to offer the same religious funeral services that it has provided without issue for the past decade.  (Dkt. # 46 at 10–14.)  At this stage of the proceedings,

18

the Court must accept all factual pleadings as true and allow discovery to bear out the truth of the information-and-belief allegations.  See id.

Moreover, although EPIC has not identified specific comparators, it relies on TFSC's deviation from its historic non-enforcement.  The Supreme Court in Church of Lukumi and Masterpiece Cakeshop expanded its assessment of governmental neutrality beyond identified comparators, considering factors such as "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."  Masterpiece Cakeshop, 584 U.S. at 639 (citing Church of Lukumi, 508 U.S. at 540).  Applying such factors to the instant pleadings, the Court can reasonably infer that Tips and TFSC's alleged conduct, taken as true, violated a clearly established right as defined by the above cases.

First, EPIC alleges that TFSC has historically recognized, as far back as 1987, that Texas law "allows a family or friends to prepare and bury a body so long as they do not receive compensation for services, file a death certificate and obtain a burial transit permit."  (Dkt. # 46 at 8.)  EPIC attaches a letter written in 1987 from the TFSC to the Islamic Center of Greater Austin confirming that it "may prepare and bury members of [its] mosque without being licensed by this agency so long as they follow the guidelines listed above."  (Id. at 76.)  In 2014,

19

TFSC's staff attorney again confirmed the same in a letter regarding the Texas Islamic Center of Houston.  (Id. at 77.)  EPIC alleges that for the past decade it has offered non-commercial Muslim funeral services and burials that have complied with the guidelines provided in Texas Occupations Code Chapter 651 and the guidelines provided by the TFSC itself.  (Id. at 10–14.)  However, in March of 2025, TFSC allegedly changed course and issued the C&D Letter to EPIC "after years of EPIC performing the Janaza prayer without protest . . . ."  (Id. at 14.)

Lastly, EPIC discusses the alleged series of events leading up to and surrounding the C&D Letter as well as Tips's actions around the same period, which EPIC contends demonstrate Tips's hostility toward Islam.  (Id. at 15–20, 27–30.)  After EPIC began planning a development that would include housing, a mosque, a school, a senior living center, and a retail center; EPIC allegedly came under fire by "misguided activists" who saw the planned development as an "Islamic separatist agenda" that would promote "Sharia law."  (Id. at 15.)  Texan politicians, including Governor Greg Abbot and Attorney General Ken Paxton, got involved and publicly announced that a dozen state agencies were investigating EPIC and its project.  (Id. at 16–20.)  EPIC attaches several Tweets from Attorney General Paxton, Governor Abbott, and the RAIR Foundation founder raising the alarm about EPIC, its planned development, and the alleged rise of "Sharia law" in Texas.  (Id. at 15–20.)  To demonstrate the blatant Islamophobia of the RAIR

20

Foundation founder, Amy Mek, EPIC highlights one of her Tweets from June 2025 which states, "At this point, if you're not being called 'Islamophobic,' you're doing something very wrong."[5] (Id. at 20.) EPIC alleges that Tips herself "circulated and endorsed materials expressing hostility toward Islam" during the same period, "including content asserting that Muslims are 'taught hate' and that Islam promotes violence and inferiority compared to other religions." (Id. at 27.) She also allegedly shared a link to a Youtube video criticizing EPIC's planned development and stating it would breed "terrorists." (Id. at 28.) Although the text messages were sent in May of 2025, weeks after the Bingaman issued the C&D Letter, the Court agrees with EPIC that it is reasonable to infer that an official, or any individual, who expresses anti-Muslim views in May held those same views in March. (See Dkt. # 51 at 10.) Additionally, this inference is strengthened by the context of the political backlash surrounding the influx of Muslim communities and alleged "Sharia law" in North Texas, as well as Tips's alleged communications with the Governor's office regarding enforcement activity. (Id. at 17, 18, 26.)

---

[5] As alleged, Amy Mek sparked the hysteria about Sharia law and EPIC with her 222-word Tweet in February of 2025, calling the planned development an "Islamic stronghold . . . pushing an Islamic separatist agenda right in the heart of Texas." (Id. at 15.) RAIR Foundation USA ("Rise Align Ignite Reclaim") describes itself as a "grassroots activist organization comprised of everyday Americans leading a movement to reclaim our Republic from the network of individuals and organizations waging war on Americans, our Constitution, our borders and our Judeo-Christian values." (Dkt. # 46 at 15 (citing RAIR Foundation USA, About Us, https://rairfoundation.com/about/ (last accessed on June 27, 2025)).)

Taking the pleadings as true and drawing all reasonable inferences in favor of EPIC, the Court finds that the provided context illustrates plausible bias Tips's alleged targeting of EPIC.  When considered against the backdrop of TFSC permitting the same religious funeral rites for 38 years, the recent political backlash against EPIC's planned development and the perceived threat accompanying the rise in the Texan Muslim population, combined with the lack of explanation in the C&D Letter identifying what specific guidelines EPIC violated, it can be reasonably inferred that the C&D Letter and Tips's role therein was the result of religious discrimination.  Therefore, considering the series of events and historical context surrounding the issuance of the C&D Letter, as the courts have done in the above cases, the Court finds that Tips's alleged conduct and involvement in the C&D Letter violated EPIC's clearly established right "that our laws be applied in a manner that is neutral toward religion."  See Masterpiece Cakeshop, 584 U.S. at 640.

Lastly, the Court acknowledges the lack of a strict scrutiny analysis in the present Order and again finds support for this approach in binding precedent. Supreme Court Justice Gorsuch writes,

> Under this Court's precedents, laws targeting acts for disfavor only when they are religious in nature or because of their religious character are "doubtless . . . unconstitutional." . . . As a result, where "official expressions of hostility to religion" accompany laws or policies burdening free exercise, we have simply "set aside" such policies without further inquiry. . . . As a result, we have said that government

22

actions burdening religious practice should be "set aside" if there is even "slight suspicion" that those actions "stem from animosity to religion or district of its practices."

Dr. A v. Hochul, 142 S. Ct. 552, 555 (2021) (Gorsuch, J., dissenting) (citation modified) (citing Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 877 (1990); Masterpiece Cakeshop, 584 U.S. at 639–40).

Indeed, the Court finds the most support in Masterpiece Cakeshop, which similarly involved discriminatory conduct by a government body in applying and enforcing its laws in a manner that reflected religious hostility and ultimately resulted in a cease-and-desist order.  Id. at 618–19, 630.  The Supreme Court found that the Colorado Civil Rights Commission treated the plaintiff's case in a manner that was "neither tolerant nor respectful of [the plaintiff's] religious beliefs."  Id. at 639.  In reaching that conclusion, the Court considered the Commission's disparate consideration of the plaintiff's case compared to similarly situated cases and comments from commissioners in discussing the plaintiff's case that reflected "clear and impermissible hostility" towards the plaintiff's religious beliefs.  Id. at 634–38.  The Court did not conduct a formal strict scrutiny analysis, but instead found that "[o]n these facts, the Court must draw the inference that [the plaintiff's] religious objection was not considered with the neutrality that the Free Exercise Clause requires."  Id. at 639.

The Court has likewise considered the historical background of TSFC's failure to enforce the law at issue against religious rites, the sequence of events and resulting political backlash against EPIC that culminated in the C&D Letter, and the alleged statements and shared content by Tips demonstrating animus toward Islam.  See id. at 639 (citing Church of Lukumi, 508 U.S. at 540). This binding precedent should have made clear to Tips and TSFC that targeting a religious organization for differential treatment violates the Constitution. Although there may be no factually identical case involving the precise conduct alleged here, "we know this with certainty: When the government fails to act neutrally toward the free exercise of religion, it tends to run into trouble." Id. at 643 (Gorsuch, J., concurring).

## 2.  Equal Protection

For the foregoing reasons, the Court also finds that Tips's alleged conduct also violates the clearly established law of the Equal Protection clause.  To properly state an equal protection claim, EPIC's allegations must satisfy two prongs: (1) that it received treatment different from that received by similarly situated individuals or groups, and (2) that the unequal treatment stemmed from a discriminatory intent.  Taylor v. Johnson, 257 F.3d 470, 473 (5th Cir. 2001).

The Court has already found that, as alleged, Tips's and TFSC's conduct can be reasonably inferred to stem from a discriminatory intent.  Tips

24

again attacks the lack of a comparator, which the Court has already addressed. (Dkt. # 52 at 8.)  And lastly, the Court has already found that Tips's conduct violated clearly established law protecting religious liberty.  "As [the Supreme Court] has repeatedly held, governmental discrimination against religion—in particular, discrimination against religious persons, religious organizations, and religious speech—violates the Free Exercise Clause *and the Equal Protection Clause*."  Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found., 586 U.S. 1213, 1214 (2019) (emphasis added).  Moreover, in Trinity Lutheran Church of Columbia Inc. v. Comer, the Supreme Court declined to reach the church's equal protection claim because it already found that the defendant's conduct violated the Free Exercise Clause.  582 U.S. 449, 566 n.5 (2017).  But cf. Locke v. Davey, 540 U.S. 712, 720 n.3 (2004) (stating that because the Court already found that the defendant's conduct did not violate the Free Exercise Clause, it applies a rational-basis scrutiny to the plaintiff's Equal Protection claims).  See also McDaniel v. Paty, 435 U.S. 618 (1978) (White, J., concurring) (opining that the plaintiff's claim should be analyzed under the Equal Protection Clause rather than the Free Exercise Clause).  Accordingly, the Court is satisfied that EPIC has alleged, with sufficient specificity, a constitutional violation that was clearly established under both the Equal Protection and Free Exercise Clauses,

25

which operate in tandem to protect the fundamental American values of religious liberty and equality.[6]

CONCLUSION

Based on the aforementioned reasons, the Court **DENIES** Defendant Kristin Tips's Motion to Dismiss (Dkt. # 47).

**IT IS SO ORDERED.**

**SIGNED:** Austin, Texas, June 24, 2026.

_____
David Alan Ezra
Senior United States District Judge

---

[6] The Court would note that no evidence has been presented—and the Court is not aware of any factual allegations—suggesting that EPIC has applied, or intends to apply, "Sharia law" in its practices, including those related to Islamic burial rites. Rather, EPIC's Constitution emphasizes that its vision is to service with "tolerance, and unity," and to "[s]trive to work in harmony with other Muslim and *non-Muslim* civic organizations." (Dkt. # 46 at 50 (emphasis added).) Article III further provides that "EPIC shall comply with all local, state, and federal laws and will not carryout [sic], perform, and allow any activities, which are not permitted, are prohibited by law, and are contrary to the vision, mission, and objectives of EPIC." (Id. at 51.) Whether EPIC has, in fact, disregarded Texas or federal law in favor or "Sharia law" is not a question before the Court at this stage of the litigation. In resolving the present Order, and without purporting to be an expert in Islamic teachings, the Court simply notes the absence of any evidence or allegation that Islamic burial rites qualify as "Sharia law" of the sort that threaten Texas law, and that the C&D Letter does not identify any specific aspect of EPIC's burial services that allegedly violates Texas law.