IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| EAST PLANO ISLAMIC CENTER (EPIC), | § | NO. 1:25-CV-1085-DAE |
| *Plaintiff*, | § | |
| vs. | § | |
| TEXAS FUNERAL SERVICES COMMISSION, and TEXAS FUNERAL SERVICES COMMISSION EXECUTIVE DIRECTOR, in their official capacity, and KRISTIN TIPS, in her individual capacity | § | |
| *Defendants*. | § | |

MEMORANDUM OPINION AND ORDER DENYING TEXAS FUNERAL SERVICES COMMISSION'S AND TEXAS FUNERAL COMMISSION EXECUTIVE DIRECTOR'S MOTION TO DISMISS

Before the Court is Texas Funeral Service Commission's ("TFSC" or "the Commission") and Texas Funeral Service Common Executive Director's (collectively, "Agency Defendants") Motion to Dismiss (Dkt. # 55) East Plano Islamic Center's ("Plaintiff" or "EPIC") Second Amended Complaint ("Complaint") (Dkt. # 46), which they filed on April 30, 2026. EPIC filed a Response in Opposition on May 14, 2026. (Dkt. # 56.) Agency Defendants then filed a Reply on May 21, 2026. (Dkt. # 57.) The Court finds these matters suitable for disposition without a hearing. After careful consideration of the filings and the

relevant law, the Court **DENIES** Agency Defendants' Motion to Dismiss (Dkt. # 55).[1]

BACKGROUND

East Plano Islamic Center ("EPIC") brings this action to vindicate its right to conduct religious funeral rites in accordance with the Islamic faith and tradition. (Dkt. # 46 at 1.) EPIC is a nonprofit Islamic organization in Plano, Texas, formed to "provide religious, social, and educational services to inspire the Muslim community to fulfill its responsibility and contribute to the betterment of society by following the principles of Quran and the noble life of Prophet Muhammed (peace be upon him)." (Id. at 2–3, 50.) One of the sincerely held religious beliefs of EPIC and its Muslim membership is the collective obligation held by the religious community to perform proper Islamic funeral rites for the deceased. (Id. at 10.) Islamic religious law calls for prompt ritual cleansing, shrouding, prayer, and burial in which the integrity and dignity of the decedent's remains are scrupulously maintained. (Id.) To that end, EPIC offers traditional, non-commercial, Muslim funeral rites; especially for Muslim families unable to

[1] The Court previously denied Defendant Tips's Motion to Dismiss (Dkt. # 47). (Dkt. # 58.) Because of the similarity in factual and procedural background between EPIC's claims against Agency Defendants and Defendant Tips, the Court incorporates the alleged facts as discussed in its prior order and adds others relevant to Agency Defendants' jurisdictional arguments. (Dkt # 58.)

afford the services. (Id.) EPIC assists Muslim families by arranging and facilitating religious funeral rites (washing, shrouding, and performing the *Janaza* prayer) in partnership with, and under the supervision of, licensed funeral providers. (Id. at 11–13.)

Chapter 651 of the Texas Occupations Code regulates the funeral industry in Texas. It requires licensure for persons or entities that engage in the business of funeral directing or operating a funeral establishment. See Tex. Occ. Code §§ 651.001(7)–(8), 651.351(a). Further, it defines "Funeral directing" as "acts associated with or arranging for the disposition of a dead human body, performed by a person for compensation, from the time of first call until . . . inurnment, interment, or entombment services are complete." Tex. Occ. Code § 651.001(7). And lastly, the Texas Funeral Services Commission derives its existence and statutory authority from Chapter 651 and is tasked with enforcing these provisions. See Tex. Occ. Code Chapter 651.

On March 26, 2025, the Commission issued a cease-and-desist letter to EPIC. (Dkt. # 46 at 14, 78.) It ordered EPIC to immediately halt what the Commission alleged were unlicensed funeral service operations. (Id.)[2] The letter

---

[2] In the days and weeks before the cease-and-desist letter, EPIC's Complaint pleads a bevy of public statements attributed to certain State officials that amplified unsubstantiated theories about EPIC's ties to Sharia law and peddled in Islamophobic tropes. (See Dkt. # 46 at 15–20 (contending that Hysteria About 'Sharia Law' Le[d] to a Witch Hunt" that weaponized Texas's administrative state

also accused EPIC of operating as a funeral home without an establishment license, in violation of Texas Occupations Code § 651.351. (Id.) Moreover, it allegedly notified EPIC that it was referring the matter for criminal investigation to the Collin County District Attorney. (Id.)

EPIC contends that Agency Defendants did not identify any specific practices that violated the Occupation Code. (See id.) Instead, EPIC alleges that it was given the contact information of TFSC's attorney and told to reach out to if it had "any questions." (Id.) EPIC claims that it was not running a place of business and did not engage in any for-profit embalming or funeral directing. (Id. at 31.)

To comply with the cease-and-desist letter, EPIC reports that it ceased performing religious funeral rites, which resulted in at least eleven congregants being buried without receiving the *Janaza* prayer at their mosque. (Id. at 22.) EPIC contends that the Agency Defendants violated both state and federal constitutional and statutory protections for religious exercise, and it claims the Commission exceeded its statutory authority under Texas law. (Id. at 30–46.) EPIC points to the Commission's prior affirmations that religious organizations

---

against EPIC); see also Dkt. # 58 at 26 n.6 (observing that "that no evidence has been presented and the Court is not aware of any factual allegations supporting those contentions). Moreover, "EPIC's Constitution emphasizes that its vision is to service with 'tolerance, and unity,' and to '[s]trive to work in harmony with other Muslim and *non*-Muslim civic organizations.'" (Dkt. # 58 at 26 n.6 (quoting Dkt. # 46 at 50).)

could perform burial-related rites so long as they were not doing so for profit. (Id. at 8–9, 76–77.) These allegations, it posits, support its claim that "hysteria" and "religious animus" concerning a planned commercial development in Josephine, Texas, motivated Agency Defendants' cease-and-desist letter (and the State officials' comments, generally) rather than any legitimate regulatory concern about EPIC's not-for-profit performance of sacred Muslim funeral rites. (Id. at 15–17, 19, 79–83.)

On July 2, 2025, EPIC filed its Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction in the 250th District Court of Travis County. (Dkt. # 1-3 at 5.) The Agency Defendants then removed the suit from state court to this Court. (Dkt. # 1.) Following Agency Defendants' removal, EPIC again filed a Motion for TRO on July 11, 2025. (Dkt. # 4.) The day before the TRO was set for hearing, the Commission issued a letter purporting to clarify the scope of its prior cease-and-desist letter. (Dkts. ## 12; 12-1.) Because the clarification addressed the narrow question of emergency relief raised in EPIC's TRO application, the hearing was cancelled. (See Dkts. ## 12; 12-1; 14.)[3] In its Notice of Advisory and Request to

[3] In pertinent part, the Commission's letter reads as follows:

> Texas law requires that an individual or establishment be licensed only if they are engaged in directing funerals or preparing bodies for compensation. In accordance with longstanding policy, the TFSC has always permitted religious organizations to engage in: 1) operating a hotline or otherwise

Remove Emergency Setting, EPIC contended (and continues to allege (see Dkt. 56)) that the "cease-and-desist letter remains operative, and with it, the continuing

---

> receiving and providing information to/from members within the religious community related to organization of religious rites for a deceased person; 2) helping persons affiliated with the deceased identify and/or contact a licensed funeral establishment or funeral director; 3) notifying members of the community of the community prayers to be performed for the deceased; 4) performing the funeral prayer (*Janaza*); or 5) helping persons affiliated with the deceased with collecting the death certificate (but without EPIC itself providing or filing the certificate). The Texas Funeral Service Commission does not regulate such practices and the March 26, 2025 letter does not relate to such activities. EPIC will not be in violation of the cease-and-desist order if it engages in the aforementioned practices.
>
> To the extent that you are 1) helping persons affiliated with the deceased arrange for the transportation of the body to and from the EPIC mosque or 2) helping persons affiliated with the deceased wash and shroud the body, please be advised that such activities must be done in compliance with applicable Texas law, including the requirements of Chapter 651 of the Texas Occupations Code, because they involve the handling of human remains. But if they are done in compliance with applicable Texas law, the TFSC also permits religious organizations to engage in those activities and does not consider them "funeral service operations" if performed without compensation. EPIC will not be in violation of the cease-and-desist order if it engages in the aforementioned practices if performed in compliance with Texas law and without compensation. . . .
>
> The aforementioned activities may proceed so long as they are done in compliance with Texas law. If TFSC receives credible information suggesting that any of the aforementioned activities are being performed in a manner not in compliance with Texas law, we will notify your counsel promptly and attempt to resolve the allegation prior to taking further action. If you have any questions, please contact the TFSC for further information. Otherwise, we will be in touch as necessary for our investigation.

(Dkt. 12-1.)

threat of civil penalties and criminal prosecution by the State for conduct that lies at the heart of EPIC's religious exercise." (Dkt. # 12 at 1–2.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1); see also Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006). When evaluating a Rule 12(b)(1) motion, "the general rule . . . is to take allegations as true unless denied or controverted by the movant." Fed. Bureau of Investigation v. Fikre, 601 U.S. 234, 237 n.1 (2024) (quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004)) (citation modified). The Court may dismiss a suit "for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Freeman v. United States, 556 F.3d 326, 334 (5th Cir. 2009) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).

To withstand a motion to dismiss for lack of subject matter jurisdiction, a plaintiff must plead standing and ripeness. See Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714–15 (5th Cir. 2012). To plead standing, a plaintiff must allege that it: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016); see also id. ("Where . . . a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating *each element*." (citation modified) (emphasis added)). And to plead ripeness, a plaintiff must allege that the issues are fit for judicial review and that it will suffer hardship without judicial review. See Greenstein, 691 F.3d at 715. Additionally, the Fifth Circuit has clarified that the party that "invoked federal jurisdiction" in the first place (typically a plaintiff but also, in theory, a defendant who removes an action to federal court) has the burden of establishing a plaintiff's standing. Lutostanski v. Brown, 88 F.4th 582, 588 (5th Cir. 2023); see also Travis v. Irby, 326 F.3d 644, 649 (5th Cir. 2003) (characterizing a removing defendant's burden as a "heavy" one).

## DISCUSSION

Agency Defendants press three arguments concerning this Court's jurisdiction to hear the case that Agency Defendants themselves removed to this Court. First, and similar to Defendant Tips's previous argument that the Court has already addressed (see Dkt. # 58), Agency Defendants argue that "the Eleventh Amendment bars all claims against the TFSC." (Dkt. # 55 at 4.) Second, they contend that "EPIC's *ultra vires* theory fails because the challenged conduct falls squarely within the Commission's statutory authority." (Id.) And, third, they assert that "EPIC's claims are not ripe, and EPIC lacks standing," principally

because Agency Defendants "ha[ve] not taken a final enforcement action, and any alleged injury results from EPIC's own voluntary decisions."

I. Agency Defendants Waived Sovereign Immunity (and their state law immunity to EPIC's *Ultra Vires* claim) by Removing the Case to Federal Court

A. Sovereign Immunity

As a threshold matter, "[s]overeign immunity is the privilege of the sovereign not to be sued without its consent." Va. Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011).[4] By its plain text, the Eleventh Amendment forbids the application of "[t]he Judicial power of the United States . . . to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. And, although not a dead ringer, "the Supreme Court has often used [the term] 'Eleventh Amendment immunity' as a synonym for the States' broader constitutional sovereign immunity" from suit. Sullivan v. Tex. A&M Univ. Sys., 986 F.3d 593, 596 n.1 (5th Cir. 2021). In fact, since 1890, the Supreme Court has "understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact,

[4] *Sovereign immunity*, Black's Law Dictionary (12th ed. 2024) ("A state's immunity from being sued in federal court by the state's own citizens.")

unlimited by Article III's jurisdictional grant." Stewart, 563 U.S. at 253 (citing Hans v. Louisiana, 134 U.S. 1 (1890)).

Still, the Supreme Court has recognized that sovereign immunity is not absolute. A State can waive its sovereign immunity. See, e.g., Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675–76 (1999) (reaffirming that a State may waive its sovereign immunity at its "pleasure" (citation omitted)). And Congress can abrogate it. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 65 (1996) (observing that Congress can abrogate a State's sovereign immunity pursuant only to the Section 5 of the Fourteenth Amendment).

Included in the Supreme Court's understanding of waiver of a State's sovereign immunity, as it later clarified in Lapides v. Board of Regents of the University System of Georgia, is the concept of waiver by removal. 535 U.S. 613, 619 (2002). In Lapides, a unanimous Court held that a state agency party who had invoked a federal court's jurisdiction by removing had affirmatively waived any immunity it would have enjoyed from suit in *state* court. See id. The Court reasoned that "[i]t would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand." Id. What is more, the Court explained, "a Constitution that

permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results." Id.

The Fifth Circuit has recognized the propriety of Lapides's rule as well. See, e.g., Meyers ex rel. Benzig v. Texas, 410 F.3d 236, 252 (5th Cir. 2005 (relying on Lapides to reject Texas's argument that its Eleventh Amendment immunity from suit remained in force *post*-voluntary removal from state to federal court). The Meyers Court also addressed arguments that Texas made then, and much like those that Agency Defendants advance now, about how Pennhurst State School & Hospital v. Halderman and Ex parte Young militate in favor of dismissal on sovereign immunity grounds. (See Dkt. # 55 at 2–3 (citing Pennhurst, 465 U.S. 89, 117, 121 (1984) and Ex parte Young, 209 U.S. 123 (1908)).) As the Court reads the relevant law, it finds that Meyers controls. See Meyers, 410 F.3d at 252–56. Accordingly, Meyers forecloses Agency Defendants' arguments on this issue, and it adopts the Fifth Circuit's reasoning.[5]

[5] See Meyers, 410 F.3d at 256 ("[I]t is not necessary to address Texas's arguments in opposition to plaintiffs' Ex parte Young suit. The purpose of the doctrine of Ex parte Young is to allow plaintiffs asserting federal law claims to circumvent the state's sovereign immunity from suit by suing state officers instead. Because [Agency Defendants] ha[ve] waived [their] immunity from suit in federal court in this case it is not necessary for the plaintiffs to invoke the Ex parte Young doctrine in order to prosecute their action against the defendants." (first citing Home Tel. & Tel. Co. v. City of L.A., 227 U.S. 278 (1913); and then citing Ex parte Young, 209 U.S. 123)). As the Fifth Circuit said in Meyers, so too here. See id. at 252.

Intuitively, Lapides and Meyers make sense. In any event, they bind this Court. Agency Defendants cannot prevail on the argument, as they have attempted to do in their briefing, "Heads I win; tails EPIC loses." (See Dkt. # 55 at 2–3.) By voluntarily removing this case from the 250th Judicial District Court of Travis County, Agency Defendants knowingly waived their ability to assert an Eleventh Amendment defense or any permutation of sovereign immunity. (See Dkt. # 1 at 1 (invoking 28 U.S.C. § 1441(a), which permits removal from state court when the state court action contains claims that implicate a basis of this Court's original jurisdiction)); Lapides, 535 U.S. at 619; Meyer, 410 F.3d at 252–55. Although the procedural posture in which the Fifth Circuit decided Lutostanski differs slightly from the facts of this case, that Court's shrewd observation applies with full force to Agency Defendant's attempt at jurisdictional gamesmanship here: "Federal jurisdiction is not a game of whack-a-mole." Lutostanski, 88 F.4th at 588. This means that parties like Agency Defendants cannot have their

---

"Lapides and the present case are quite different from Pennhurst. Id. To start, "[t]hey hold that a state's removal of a case into federal court, without more, clearly demonstrates the state's consent to invoke and submit to federal jurisdiction so that the general legal principle of voluntary invocation requiring waiver of immunity ought to apply." Id. Moreover, because "Pennhurst is devoid of any feature that is analogous to this case or that would lend any support to [Agency Defendants'] theory of sovereign immunity structure . . . it is inapposite, irrelevant and does not support [Agency Defendants'] arguments in any respect." Id.

proverbial cake (*i.e.*, immunity from suit in state court) and eat it too (*i.e.*, invoke this Court's original jurisdiction and then turn around and claim sovereign immunity). See id.[6] Rather than remand to state court, however, the Court concludes that EPIC's claims have been properly removed and, for the reasons that follow, are justiciable in federal court. See id.; see also infra (analyzing standing and ripeness).

B. Agency Defendants Have Also Waived Any Immunity to EPIC's *Ultra Vires* Claims

Additionally, "[u]nder Texas law, '*ultra vires* acts—or those acts without authority—should not be considered acts of the state at all." Horizon Bank SSB v. Patrick, No. 23-CV-691, 2024 WL 409728, at *4 (W.D. Tex. Feb. 2, 2024) (quoting Hall v. McRaven, 508 S.W.3d 232, 238 (Tex. 2017)), appeal dismissed sub nom. Horizon Bank S.S.B. v. Hancock, No. 24-50133, 2026 WL 1128574 (5th Cir. Apr. 22, 2026). Per Agency Defendants, because "Texas law does not allow a

[6] The Court is not persuaded by Agency Defendants' argument that "[r]emoval does not create subject-matter jurisdiction where none otherwise exists." (Dkt. # 55 at 7 (citing The Lamar Co. LLC v. Miss. Transp. Comm'n, 976 F.3d 524, 528–29 (5th Cir. 2020)).) The Court agrees that this is a true statement of law, but it does not apply here. To wit, federal question jurisdiction exists. And it is not a close call. Plaintiff alleges constitutional violations of its and its members' First Amendment and Fourteenth Amendment rights. (See, e.g., Dkt. # 46 at 40, 43.) These lie in the heartland of federal courts' original jurisdiction. See 28 U.S.C. § 1331.

plaintiff to circumvent sovereign immunity merely by disagreeing with how an agency interprets or enforces a statute," this Court should dismiss EPIC's *ultra vires* claims. (Dkt. # 55 at 2–3, 8–10 (citing, *inter alia*, City of El Paso v. Heinrich, 284 S.W.3d 366, 372 (Tex. 2009)); and McRaven, 508 S.W.3d at 242–43)). Yet, Agency Defendants' waiver of Eleventh Amendment sovereign immunity by removal, see supra, also abrogates any claim to sovereign immunity that they had under Texas state law. See Lapides, 535 U.S. at 619; Meyer, 410 F.3d at 252–55. And, while the Court is unaware of any *published* Fifth Circuit case addressing this issue, the Fifth Circuit's 2018 decision in Zeng v. Texas Tech University Health Science Center suggests that Agency Defendants' argument must fail. 836 F. App'x 203 (5th Cir. 2020). As one district Court recently described Zeng, it stands for the proposition that "a State waives sovereign immunity when it removes a case from state court to federal court for state-law claims, in respect to which the State has explicitly waived sovereign immunity from state-court proceedings." Willie v. Univ. of Tex. Sw. Med. Ctr., No. 25-CV-3235, 2026 WL 1601573, at *3 (N.D. Tex. June 3, 2026) (quoting Zeng, 836 F. App'x at 207). Here, and like the Willie court described the effect of a Texas state actor's decision to remove a plaintiff's suit, "by removing the case to federal court, [Agency Defendants] ha[ve] waived [their] immunity from answering in federal court for [*ultra vires*] claims." Id. at *4.

## II. Agency Defendants Have Sufficiently Pleaded Article III Standing and Ripeness[7]

Federal courts are courts of limited jurisdiction. See U.S. Const. art. III, § 2. In practice, this means that district courts like this Court lack the power to adjudicate claims that fall outside of their subject-matter jurisdiction. See, e.g., Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 778–79 (2000). In Vermont Agency, the Supreme Court held that "[q]uestions of jurisdiction . . . should be given priority—since if there is no jurisdiction there is no authority to sit in judgment of anything else." Id. Furthermore, it observed the cold truth that, because "[j]urisdiction is power to declare the law, . . . when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Id. at 778–79 (quoting Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868)); see also TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).

---

[7] The Fifth Circuit has opined that "[t]he justiciability doctrines of ripeness and standing often intersect because the question of whether a plaintiff has suffered an adequate harm is integral to both." Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cnty., 205 F.3d 265, 268 n.7 (5th Cir. 2000). Other courts have commented on this overlap "in the pre-enforcement First Amendment context," observing that "the line between Article III standing and ripeness . . . has evaporated." E.g., Miller v. City of Wickliffe, 852 F.3d 497, 506 (6th Cir. 2017) (quoting Winter v. Wolnitzek, 834 F.3d 681, 687 (6th Cir. 2016)) (citation modified). Although they intersect (and are often mutually reinforcing), the Court will address Agency Defendants' standing and ripeness arguments separately for clarity.

As it did in a prior order, the Court highlights the similarity that this case presents to Lutostanski. (See Dkt. # 64 at 4 n.1.) Like Lutostanski, here, Agency Defendants, "having invoked federal jurisdiction . . . turned around and sought a dismissal in federal court on the grounds that the plaintiffs lacked standing." Lutostanski, 88 F.4th at 588. The Fifth Circuit reminded the removing parties, "[t]hat is not how the system works." Id.; cf., e.g., Gallagher v. Santander Consumer USA, Inc., 125 F.4th 865, 867 (8th Cir. 2025) (per Stras, J.) (holding that the removing defendant "had the burden of establishing [standing] as the one who "invok[ed] federal jurisdiction"); Fox v. Dakkota Integrated Sys., LLC, 980 F.3d 1146, 1151 (7th Cir. 2020) (per Sykes, C.J.) ("Where, as here, a case is removed from state court, the roles are reversed and the burden flips: In this procedural posture, *the defendant*, as the proponent of federal jurisdiction, must establish the plaintiff's Article III standing." (emphasis in original)).

* * *

To withstand a 12(b)(1) motion to dismiss for lack of standing on First Amendment injury, the Fifth Circuit has held that a plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation,' and [that] 'general factual allegations suffice to establish standing at the motion to dismiss stage.'" Lowery v. Mills, 157 F.4th 729, 738 (5th Cir. 2025) (first quoting Susan B. Anthony List v. Driehaus, 573

U.S. 149, 158 (2014); and then quoting Dobbin Plantersville Water Supply Corp. v. Lake, 108 F.4th 320, 327 n.4 (5th Cir. 2024)), cert. denied, No. 25-927, 2026 WL 1855135 (U.S. June 29, 2026); see also Freeman, 556 F.3d at 334. A plaintiff must clearly allege—rather than adduce admissible evidence to establish—that its speech was chilled. See Spokeo, 578 U.S. at 338.

In this case, and for the reasons that follow, the Court concludes that the Plaintiff has established standing on the face of its well-pleaded complaint. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California, 463 U.S. 1, 10 (1983) ("For better or worse . . . a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case 'arises under' federal law."); Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 152 (1908) (same); see also La. Indep. Pharms. Ass'n v. Express Scripts, Inc., 41 F.4th 473, 478 (5th Cir. 2022) (same).

A. EPIC Has Pleaded a Concrete Injury in Fact

First, Plaintiff has sufficiently alleged a concrete injury in fact. See Spokeo, 578 U.S. at 338. In the First Amendment context, the Fifth Circuit has been unequivocal: "In pre-enforcement First Amendment challenges like this one, a plaintiff need not have experienced 'an actual arrest, prosecution, or other enforcement action' to establish an injury." Inst. for Free Speech v. Johnson, 148 F.4th 318, 327 (5th Cir. 2025) (quoting Driehaus, 573 U.S. at 158). Instead, "[a]

plaintiff has suffered an injury in fact if [it] (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) [it]s intended future conduct is arguably . . . proscribed by [the agency determination in question], and (3) the threat of future enforcement of the [challenged agency determination] is substantial." Speech First, Inc. v. Fenves, 979 F.3d 319, 330 (5th Cir. 2020) (quoting Driehaus, 573 U.S. at 161–64) (citation modified). Here, EPIC satisfies all three elements. First, EPIC's conduct implicates a constitutional interest: its and its members' First Amendment right to Free Exercise of religion. (See Dkt. # 46 at 1, 11–14, 20, 28); Fenves, 979 F.3d at 330. Second, there is no question that the plain letter of Agency Defendants' alleged cease-and-desist letter proscribes EPIC's offerings of sacred Islamic funeral rites. See Fenves, 979 F.3d at 330. And, third, EPIC alleges that Agency Defendants' "cease-and-desist letter remains operative, and with it, the continuing threat of civil penalties and criminal prosecution by the State for conduct that lies at the heart of EPIC's religious exercise." (Dkt. # 56 at 7 (quoting Dkt. # 12 at 1–2)); Fenves, 979 F.3d at 330; (see also Dkt. # 46 at 16.)[8]

---

[8] The Court takes judicial notice of a March 10, 2026, letter from Attorney General Ken Paxton to members of the Collin County Commissioners Court. See Letter from Ken Paxton, Tex. Att'y Gen., to Chris Hill et al., Collin Cnty. Comm'rs Ct., (Mar. 10, 2026) https://www.texasattorneygeneral.gov/sites/default/files/images/press/Letter_10.pdf [perma.cc/AV7J-LKP7]; see also Sosebee v. Steadfast Ins. Co., 701 F.3d 1012, 1018 n. 1 (5th Cir.2012) (holding that a court is "entitled to take judicial notice of

Thus, even if the Court were to accept Agency Defendants' argument that the pendency of the investigation does not constitute any final agency action (see Dkt. # 55 at 3–6, 8, 10–14), this does not defeat EPIC's standing. See Driehaus, 573 U.S. at 158. Instead, "the Supreme Court has recognized that chilled speech or self-censorship is an injury sufficient to confer standing." Johnson, 148 F.4th at 327 (first quoting Barilla v. City of Houston, 13 F.4th 427, 431 (5th Cir. 2021); and then citing Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 782 (5th Cir. 2024)); see also Dombrowski v. Pfister, 380 U.S. 479, 486–87 (1965); Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 392 (1988); Ctr. for Individual Freedom v. Carmouche, 449 F.3d 655, 660 (5th Cir. 2006); Hous. Chron. Publ'g Co. v. City of League City, 488 F.3d 613, 618 (5th Cir. 2007).

The Supreme Court also observed in Babbit v. United Farm Workers National Union that "the prospect of issuance of an administrative cease-and-desist order . . . or a court-ordered injunction . . . against such prohibited conduct provides substantial additional support" to the arguments that claims by one who is threatened with enforcement are justiciable. 442 U.S. 289, 302 n.13 (1979); accord Driehaus, 573 U.S. at 166 (relying on Babbit to conclude that when "burdensome Commission proceedings . . . are backed by the additional threat of criminal

---

adjudicative facts from reliable sources 'whose accuracy cannot reasonably be questioned'" (quoting Fed. R. Evid. 201(b))).

prosecution," then "the combination of those two threats suffices to create an Article III injury under the circumstances"); cf. Seattle Pac. Univ. v. Ferguson, 104 F.4th 50, 60 (9th Cir. 2024) (holding that "[a] letter requesting documents and a litigation retention hold is also a clear sign of a substantial threat" under Driehaus).

As in Babbit, EPIC has alleged (and Agency Defendants have conceded, (see Dkt. # 55 at 3)), that it received a civil regulatory cease-and-desist letter from TFSC, which also threatened criminal penalties. (See Dkt. # 46 at 1, 14, 18, 21, 38, 78.) The cease-and-desist letter is itself enough to allege an injury-in-fact. See Babbit, 442 U.S. at 302 n.13. The Court is hard-pressed to think of something more chilling to EPIC's and its members' First Amendment rights than the alleged cease-and-desist letter. In pertinent part, it reads:

> The Texas Funeral Service Commission has determined that you [EPIC] are operating as a funeral home without an establishment license in violation of Tex. Occ. Code § 651.351. . . . Based in part on this determination, the Texas Funeral Service Commission is also making a criminal referral to the Collin County District Attorney.

(Id. at 78.) To the Court, this allegation occupies the heartland of threats to chill protected First Amendment activities like religious rituals, which the Supreme Court has long held to confer injury-in-fact. See, e.g., Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 154 (1970) ("A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause." (citing

Abington Sch. Dist. v. Schempp, 374 U.S. 203 (1963))); Driehaus, 573 U.S. at 166; see also Johnson, 148 F.4th at 327.

B. EPIC's Claims are Traceable to Agency Defendants

Concerning the second prong of the Article III standing analysis, Agency Defendants argue that EPIC's "alleged injuries are not fairly traceable to any final or coercive action by Defendants." (See Dkt. # 55 at 12–14.) They claim that "EPIC's decision to suspend its operation . . . constitutes a voluntary response to a non-final agency action, not an injury fairly traceable to Defendants" because EPIC "independent[ly] deci[ded] to alter its behavior in response to a perceived regulatory risk rather than from a concrete legal requirement." (Id. at 12–13.) In support of this argument, they cite Zimmerman v. City of Austin. 881 F.3d 378, 389–90 (5th Cir. 2019).

Plaintiff responds that "a party facing down an order to cease unspecified conduct with a referral for criminal prosecution can hardly be expected to sort through which activities are covered by the prohibition and which were not, and then continue engaging in the latter." (Dkt. # 56 at 19.) And, second, EPIC argues that "Agency Defendants' contemporaneous press release specifically identifies EPIC's religious activities as 'activities that collectively necessitate a funeral establishment license under Texas law.'" (Id. (quoting Dkt. # 56-2 at 6–7).)

* * *

EPIC's arguments are meritorious. First, the rules of decision that bind this Court obviate Agency Defendants' contention that EPIC's decision "to suspend sacred funeral rites" makes the injury not traceable. See First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. ___, 146 S. Ct. 1114, 1122 (2026) ("[A] party need not always wait for the government to take coercive action against it before filing suit to challenge the government's conduct. Instead, a litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as it faces 'a credible threat of enforcement.'" (quoting Driehaus, 573 U.S. at 161, 164–167)); MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29 (2007). Here, the Court concludes that because Agency Defendants' alleged cease-and-desist letter purports to be "effective immediately" and it was signed on official TFSC letterhead by the Commission's Executive Director, the injury occasioned by its issuance necessarily traces directly back to its Agency Defendant-issuers. (See Dkts. ## 46 at 78; 56-2 at 7–8.) The Article III standing analysis would require the same conclusion *regardless* of whether EPIC had decided not to suspend its sacred funeral rites. See Davenport, 146 S. Ct. at 1122.

Additional authorities from the Supreme Court and Fifth Circuit militate in favor of this holding. For example, "[a]lthough 'standing cannot be

conferred by a self-inflicted injury,' in the context of the First Amendment, 'government action that chills protected speech without prohibiting it can give rise to a constitutionally cognizable injury.'" Lowery, 157 F.4th at 739 (quoting Glass v. Paxton, 900 F.3d 233, 238 (5th Cir. 2018) (internal citation omitted)). Lowery suggests that Agency Defendants' conduct, as alleged in EPIC's complaint, creates a concrete injury directly traceable to Agency Defendants because allegations of "[s]uch governmental action may therefore 'be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights.'" Lowery, 157 F.4th at 739 (quoting Laird v. Tatum, 408 U.S. 1, 12–13 (1972)); (see Dkt. # 46 at 20–40); cf. L.M.L v. Martin, 833 F. Supp. 3d 692, 713 (W.D. Tex. 2026) (relying on Driehaus for the proposition that "although courts may consider an affirmative, individual threat of enforcement on this element, there is no such requirement to lodge a pre-enforcement challenge").

Additionally, it would defy credulity for Agency Defendants' alleged actions to require that one in EPIC's position heed Agency Defendants' proposed course of action to establish traceability. For example, why would anyone in EPIC's circumstances, *i.e.*, subject to "a state official['s] . . . order purporting to enjoin certain activities," be required to hazard a guess about whether the particular "official . . . actually possess[es] legal authority to issue the order or impose consequences for its violation" when the official is acting under color of law in the

first place? (Dkt. # 56 at 20.) By their own terms, Agency Defendants would require every recipient of a cease-and-desist letter or other communication purporting to exercise the coercive authority of the state to determine on their own whether official lacks power, and, if so, "then the recipient's compliance is strictly voluntary and any injury experienced by the recipient because of its compliance is self-inflicted." (Id.)

To see why such an argument defies common sense, consider the following. When a motorist sees a car that looks like a police cruiser, and the car then turns on a horizontal strip of flashing lights to initiate a traffic stop, she ordinarily pulls over. From her vantage point, the police cruiser's markings and flashing lights are heuristics. They suggest that the officer possesses the lawful authority to initiate the stop. Then, upon the officer's approach of her vehicle, the officer's uniform and badge further affirm that the officer is acting under color of state law. Before complying with the officer's orders, however, the motorist does not, as Agency Defendants essentially urge this Court to require of EPIC here, demand to see the statutory text conferring the officer authority to enforce the motor vehicle code. She takes an official acting under the color of state law, like the police officer, to have the legal authority to do so—she does not engage in a robust legal analysis (the same inquiry that Agency Defendants would have this Court impose on EPIC) *before* determining whether the officer's commands are

lawful and whether her compliance is "strictly voluntary." (Cf. Dkt. # 55 at 12–13. (contending that the Commission's cease-and-desist letter did not amount to a "binding enforcement action" or a "coercive enforcement action").)

Here, much like the hypothetical traffic stop discussed above, the cease-and-desist letter was replete with indications of the Agency Defendants' authority under color of state law such that a recipient's compliance was required. First, it was written on Agency Defendants' official letter head. (Dkt. # 46 at 78.) Second, it identified a specific Texas statute that Agency Defendants "determined" EPIC to have violated. (Id.) Third, it threatened prosecution by a specific district attorney. (Id.) And, finally, it was signed by the Commission's Executive Director, Scott Bingaman. (Id.) How these details—whether cumulatively or even one standing on their own—project anything other than enforcement authority that would render EPIC's compliance anything but voluntary remains a mystery to the Court.[9] (See id. at 20, 78.) Controlling precedent does not compel one to "wait and see" whether a state actor in Agency Defendants' position is bluffing before one's lack of compliance with orders made under color of state law bring legal consequences. E.g., Genentech, 549 U.S. at 128–29 ("[W]here threatened action

[9] Agency Defendants would balk (and justifiably so) if this Court held that all police officers anywhere in the Western District needed to present anything more than their official badge to demonstrate to a member of the public to identify an officer as law enforcement.

by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat. . . . The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction . . . because the threat-eliminating behavior was effectively coerced." (citation modified)); Davenport, 146 S. Ct. at 1122; Driehaus, 573 U.S. at 158; Roake v. Brumley, 170 F.4th 292, 300 (5th Cir. 2026) (en banc).[10]

C. Redressability

Agency Defendants contend that EPIC's alleged injuries are unlikely to be redressed by judicial relief. In support of this claim, however, they cite no legal authority and gesture at the fact that "uncertain future enforcement scenarios or hypothetical disputes" take this out of the Case or Controversy arena. (Dkt. # 55 at 13.) Nonetheless, it is clear to the Court that a party like EPIC, which is "exposed to a risk of future harm" such as the specter of Agency Defendants' allegedly pretextual, anti-Muslim enforcement of oblique statutory provisions, "may pursue forward-looking, injunctive relief to prevent the harm from occurring." TransUnion, 594 U.S. at 435–36 (citing Clapper v. Amnesty Intern.

---

[10] As discussed above, the standing and ripeness inquiries overlap. See supra note 7. The subsequent discussion of ripeness adopts the foregoing discussion of standing insofar as it implicates ripeness, but it also discusses the ripeness factors as outlined in rules of decision binding on this Court. See infra.

USA, 568 U.S. 398, 414 n.5 (2013)). And this is so "so long as the risk of harm is sufficiently imminent and substantial." Id. at 435. As EPIC observes, judicially noticeable material indicates that Agency Defendants have modified their official stance on the legality of EPIC's conduct as a consequence of this case. (See Dkt. # 56; cf. Dkts. ## 56-2 at 6–7;12-1 at 2–3.)[11] However, any alleged change has not dampened the "sufficiently imminent and substantial" risk of harm that EPIC faces absent a court's review. See TransUnion, 594 U.S. at 435; see also infra (discussing mootness and concluding that EPIC's claims are not moot)

III. EPIC's Claims Are Ripe

As the Fifth Circuit has long recognized,"[t]he basic rationale [behind the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Roark & Hardee LP v. City of Austin, 522 F.3d 533, 544 (5th Cir. 2008) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 148 (1967)) (citation modified). "For these reasons, a ripeness inquiry is often required when a party is seeking pre-enforcement review of a law or regulation." Id. (first citing Poe v. Ullman, 367

[11] EPIC further observes that "Agency Defendants have backed away from what they previously 'determined' about whether EPIC was 'operating as a funeral home without an establishment license,' what their press release described as 'findings' of such 'seriousness' as to warrant 'a criminal referral.'" (Dkt. # 56 at 19 (first quoting (first quoting Dkt. #46 at 78; and then quoting Dkt. # 56–2 at 6–7).).

U.S. 497 (1961); and then citing Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498 (1972)). The Fifth Circuit's test asks (1) whether claims are fit for judicial decision and (2) whether EPIC would face hardship if judicial review were delayed. See Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 287–88 (5th Cir. 2012); Greenstein, 691 F.3d at 714–15. The Court concludes both that EPIC's claims are fit for judicial decision and that EPIC would face hardship if judicial review were further delayed.

As a threshold matter, EPIC has already alleged that Agency Defendants' violated its First Amendment right to Free Exercise. See, e.g., United States v. Magana, 837 F.3d 457, 459 (5th Cir. 2016) ("A claim is not ripe for review if 'it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting United States v. Carmichael, 343 F.3d 756, 761 (5th Cir. 2003) (internal citation omitted))). Thus, the cease-and-desist letter (past action) make this case ripe for review. See id. The continued specter of Texas's executive agencies' pretextual enforcement actions against EPIC (concrete, future action) also make this case justiciable. See, e.g., Umphress v. Hall, 133 F.4th 455, 468 (5th Cir. 2025) (holding that a claim was ripe for pre-enforcement review when the threat of enforcement was contingent upon a State actor's future determination), certified question answered sub nom. Umphress v. Steel, 728 S.W.3d 716 (Tex. 2026); (see also Dkt. # 56 at 7, 11, 17, 20 (indicating

that the Commission has "already changed position" in response to this lawsuit and that claiming that the threat of enforcement motivated by state actors' religious animus towards Muslims is substantial and imminent).)

In Opulent Life Church, the plaintiff church brought a legal challenge to a city ordinance. See 697 F.3d at 287–88. Here, EPIC's lawsuit attacks the validity of the Agency Defendants' actions on legal grounds. See id.; (cf., e.g., Dkt. # 46 at 2, 30–40.) Second, the Opulent Life Court determined that the church "would suffer hardship if [judicial] review were delayed." 697 F.3d at 288. And, the Fifth Circuit determined that the church had "already faced considerable hardship absent immediate judicial review." Id. There the hardship was the alleged loss of space in which to congregate. See id. ("Each day that passes without Opulent Life being able to occupy its new building is a day in which its religious free exercise is curtailed."). Here, the hardship is the inability for EPIC's membership to practice their sincerely held religious beliefs and administer sacred Islamic funeral rites. (Dkt. # 46 at 1, 6, 10, 12, 22, 29, 32, 35, 37–39, 41; see also id. at 22 (alleging that Agency Defendants' conduct resulted in at least "11 of [EPIC']s congregants pass[ing] without receiving funeral rites at their home mosque"). That Agency Defendants' alleged discriminatory enforcement of Texas law may persist against EPIC is evident to the Court on the face of EPIC's Amended Complaint as well as in the documents that both parties reference in their

memoranda of law supporting and opposing Agency Defendants' Motion to Dismiss. (See, e.g., Dkt. # 56 at 7 (quoting Dkt. # 12 at 1–2); see also Dkt. # 46 at 16–17 (alleging that a Texas elected official published a Tweet discussing a civil investigative demand about EPIC on the heels of a Tweet from another Texas elected official implying that he had directed "[a] dozen state agencies" and "the Attorney General" to "investigate" and "look into" plans for the "EPIC Compound in Collin Co[unty]); id. at 18 (alleging that elected State officials retweeted a post asserting uncorroborated connections between EPIC and Sharia Law and associating EPIC with "pedophilia, total oppression of women, honor killings," and other unfounded claims).) Like the plaintiff church in Opulent Life Church, then, the Plaintiff mosque in this case has adequately pleaded a ripe case or controversy. Cf. 697 F.3d at 287–88.

It is also clear to the Court, for reasons discussed supra, that this case is not moot. Mootness is an inquiry that, like ripeness, folds into the standing and general Article III justiciability analysis.[12] See, e.g., Green Valley Special Util. Dist. v. City of Schertz, 969 F.3d 460, 469 (5th Cir. 2020) (stating that a case is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (quoting Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S.

[12] That the Commission has not expressly disavowed any further investigation of EPIC for the same reasons that motivated its cease-and-desist letter means. (See generally Dkts 12; 12-1; 55; 56.) T

298, 307 (2012))) (citation modified); Allied Home Mortg. Corp. v. U.S. Dep't of Hous. & Urb. Dev., 618 F. App'x 781, 788 (5th Cir. 2015) (similar, observing that a case is moot when "effective relief is not available"); see also In re Al-Nashiri, 47 F.4th 820, 825 (D.C. Cir. 2022) (per Sentelle, J.) (observing that "[m]ootness and ripeness are two sides of the Article III justiciability coin"). The Court concludes that it is neither impossible for it to grant relief to EPIC in this case in any of the forms requested against Agency Defendants nor, in light of the clarifying letter the Agency Defendants issued on the eve of the TRO hearing, would any relief be ineffective. See Green Valley, 969 F.3d at 469. Additionally, in general, a party's voluntary conduct, like Agency Defendants' here, does not moot a case unless they demonstrate that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Freedom from Religion Found., Inc. v. Abbott, 58 F.4th 824, 833 (5th Cir. 2023) (quoting Sossamon v. Lone Star State of Tex., 560 F.3d 316, 325 (5th Cir. 2009), aff'd on other grounds sub nom. Sossamon v. Texas, 563 U.S. 277 (2011)); Franciscan All., Inc. v. Becerra, 47 F.4th 368, 376 (5th Cir. 2022).

The Court is not satisfied that any voluntary cessation by Agency Defendants' letter (Dkt. 12-1)—only as EPIC was poised to obtain emergency equitable relief in this Court—removes this case from the realm of Cases or Controversies. Cf. Freedom from Religion, 58 F.4th at 833. And the Court notes a

similarity between this case and Speech First, Inc. v. McCall, 138 F.4th 219, 224 (5th Cir. 2025) (per Ho, J.). Here, as in Speech First, Agency Defendants changed [their] policies after the complaint was filed." Id. (citation modified). And they did so "in response to judicial pressure." Id. Thus, like the state university in McCall that had agreed not to enforce a policy restricting student speech, the Court here finds Agency Defendants' letter to EPIC insufficient to extinguish Article III standing on mootness grounds. (Cf. Dkt. # 12-1.) Like the relevant university officials in McCall, Agency Defendants can change their minds. See 138 F.4th at 224 (noting that changes to the policies at issue were "suspiciously timed"). EPIC faces a similar situation here.

* * *

In closing, the Court observes the strong likelihood that James Madison and others who realized their vision for a pluralistic Republic in the federal Constitution would be gravely troubled by the allegations in EPIC's complaint. At the dawn of the new federal Constitution, Madison's warning about governments that "employ Religion as an engine of Civil policy" applies equally to those who, as EPIC alleges here, employ religion as an engine of civil regulatory and criminal enforcement. James Madison, Memorial and Remonstrance Against Religious Assessments (1785), in 5 The Founders' Constitution 82, 83 (Philip B. Kurland & Ralph Lerner eds., 1987)). (See generally Dkt. # 46.) And like

Madison warned and as EPIC now alleges, such conduct amounts to "an unhallowed perversion of the means of salvation." Madison, supra.[13]

CONCLUSION

Based on the aforementioned reasons, the Court **DENIES** Agency Defendants' Motion to Dismiss (Dkt. # 55).

**IT IS SO ORDERED.**

**SIGNED:** Austin, Texas, September 9, 2026.

David Alan Ezra
Senior United States District Judge

[13] To wit, it is unfortunate that the attitudes Professor Said catalogued in 1978 persist today as alleged in EPIC's complaint.

> In newsreels or news photos, the Arab is always shown in large numbers. No individuality, no personal characteristics or experiences. Most of the pictures represent mass rage and misery, or irrational (hence hopelessly eccentric) gestures. Lurking behind all of these images is the menace of *jihad*. Consequence: a fear that the Muslims (or Arabs) will take over the world. Books and articles are regularly published on Islam and the Arabs that represent absolutely no change over the virulent anti-Islamic polemics of the Middle Ages and the Renaissance. For no other ethnic or religious group is it true that virtually anything can be written or said about it, without challenge or demurral.

Edward Said, Orientalism 287 (1978); see also Cyra Akila Choudhury, Racecraft and Identity in the Emergence of Islam As A Race, 91 U. Cin. L. Rev. 1, 34 (2022) ("[O]ne of [Professor] Said's key insights is that Orientalism has less to do with the realities of colonized lands and peoples and their subjective experience than with a reflection of the fears, the imagination, and the political exigencies of the producers of such stereotype.")).